IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

_____
                                    )
ERIC KINSINGER and                  )
DENISE KINSINGER,                   )
                                    )
            Plaintiffs,             )
                                    )
                                    )  DOCKET NO. 3:17-CV-643
            vs.                     )
                                    )
SMARTCORE, LLC, et al.,             )
                                    )
            Defendants.             )
_____ )

TRANSCRIPT OF SUMMARY JUDGMENT HEARING
BEFORE THE HONORABLE FRANK D. WHITNEY
UNITED STATES CHIEF DISTRICT COURT JUDGE
MONDAY, FEBRUARY 4, 2019, AT 11:10 A.M.


<u>APPEARANCES</u>:

On Behalf of the Plaintiffs:

        BRYAN TYSON, ESQ.
        RACHEL MATESIC, ESQ.
        Marcellino & Tyson, PLLC
        2820 Selwyn Avenue, Suite 350
        Charlotte, North Carolina  28209

On Behalf of the Defendants SmartCore, LLC, SmartCore
Electrical, LLC, SmartCore Electrical Services, LLC, SmartCore
Group Health Benefit Plan, Steven Matthew Good, and William H.
Winn Jr.:

        MATTHEW J. NORRIS, ESQ.
        Norris Law Group, P.C.
        10940 Wilshire Boulevard, Suite 1600
        Los Angeles, California  90024

                JILLIAN M. TURNER, RMR, CRR, CRC
                     Official Court Reporter
                  United States District Court
                   Charlotte, North Carolina

<u>APPEARANCES (Cont'd):</u>

     MILTON HEATH GILBERT JR., ESQ.
     Baucom, Claytor, Benton, Morgan and Wood, PA
     200 Providence Road, Suite 106
     Charlotte, North Carolina  28204

On Behalf of Defendant Jared Crafton Crook:

     WALTER LEWIS GLENN III, ESQ.
     Wishart Norris, PA
     6832 Morrison Boulevard
     Charlotte, North Carolina  28031

1    (Court called to order on Monday, February 4, 2019,
2  commencing at 11:10 a.m..)
3                    P R O C E E D I N G S
4         THE COURT:  Give me a moment to organize my notes.
5         We are here in the case of Kinsinger, et al., versus
6  SmartCore LLC, et al., on the cross-motions for summary
7  judgment.
8         Let's see.  Mr. Tyson.
9         MR. TYSON:  Yes, Your Honor.
10        THE COURT:  And?
11        MS. MATESIC:  Rachel Matesic, Your Honor.
12        THE COURT:  Matesic.  All right.  On behalf of
13  plaintiff.
14        And we go to defense, the multiple legal entities
15  and human defendants.
16        Is counsel representing the whole group of
17  defendants?
18        MR. NORRIS:  Except for Jared Crook, Your Honor.
19        THE COURT:  Except for Mr. Crook.  And he's in
20  default, right?
21        MR. NORRIS:  Actually, there's a motion.  I'll let
22  Mr. Glenn address that.  He's here.
23        I'm Matthew Norris for all operative defendants,
24  except for Mr. Crook.
25        THE COURT:  All right.  Thank you, Mr. Norris.

1    MR. GILBERT:  Heath Gilbert here as well.

2    THE COURT:  Mr. Gilbert, thank you for being here.

3    You didn't quite have to come as far as Mr. Norris.

4  Just down the block, right?

5    MR. GILBERT:  Yes, sir.

6    THE COURT:  And you're representing Mr. Crook?

7    MR. GLENN:  Your Honor, yes.  Lou Glenn.  I'm

8  representing Mr. Crook by appearance in the motion filed last

9  week.

10    THE COURT:  Right.  So plaintiffs have not had an

11  opportunity to respond to the motion to set aside default;

12  isn't that right?

13    MR. TYSON:  Yes, that's correct, Your Honor.

14    THE COURT:  That will probably be decided on paper.

15  I don't see a reason for a hearing on that.

16    MR. GLENN:  Yes, Your Honor.

17    THE COURT:  I mean, there's -- there's no disputed

18  facts.  Well, I shouldn't comment.  I just have to let parties

19  file something and then we'll rule on it.

20    So we'll focus in today on the two summary judgment

21  motions and the cross-motions for summary judgment.  And since

22  plaintiffs do have a motion for summary judgment, I will let

23  Mr. Tyson begin and then we'll turn it over to defense.

24    MR. TYSON:  Thank you.  Good morning, Your Honor.

25    I, Brian Tyson, and Rachel Matesic are counsel for

1   the plaintiffs in this case, Eric Kinsinger and Denise

2   Kinsinger.  We filed our briefs in this case requesting that

3   the Court grant summary judgment to us on all of our claims

4   and deny defendants' motions for summary judgment in its

5   entirety.  We stand on our briefs.  We believe the briefs, the

6   evidence that we submitted contain all the information for the

7   Court to rule in our favor and to deny defendants' motion.

8           But there were a few items I thought might be

9   helpful to the Court that we wanted to point out for some of

10  our claims.

11          First, with respect to our claim for wages, under

12  the North Carolina statute, the North Carolina statute says

13  that employers or anyone acting in the interest of an employer

14  must pay promised wages.  They didn't.  We've submitted an

15  affidavit from Eric.  He also attaches his paystubs.  He

16  attached documents from SmartCore showing that they did not

17  pay him.  And notably, in none of the affidavits or in their

18  briefs did they deny they didn't pay him.  This is an easy

19  case.

20          THE COURT:  That part, right?

21          MR. TYSON:  Yes, Your Honor.  Yeah, I think --

22          THE COURT:  Well, I said "that part."  I mean, the

23  Wage and Hour Act and breach of contract issue.  At least I

24  get the impression that that's not being contested, but we'll

25  hear that in a moment.

1     MR. TYSON:  Okay.  So, yes, the wages are due to
2  Eric.

3          And then in addition, the statute provides that the
4  Court shall double the amount of wages as liquidated damages.

5          THE COURT:  I thought we had to have a hearing on
6  that?

7          MR. TYSON:  No, Your Honor.  The statute says -- and
8  I can actually get a copy of it.

9          THE COURT:  That doesn't it require a bad faith
10  finding?

11          MR. TYSON:  No, Your Honor, it does not.  And here,
12  let me -- if I can read the portion of the statute to the
13  Court, that might be helpful.  Here we go.  And this is
14  95-25.22(a1) of the North Carolina General Statutes.

15          So it says, "In addition to the amounts awarded
16  pursuant to subsection (a)," and that's the base wages, "the
17  court shall award liquidated damages in an amount equal to the
18  amount found to be due provided that if the employer shows to
19  the satisfaction of the court."

20          So it says the Court shall do that.  However, If the
21  employer was able to show to the satisfaction of the Court
22  that it had good faith and reasonable grounds for believing
23  that it was not violating the statute, the court may, in its
24  discretion, choose not to award damages or to award some
25  lesser amount.

1          So they have the burden of production and
2     persuasion.  They have produced no reason --
3          THE COURT:  But there's still a hearing on that
4     issue or whether you want to call it acting in bad faith or
5     not acting in good faith.  And I guess the way you read me the
6     statute is not acting in good faith is probably the better
7     interpretation.  But they have the burden to show they didn't
8     act -- well, that they did act in good faith.  Doesn't that --
9     that requires a bench trial, right?
10          MR. TYSON:  I mean, we would say, no, Your Honor,
11     and let me explain.
12          THE COURT:  But you just said that after the Court
13     finds -- read that last half of the sentence again.  Provided
14     that or whatever.
15          MR. TYSON:  Right, certainly.  So it says, "The
16     Court shall award liquidated damages if the employer shows to
17     the satisfaction of the Court that the act or omission
18     constituted a violation was in good faith and the employer had
19     reasonable grounds, the Court may in its discretion liquidate
20     damages."
21          The reason we're saying we don't need a hearing on
22     that is they provided no evidence whatsoever to explain why
23     they didn't pay him his wages.  They have not shown anything
24     as to good faith or reasonable belief of compliance with the
25     law.  The only thing they said, yeah, we didn't pay him his

 1  wages.  So they would actually have to bring forth some
 2  evidence to Your Honor to say, no, no, we've created a genuine
 3  issue of material fact.  And, again, the genuine issue of
 4  material fact; not just, well, we didn't feel like paying him
 5       An example might be if an employer accidentally ran
 6  the wrong payroll or made a mistake and two weeks later tried
 7  to correct that and made some good faith attempt.  They've
 8  provided nothing.  They simply said -- they don't even contest
 9  that they owe him this money.  Instead, they've litigated this
10  case for the past year.  The amount of damages that he is due
11  is $6,250.
12       THE COURT:  Right, plus statutory interest.
13       MR. TYSON:  Yes, Your Honor.  Correct.  Yes.
14  Statutory interest at the North Carolina rate.  And we're
15  requesting attorney fees as well under the North Carolina
16  statute.  But that's what they've litigated over the past
17  year.
18       THE COURT:  Under the wage and hour statute.
19       MR. TYSON:  Yes, Your Honor.
20       But they have provided no evidence to the Court as
21  to why they didn't pay anything.  So they actually have to
22  provide some evidence for there actually to be a genuine issue
23  of material fact over whether there was good faith or
24  reasonable grounds.  The fact that they haven't means we
25  should be granted summary judgment.  And if the Court should

1  award us, the double damages as well.

2          THE COURT:  All right.

3          MR. TYSON:  With respect to our claim --

4          THE COURT:  Let's go to the ERISA stuff now.

5          MR. TYSON:  Yes, sir.

6          With respect to our benefits claim -- and that's

7  under ERISA 502(a)(1)(B) -- I have good news for you.  This is

8  a really easy ERISA case.  I know ERISA gets a bad rep

9  sometimes for being a complex statute.  This one is not.  The

10 plan is the plan is the plan.  This is just a simple plan

11 document.  It says that if you have a medically necessary

12 surgery, then you are entitled to have that paid for.

13 Denise Kinsinger had a medically necessary surgery.  Her

14 doctor, Dr. Pillai, said it was medically necessary.  That

15 information got sent to Starmark, which was the claims

16 fiduciary at the time.  Starmark --

17         THE COURT:  Starmark is no longer a party, correct?

18         MR. TYSON:  That is correct, Your Honor.

19         THE COURT:  They initially were sued, but they --

20         MR. TYSON:  Yes, they dropped them.

21         THE COURT:  Yeah, they were kind of a conduit,

22 right?  Money comes to them, and then they send the money out

23 to settle claims.

24         MR. TYSON:  Exactly.

25         THE COURT:  Even if it didn't come to them in the

1  first place, they're not at fault for that.  So that's why
2  they're no longer in the action.
3          MR. TYSON:  I think that -- yes.  And Your Honor
4  raises an important point, and it sounds like the Court
5  already understands it, but just to be clear.  This is what is
6  called a self-funded plan.  So in the ERISA world you have
7  insured plans and then self-funded plans.  This was not a plan
8  that has health insurance on it; rather, it was self-funded.
9          So SmartCore was responsible for paying all the
10  money to pay benefits.  So they're supposed to pay benefits.
11  They're supposed to pay Starmark for its administrative work
12  and actually running the plan.  And then SmartCore had
13  purchased what's called a "stop-loss policy."  So, in other
14  words, they still had a self-funded plan.
15          THE COURT:  A reinsurance type of thing?
16          MR. TYSON:  Exactly, yes.
17          So if the claims got too long, then potentially
18  SmartCore, the employer, would get reimbursed.  But it was a
19  self-funded plan.  So there is no dispute.
20          And as far as --
21          THE COURT:  I thought there was a dispute about
22  denials?  They said, oh, this was denied by over the phone and
23  denied in other ways, and so they -- Ms. Kinsinger shouldn't
24  have had a hysterectomy in the first place.
25          MR. TYSON:  So let me address that.

1          No, there is not a -- there's not a genuine issue of

2     dispute of fact that would not entitle us to summary judgment.

3     So they attached a couple of emails where Eric, my client, had

4     emailed them when the company was starting not to do well and

5     said, What's going on?  I've got information saying that

6     Starmark isn't now going to follow through, Starmark is going

7     to do this.  What happened here?

8          So there's emails going back and forth, but there is

9     not an ERISA denial, and that's important because the ERISA

10    claims regs under Section 502 -- I'm sorry -- 503 specifically

11    state what a denial has to provide.  So it has to provide five

12    different pieces of information.  It has to provide why I'm

13    denying your claim; has to tell you part of the benefit plan

14    under which you're denying the claim.  For medical necessity

15    determination, which is exactly what was at issue here, they

16    actually have to say why this is not medically necessary.  And

17    they have to consult a doctor who is trained in that area of

18    practice.  None of the documents, the emails that they

19    submitted have any of that information.

20         And so the ERISA claims regs then say if you don't

21    provide a denial that complies with ERISA's claims regs, there

22    is no administrative procedure.  You're welcome to go to

23    court.

24         So we actually tried -- that's what Eric tried to

25    do.  We, nonetheless, submitted a claim and said, I'd really

1   like to get this resolved.  I just want the claim paid.  I

2   want my wife's surgery paid for.  So we went ahead and

3   submitted all the documentation.  They never responded.  Eric

4   was entitled to come to court as soon as they send an email

5   saying, Hey, we're not going to follow through at this time.

6           THE COURT:  Are the Kinsingers personally liable for

7   the medical services at this point?

8           MR. TYSON:  Your Honor, they're getting sued in

9   South Carolina state court as we speak.

10          THE COURT:  That's why I was wondering.

11          MR. TYSON:  Yes.

12          THE COURT:  I thought there had to be a suit.

13          MR. TYSON:  Yes.

14          THE COURT:  And I didn't know why it wasn't here.

15  It kind of tied into it, but now I see it's down in

16  South Carolina because that's where they live?

17          MR. TYSON:  Yes, Your Honor.

18          THE COURT:  Where the hospital was?

19          MR. TYSON:  Correct.  Yes.  And we had tried to

20  remove it.  The Court ended up deciding to put that back in

21  South Carolina.

22          THE COURT:  Yeah.  When my workload is sufficient

23  that where there's already a suit pending someplace else, I

24  don't need to add it to this case.  But if it had been

25  originally here, it would be a different story.

1    MR. TYSON: Right. So, yes, they're getting sued
2    currently in South Carolina because they refuse to fund the
3    plan and to follow through.

4    But the only evidence before the Court and why we
5    should be entitled to summary judgment on this (a)(1)(B)
6    claim, the benefits claim, is we filed the administrative
7    record. The only thing that the Court is supposed to look at
8    under the Fourth Circuit precedent in *Quesinberry* is the
9    administrative record.

10   The only thing in there is Denise Kinsinger's
11   doctor's, Dr. Pillai's, medical records that say medically
12   necessarily. Starmark's doctor looked at these,
13   Dr. Zawilenski. He said medically necessary. Starmark said
14   medically necessary and precertified the surgery. That's the
15   only evidence in there. They provided no evidence to the
16   contrary. They've submitted no affidavits from doctors. They
17   haven't provided any kind of medical evidence whatsoever.
18   They haven't said why she might not be entitled to this. The
19   only evidence before the Court is that the surgery was
20   medically necessary and it should have been paid.

21   I wanted to talk about the fiduciary breach claim,
22   and that's under 502(a)(2).

23   THE COURT: Um-hum.

24   MR. TYSON: And, again, this case is a simple ERISA
25   claim. What we're asking for here is on behalf of the plan,

they set up a health insurance plan.  They took money from participants' paychecks.  They said we're going to go and put that money and spend it on a health plan and fund clients' claims, like my client.  Instead, they can't.

We don't know what they did with the money.  It doesn't matter, though.  It doesn't matter whether they spent it on corporate purposes.  It doesn't matter if they gave it to charity.  It doesn't matter whether they spent it at the Dollar Tree.  The only question under ERISA is whether they spent it for a health purpose.  The evidence is clear they did not.  We submitted that evidence to the Court and, once again, they haven't denied that.  None of their affidavits say, oh, no, we didn't take the money and spend on it on health care. They didn't argue that in the brief.

So they are liable for this.  Good and Winn are individually liable.  The ERISA statute provides for individual liability for fiduciaries.

THE COURT:  Right.

MR. TYSON:  So we're requesting --

THE COURT:  And, likewise, your position is Mr. Quick is liable also because you got default judgment but --

MR. TYSON:  That -- that is correct, Your Honor. Yes, he has admitted everything in the complaint; so he would be liable as well as jointly and severally.

THE COURT:  All right.

MR. TYSON:  With respect to our (a)(3) claim -- and that's under ERISA 502(a)(3) for appropriate equitable relief -- as we mentioned, that claim is pled in the alternative to our benefits claim and fiduciary breach claim. So if the Court did grant summary judgment on those two claims, this would be a moot alternative claim for us at that point.

With respect to the plan documents claim, Congress has said that a participant is entitled to obtain a copy of: The latest SPD, summary plan description; the latest plan document; any other contract under which the plan has established or operated.

So when Eric got information saying from the -- from Good and Winn saying we think we might start to look at this again, we requested -- he requested a copy of the plan documents.  He's the participant, so he's allowed to do that. He wrote to them and said, Please give me a copy of the plan documents and any other information which the plan has maintained.  They never responded.

Once again, summary judgment is proper because they don't deny that.  So they never responded to and provided us the latest copy of the plan document, the summary plan description, the administrative services agreement, the Trustmark insurance contract, or even the administrative

1  record.

2          Factors that courts have looked at in looking at
3  damages under this portion of ERISA are the length of time
4  that has occurred.  So in this case it was 740 days, over two
5  years.  Additionally, they never even responded to it.  The
6  only way we got this information was through discovery.  They
7  finally had to respond to discovery.  And that's -- we
8  actually amended our complaint.  Our second amended complaint
9  added this cause of action.  Even after that they didn't
10  bother responding.  It was only finally after discovery when
11  they actually produced the documents to which Eric was
12  entitled.  They made no efforts to comply.

13          Eric had to prosecute his claim without having the
14  documents which explain who is a fiduciary, whether the plan
15  is self-funded, and provide other information he's entitled to
16  under ERISA.

17          And then there's five documents.  This wasn't like,
18  hey, we forgot the last page or we kind of messed up and
19  didn't send something.  They didn't do anything.  They wholly
20  aggregated the responsibility to send these documents to Eric.
21  And one of ERISA's most important parts is to apprize
22  participants and beneficiaries of information so they can
23  understand what their rights and responsibilities under the
24  plan are.

25          THE COURT:  Okay.  Let's finish up so we can hear

1   from the defense.

2           MR. TYSON:  Yes, Your Honor.

3           So, Your Honor, is entitled -- it's within the

4   Court's discretion.  Your Honor is entitled to zero.  And by

5   my calculation, five documents, $110 a day, 740 days,

6   $410,300.  So it's within the Court's discretion to award

7   those.  And the Fourth Circuit has made clear this is to

8   punish; this is not to compensate someone.  This is to punish

9   defendants for not responding as they should have as

10  fiduciary.

11          We request that you grant our motion in full and

12  deny theirs.  Thank you.

13          THE COURT:  Thank you.

14          So, Mr. Norris, you're arguing, right?

15          MR. NORRIS:  Yes.

16          THE COURT:  You may proceed.

17          MR. NORRIS:  Good morning, Your Honor.  Thank you.

18          A little bit of confusion here, I think, results

19  from the posture of not necessarily the litigation, but the

20  posture of how things were handled when SmartCore had the

21  responsibility, and it did have responsibility as a fiduciary.

22  The names are a little confusing.  I'm the sure the Court is

23  on top of it but --

24          THE COURT:  Not necessarily.

25          MR. NORRIS:  All right.

1    THE COURT:  I mean, SmartCore versus Starmark.

2 Starmark's out.

3    MR. NORRIS:  Exactly.  Well --

4    THE COURT:  Each had different responsibilities.

5 One is the employer and one is kind of an agent.

6    MR. NORRIS:  That's what they say, and that's where

7 we need to be able to clarify that.

8    THE COURT:  Okay.  Go ahead.

9    MR. NORRIS:  Yeah.  So SmartCore is who I represent,

10 and Mr. Winn and Mr. Good were the principals effectively of

11 SmartCore.  Mr. Crook was an employee of SmartCore.

12    Starmark basically, if you want to distill things

13 down in ERISA sense, Starmark was the plan administrator.  And

14 plaintiffs like to characterize and have characterized

15 throughout their pleadings in this case have attempted to

16 characterize Starmark as, you know, something that's not -- an

17 entity that's not particularly --

18    THE COURT:  Well, why -- why is -- why is Starmark

19 out if -- if you're pointing to Starmark?

20    MR. NORRIS:  You would have to ask the plaintiffs.

21    THE COURT:  No.  No.  They can kick them out.  But

22 you could have sued Starmark.

23    MR. NORRIS:  We did.  We had a cross-claim against

24 Starmark, and we signed a tolling agreement.

25    THE COURT:  And where -- where is that?

1        MR. NORRIS:  With subject to a tolling agreement,

2    depending on what happens in this case, Your Honor.  So we

3    dismissed them.  We each had cross-claims against each other.

4    I think technically theirs was nominated as a counterclaim

5    against us.

6        THE COURT:  Now you got to deal with Starmark, and

7    you're saying Starmark is the bad guy.

8        MR. NORRIS:  Starmark is responsible here, Your

9    Honor.  Starmark is --

10        THE COURT:  That's an interesting twist.  I don't

11    know.  I don't know.

12        MR. NORRIS:  Well, Starmark is -- well, actually,

13    the reason for the -- the reason for the tolling agreement,

14    Your Honor, was to try to simplify the case and settle the

15    case with the plaintiffs, because the way that this looked to

16    me, as someone who has been doing ERISA for, I don't know, 20,

17    21 years, the way this always looked to me was it looked like

18    an attempt by the Kinsingers to get their medical bill paid,

19    which, you know, we don't necessarily quarrel with.  And

20    indeed, Starmark has been let of the case.  And I don't know

21    how much the Court wants to hear about settlement or something

22    like that; so I won't go into it right now unless you ask,

23    Your Honor.

24        We have every reason to believe --

25        THE COURT:  Settlement is not important for the

1    Court today.

2         MR. NORRIS:  Okay.

3         THE COURT:  The Court sometimes offers a judicial

4    settlement.  Either I might do it, one of the magistrate

5    judges, or my colleagues the district judges might do it.

6         MR. NORRIS:  Sure.

7         THE COURT:  There, we are concerned about

8    settlement.  Here, we're here on law.  Settlement is totally

9    irrelevant.

10        MR. NORRIS:  I understand.  Although Your Honor's

11   procedures do provide that at summary judgment hearings that

12   the parties get an opportunity after to talk.  My clients are

13   actually here in the courtroom today.

14        THE COURT:  That's why we have these hearings.

15        MR. NORRIS:  Yeah.

16        THE COURT:  We -- we want to move the case along

17   within the schedule we've set in the case management order.

18   So we have summary judgment hearings where, you know, I can

19   touch the parties and the counsel and the parties and counsel

20   can touch each other and we can resolve some -- hopefully

21   resolve some of the case, maybe not.  But we bring everyone

22   together, and now we're on track when we leave here on track

23   for a trial in March or early April.

24        MR. NORRIS:  Sure.  And in the spirit of that, Your

25   Honor, my clients are here in the courtroom today.  I will

1  touch on it very briefly just at the end just with a few

2  words.  If the Court must ask anything else about it, I will,

3  but I don't want to on the record go into anything

4  confidential or anything like that.

5               THE COURT:  Of course not.

6               MR. NORRIS:  Circling back to Starmark, however.

7  Starmark's out of the case.  I am sure the Court can put two

8  and two together and figure out why Starmark is out of the

9  case.  We don't believe that the South Carolina action against

10 the Kinsingers should be a factor in the north.

11              We believe that the Kinsingers should now have the

12 ability to satisfy that bill, which incidentally was greatly

13 reduced by we're not sure.  They didn't answer discovery on

14 that.  We're not sure if it was reduced by voluntary --

15              THE COURT:  But that -- I don't care.

16              MR. NORRIS:  Okay.

17              THE COURT:  I mean, you're telling me all this

18 stuff.

19              MR. NORRIS:  That's fine.

20              THE COURT:  I don't care.  I want to know the legal

21 arguments.

22              MR. NORRIS:  That's fine.  The legal.

23              THE COURT:  What goes forward and what gets thrown

24 out.

25              MR. NORRIS:  I understood.

1          The legal arguments are that there's been an
2   inflation by plaintiffs of Starmark and SmartCore in this
3   case.  Starmark had fiduciary responsibilities.  Starmark was
4   the one who made the medical necessity denial, even though
5   they first approved it.  They then backed up and denied it,
6   and they told Mr. Kinsinger that.  Mr. Kinsinger is held to
7   that standard of actual knowledge.  They went ahead with the
8   procedure anyway.
9          There's a difference between pre-cert and post-cert.
10  And what Starmark did was to provide the pre-cert initial
11  approval and then followed it up with a denial.  The
12  Kinsingers were aware of that.  That's the reason why we have
13  our affidavits in the record.
14          THE COURT:  Well, how -- how -- how do we jump to
15  Mr. Good and Mr. Winn becoming, you know, the administrators
16  of the plan?  I mean, and -- so if they jumped to become the
17  administrators of the plan, and your own argument is Starmark
18  is the fiduciary and they've taken that position.  So they're
19  now the fiduciary.  You can't really have it both ways.  You
20  can't say --
21          MR. NORRIS:  I don't --
22          THE COURT:  -- Starmark is a fiduciary.  And then
23  when you get rid of Starmark, my clients really aren't
24  responsible.
25          MR. NORRIS:  But we didn't get rid of Starmark.

1   SmartCore didn't get rid of Starmark.  That's the issue.

2   Starmark got rid of itself.  And one of their last acts

3   on the way out the door was to deny the Kinsingers' claim.

4   And the Kinsingers were aware of our whole argument on failure

5   to exhaust remedies comes from -- failure to exhaust

6   administrative remedies come from because they didn't do

7   anything.  They sat on their rights for an inexplicable amount

8   of time.  And our contention, as the Court is aware, I know

9   you've read the briefs, Your Honor, is that bars all of their

10   ERISA claims except for the plan documents claim.  And breach

11   of fiduciary duty is really just a recast denial of benefits

12   claim.

13         So we've got two problems.  The first is that

14   SmartCore, they were not the fiduciaries that were responsible

15   for making medical necessity decisions at the time when a

16   denial was made of this procedure; Starmark was.  Starmark

17   made it.  Starmark's now out of the case.  So SmartCore

18   defendants ought to get credit or an offset from the fact that

19   Starmark is out of the case.

20         THE COURT:  How legally?  How does that happen

21   legally?

22         MR. NORRIS:  Well, I think it happens legally

23   because if they were still in the case, then as we've

24   attempted to put the case over --

25         THE COURT:  But you said you then tolled the

1    agreement to keep them out of the case.  Now you're saying
2    they should be in the case.
3                MR. NORRIS:  To simply --
4                THE COURT:  Your arguments are kind of circuitous.
5                MR. NORRIS:  Well, Your Honor, maybe so.
6                THE COURT:  Yeah.
7                MR. NORRIS:  Here's the thing, is that we wanted to
8    get the Kinsingers paid, frankly.  We wanted to make sure that
9    their unpaid bill was taken care.  We didn't think this needed
10   to be a whole thing.  Mr. Tyson is talking about $410,000 in
11   failure to provide documents.  Didn't think it needed to be
12   that.
13               The wage claim, yeah, they don't really contest
14   that.  However, I think they're happy to take a judgment.
15   Frankly, if the wage claim was the only thing that had been
16   brought, I don't think we'd be here today.  But the whole
17   problem is --
18               THE COURT:  Well, are you saying, and you're
19   agreeing, that there's damages of $6,250 plus 8 percent
20   interest under North Carolina law?
21               MR. NORRIS:  I would only ask that I have permission
22   to check with Mr. Winn and Mr. Good before I admit that
23   judicially, Your Honor.  I believe that's our contention.  I
24   would like to check with them and have that opportunity.
25               THE COURT:  All right.

1     MR. NORRIS:  But, in any event, the whole thing goes

2  back to Starmark as far as the medical necessity.  And I

3  understand it's circuitous, but Starmark is the one who left

4  SmartCore hanging.  So, yes, we agreed to a tolling agreement

5  because we didn't think we were going to be in a position

6  where the counterclaim and the cross-claims between Starmark

7  and the SmartCore parties that I represent were going to have

8  to be litigated.  We thought that we were going cooperatively

9  to York to settle this matter, take care of the Kinsingers,

10  get it taken care of.  That didn't happen.

11     Starmark is out of the case.  My clients have the

12  remedy against Starmark.  But it's important to understand

13  that Starmark is the one that was a fiduciary, made the

14  medical necessity decision, denied the claim.

15     It's also important to realize, Your Honor --

16     THE COURT:  Did they get the money?

17     MR. NORRIS:  Did who get the money?

18     THE COURT:  Well, initially did they get the money

19  from SmartCore for the claim?

20     MR. NORRIS:  To fund the -- yes.  To fund the claim,

21  yes.

22     THE COURT:  So SmartCore paid -- SmartCore paid --

23     MR. NORRIS:  Well --

24     THE COURT:  -- to Starmark?

25     MR. NORRIS:  -- one of the --

1         THE COURT: Yes or no. No.

2         MR. NORRIS: No.

3         THE COURT: Okay. Well, see, that's the problem.

4 You keep saying --

5         MR. NORRIS: Oh, no. I'm sorry.

6         THE COURT: -- the bad guy is not in the room --

7         MR. NORRIS: No. I misunderstood.

8         THE COURT: -- is what you're saying, and then

9 you're coming back in and saying but we never paid the money.

10 Once again, that is a circuitous argument.

11         MR. NORRIS: I misunderstood the Court's question.

12         THE COURT: They did pay?

13         MR. NORRIS: SmartCore did hire Starmark, yes.

14 Absolutely.

15         THE COURT: Did they actually pay, though?

16         MR. NORRIS: Yes.

17         THE COURT: And that money stopped at Starmark? It

18 went to them and stopped there?

19         MR. NORRIS: Yes. And Starmark had a dual role.

20 They were -- first of all, they were the third-party

21 administrator, plan fiduciary under ERISA, and they were also

22 under the Trustmark entity, which Your Honor probably saw from

23 the pleadings, they were the stop-loss insurance provider. We

24 talked about that. I wouldn't exactly call them reinsurance.

25 I'd call them excess insurance, catastrophic. Same thing Your

1  Honor said here.

2         THE COURT:  Yeah.

3         MR. NORRIS:  So, in any event, they had that dual

4  role.  And then there was a payment dispute between Starmark

5  and SmartCore, part of which revolved around the fact that in

6  terms of the Starmark and SmartCore agreement were murky.

7  Mr. Winn and Mr. Good will testify, if necessary, that they

8  didn't understand that it was a self-funded plan.  And there's

9  actually a broker, another third party, who we didn't think it

10 was necessary to bring before the Court in this case.  But

11 there's all sorts of malfeasance, Your Honor, on the part of

12 Starmark, on the part of this broker that brought this

13 arrangement to SmartCore --

14        THE COURT:  It just -- it just baffles me, though,

15 why you have a tolling agreement with Starmark when you're

16 sitting here attacking them, and that's totally inconsistent.

17        MR. NORRIS:  Well, I mean, I suppose we could bring

18 them back in the case --

19        THE COURT:  Well, that's it.

20        MR. NORRIS:  -- if the Court prefers.

21        THE COURT:  But you -- you're keeping them out of

22 the case and then blaming them, which is actually I've seen

23 this many times.  When you have a weak case, you blame a third

24 party.

25        MR. NORRIS:  Well, we -- they wouldn't have been a

1  third party, Your Honor.  Again, it was a strategy that, you

2  know, my clients asked me to agree with.  Frankly, we were

3  surprised that Starmark agreed with it because Starmark

4  claimed there was various unpaid, you know, whatever, unpaid

5  claims, something that who knows, something that SmartCore

6  owed to Starmark.  They agreed to it.  We tried to get them

7  out of the case to simplify the case to deal with the

8  plaintiffs, and that brings me to my final set of comments.

9          Oh.  On the plan documents, Your Honor, I, frankly,

10  do not understand plaintiffs' argument.  As we've covered in

11  our brief, both our summary judgment motion and response,

12  their opposition to their summary judgment motion, we did

13  provide the documents and cited the case that says, you know,

14  you don't have to keep providing the same documents over and

15  over again.

16          The one point they did raise I think in their reply

17  was that we didn't provide a copy of the administrative

18  services agreement between Starmark and SmartCore.  First of

19  all, they already had it.  That's how they knew about it.

20  Second of all, by that time it didn't exist.  It no longer

21  existed because Starmark got canceled.  So that's the plan

22  documents.

23          THE COURT:  All right.

24          MR. NORRIS:  Your Honor, Starmark definitely is a

25  wrongdoer here.  What we do not understand is why Starmark was

 1    let out of the case so easily by plaintiffs, because
 2    everything that you've heard today that goes against SmartCore
 3    has been raised against SmartCore by the plaintiffs can also
 4    be raised against Starmark, and yet Starmark was let out of
 5    the case.  My clients remain -- or there seems to be a little
 6    bit of a tinge of punitive conduct there.  I think Mr. Tyson
 7    even used that term to describe the plan documents claim.
 8    So --
 9            THE COURT:  But you're -- do you disagree that you
10    can't get punitive damages?
11            MR. NORRIS:  For the plan documents?
12            THE COURT:  Yes.
13            MR. NORRIS:  I don't think there's punitive damages
14    statutorily.
15            THE COURT:  Yes.
16            MR. NORRIS:  No.  Certainly not going to argue the
17    language of ERISA, no.  But, but if Your Honor looks at the
18    Fourth Circuit case law -- I'm sure you've handled plenty of
19    ERISA cases in your time, Your Honor.
20            THE COURT:  Not -- not as many as -- I mean, I've
21    had a lot of ERISA cases, but they're spread out usually like
22    two a year.
23            MR. NORRIS:  Okay.
24            THE COURT:  Not -- not like in employment cases
25    where kind of two a month.

1          MR. NORRIS:  Sure.  Yeah, I can imagine, ADA and

2     that sort of thing.

3          Your Honor, the plan documents.  Any research into

4     Fourth Circuit precedent or, frankly, the precedent of any

5     other circuit, Ninth Circuit which I come from, do most of my

6     litigation, not all.  The plan document claims when you get

7     into those penalties and things that Mr. Tyson is talking

8     about, the multiple hundreds of thousands of dollars, you're

9     talking about egregious failures to provide documents that

10    directly prejudice plaintiffs' case.  They actually have the

11    burden to prove that, and there's no burden here.  They can't

12    at the same time argue, well, the administrative record is the

13    exclusivity of what the Court needs to look at, and then at

14    the same time say but we were also prejudiced by failure to

15    provide plan documents.

16         There's no failure to provide plan documents in the

17    first place.  Even if there was, there was no prejudice.  So

18    we don't believe that really any award on that is proper.

19         And then the last thing I'll say, Your Honor, is I

20    can certainly check with my clients on the wage claim.

21         And I did want to say a word about settlement.  If

22    the Court is inclined to provide an opportunity for the

23    opportunities to talk, I -- I don't -- I hesitate to get into

24    this, but we thought we had this resolved it twice already,

25    twice, for the same arrangements let's put it that way, and

yet that is not the case. So we're actually a little puzzled why we're here today. But, in any event, I'll just say that.

THE COURT: It can't be done this week and that's a shame because you're here, because I have hearings this afternoon also.

MR. NORRIS: Sure.

THE COURT: Unless -- unless I get one of my colleagues. Virtually all of my colleagues want to have a little bit of time to read up on the case. So I just can't call -- pick up the phone and call them and say, "Can you suddenly do a judicial settlement conference?"

MR. NORRIS: Yeah.

THE COURT: But, I mean, we could -- we could try to fit one in in a few weeks.

MR. NORRIS: Yeah. I mean, I'd be happy to come back in March, Your Honor, for that. You mentioned early April. We'd be happy to try that.

THE COURT: My schedule in March is entirely based on what happens in a Bloods case, United Blood Nation trial, which takes precedent on the Speedy Trial Act over civil cases.

MR. NORRIS: Of course.

THE COURT: If you could check with your client. Let me turn to Mr. Lime for one quick second. Can you give me the gist -- yeah, did I say that right?

1          MR. GLENN:  Mr. Glenn.

2          THE COURT:  Oh, I'm so sorry.  Mr. Glenn.

3     Can you quickly give me the gist of the motion to

4  set aside default?

5          MR. GLENN:  Yes, Your Honor.  So just to be clear,

6  it's an entry of default only and not a default judgment.

7          THE COURT:  Right.  I know that.

8          MR. GLENN:  Yes, sir.

9          The gist of it is this:  Jared Crook was an employee

10 only of SmartCore, just like the plaintiff, SmartCore, LLC.

11 He didn't have any other involvement with either benefits,

12 whether it was procuring benefits or determining who obtained

13 benefits.  He didn't have any fiduciary or other relationship

14 to those things.  He's an electrical contractor.  And he gets

15 swept up in this case out of an abundance of caution on the

16 plaintiffs' side and I didn't -- naming all of the SmartCore

17 entities that were out there and all the folks that showed up

18 in any of their paperwork.

19         His -- his -- he shows up in the SmartCore Electric,

20 LLC's paperwork as a manager because he was the qualifying

21 person for general -- for electrical contracting purposes for

22 that entity.

23         THE COURT:  Um-hum.

24         MR. GLENN:  But he didn't have any other role

25 regarding any of these other entities.

He was -- he was served with the documentation, with the complaint initially in January. He immediately called his former employer to ask what was going on, and they said, You don't have any involvement in this. We'll take care of it. You don't have to do anything further.

So he didn't really even know he had not been responded on behalf of until he received the motion for entry of default which was served the end of December, which he didn't receive it until after he returned from vacation in early January. He didn't even realize that they hadn't responded on his behalf.

THE COURT: All right.

MR. GLENN: So he doesn't have any substantive involvement in any of this. We don't take any position with regard to any of the disputes with regard to the fiduciary obligations or anything like that.

I think it's important for the Court to note that before the motion for entry of default was filed, sworn discovery responses from the defendants in this case indicate that Mr. Crook has no involvement in any of this. It's not a matter simply of him denying the claims. It is a matter of existing sworn testimony where they acknowledged they were the folks who were involved in officiary decisions. That they, in fact, specifically said he had no involvement with any of those decisions.

1       THE COURT:  Okay.  Thank you.  I got the gist of it.

2   I appreciate it.

3       MR. GLENN:  Yes.

4       THE COURT:  And the status of the --

5       MR. NORRIS:  Sure.  If I could just follow-up.  We

6   have no problem with Mr. Crook's positions here.  We are not

7   the ones been holding any in the case.  We have no issue with

8   anything Mr. Glenn just said.

9       Yeah, Mr. Winn and Mr. Good are willing to take a

10  judgment against them for the 6,250 I believe it is, and we'll

11  even agree to the double damages award, and perhaps that could

12  prime the pump for the judicial settlement conference that

13  Your Honor proposed.  I don't know if --

14      THE COURT:  Well, let me --

15      MR. NORRIS:  -- you delegate that to a magistrate.

16      THE COURT:  Well, I can't give it to him this

17  afternoon.

18      MR. NORRIS:  No.  Later, later on, March or April.

19      THE COURT:  Let's take a 10-minute recess, and I'll

20  come back and give you some answers.  Then we can talk about

21  the future after that --

22      MR. NORRIS:  Thank you, Your Honor.

23      THE COURT:  -- regarding this morning's hearing.

24      (The proceedings were recessed at 11:46 a.m. and

25  reconvened at 12:00 p.m.)

1    THE COURT:  Thank you for your patience.  Sorry it
2  took longer than I anticipated.

3      After reviewing the briefs, the record in this case,
4  and hearing arguments from counsel, the Court is prepared to
5  issue an oral ruling on the pending motions.

6      The Court hereby grants plaintiffs' motion for
7  summary judgment and denies defendants' motion for summary
8  judgment with regards to liability for plaintiffs' breach of
9  contract and North Carolina wage and hour claims.

10     The Court finds that there's no genuine dispute of
11  material fact that plaintiff worked between January 16 through
12  February 19, 2016, and was not paid for his work.

13     Plaintiff is entitled to $6,250 plus double damages
14  and applicable interest at the North Carolina state rate.

15     Furthermore, the Court finds that as a matter of law
16  Defendants Good and Winn can be individually liable to
17  plaintiff under the North Carolina Wage and Hour Act.
18  Therefore, the Court finds that the defendants are jointly
19  and severally liable to plaintiff -- plaintiffs for unpaid
20  wages -- well, wages just the plaintiff -- plus appropriate
21  interest between January 16 and February 19, 2016.

22     Now, the Court will schedule a hearing at a later
23  date and order briefing to determine interest and attorneys'
24  fees.

25     Now, with regards to plaintiffs' ERISA claims, the

1    Court hereby denies both parties' motions for summary judgment
2    and will hold a bench trial.  At the bench trial, the Court
3    will hear from all individuals who have submitted affidavits
4    in this case.  And, of course, wants to emphasize the Court
5    wants to hear from everyone that submitted an affidavit in
6    this case.  Parties may present additional witnesses for their
7    respective cases.  Following the trial, the Court will make
8    credibility determinations as to the witnesses and findings of
9    fact.

10          Now, since the case management order in this case
11   was originally issued for a jury trial, the Court will issue a
12   revised case management order, which will also try to find
13   some time for a judicial settlement conference.  So that will
14   be -- that case management order for the bench trial and
15   settlement conference will be issued within the next two
16   weeks.

17          So this case will not be affected by the docket call
18   in early March.  We will be squeezing it in after the docket
19   call in March.  As I say, I don't have the dates yet because I
20   have to go look at my calendar.

21          And within the next couple weeks, while we're
22   putting together this case management order, we will see if
23   the Bloods case that I talked about earlier goes away.
24   There's a possibility.  I think it's an outside possibility,
25   but there's a possibility.  So that could move this bench

trial forward to an earlier date sometime in March.  But right
now I'd say it wouldn't be before subject to -- assuming the
Bloods goes forward, it wouldn't -- we wouldn't have our bench
trial and judicial settlement conference until late March,
early April.

So that is my oral ruling.  There will not be a
follow-up order other than the case -- amended case management
order.

Of course, the issue of the setting aside the entry
of default against Mr. Crook is something the Court will have
to rule on once it hears from plaintiffs.

I ask counsel is there any questions about that
ruling?

MR. NORRIS:  Just administrative questions, Your
Honor.

THE COURT:  Um-hum.

MR. NORRIS:  So I need to be able to -- I realize
this isn't the Court's problem, first of all.  I need to
schedule my calendar to know whether or not, you know, if I
get asked by bench officers out in California, "Are you
available?"  If we're going to do this trial in March now, I
need to know to tell them, "No, I'm being held over for one
that could go over in Charlotte."  Is that -- I'm confused.  I
know it depends on this case that you mentioned.

THE COURT:  Right.  We'll try to get the case

1  management order out earlier, but I'm really trying to see
2  what happens with the Bloods trial.
3          MR. NORRIS:  Okay.
4          THE COURT:  So we'll do the best we can.  I
5  understand that counsel has conflicts.  I do understand that.
6          MR. NORRIS:  Sure.
7          THE COURT:  Anything else?
8          MR. TYSON:  Yes, Your Honor.  With respect to the
9  case management order, will that talk about when the trial is
10  to be set?
11          THE COURT:  Because it's a bench trial, I can fit it
12  in around other things.  So it will, yes.
13          MR. TYSON:  Okay.  It will tell us when to do the
14  trial subpoenas and everything else for that?
15          THE COURT:  It should have all of that in there.
16          MR. TYSON:  Thank you.
17          MR. NORRIS:  And one last thing, Your Honor.  My
18  understanding is that the Court is considering ordering a
19  judicial settlement conference, which would be part of the
20  case management order.
21          THE COURT:  Right.  We're going to add that in the
22  case management conference.
23          MR. NORRIS:  Thank you.  Thank you.
24          THE COURT:  I'd like to do that separately, but that
25  would require a lot of travel.  But maybe -- if we could do

that in the near future, it might solve -- save everyone a lot
of money.  I have to look at my calendar.  We'll get it out in
the case management order as soon as we can.

MR. NORRIS:  Thank you.

THE COURT:  All right.  Thank you very much.

(The proceedings concluded at 12:30 p.m.)

*   *   *

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF OFFICIAL REPORTER

I, Jillian M. Turner, RMR, CRR, CRC, Federal Official
Court Reporter, in and for the United States District Court
for the Western District of North Carolina, do hereby certify
that pursuant to Section 753, Title 28, United States Code,
that the foregoing is a true and correct transcript of the
stenographically reported proceedings held in the
above-entitled matter and that the transcript page format is
in conformance with the regulations of the Judicial Conference
of the United States.

Dated this the 3rd day of May 2019.


                        /s/ Jillian M. Turner
                        Jillian M. Turner, RMR, CRR, CRC
                        U.S. Official Court Reporter