IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

```
_____
                                )
ERIC KINSINGER and              )
DENISE KINSINGER,               )
                                )
            Plaintiffs,          )
                                )
                                )   DOCKET NO. 3:17-CV-643
            vs.                  )
                                )
SMARTCORE, LLC, et al.,         )
                                )
            Defendants.          )
_____)
```

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE FRANK D. WHITNEY
UNITED STATES CHIEF DISTRICT COURT JUDGE
TUESDAY, JUNE 4, 2019, AT 9:05 A.M.


<u>APPEARANCES</u>:

On Behalf of the Plaintiffs:

      BRYAN TYSON, ESQ.
      RACHEL MATESIC, ESQ.
      Marcellino & Tyson, PLLC
      2820 Selwyn Avenue, Suite 350
      Charlotte, North Carolina  28209

On Behalf of the Defendants SmartCore, LLC, SmartCore
Electrical, LLC, SmartCore Electrical Services, LLC, SmartCore
Group Health Benefit Plan:

      ERIC STRAUB SPENGLER, ESQ.
      Spengler & Agans, PLLC
      352 N. Caswell Road
      Charlotte, North Carolina  28204

            JILLIAN M. TURNER, RMR, CRR, CRC
            Official Court Reporter
            United States District Court
            Charlotte, North Carolina

APPEARANCES (Cont'd):

On Behalf of Defendant William H. Winn, Jr.:

      MARC EDWARD GUSTAFSON, ESQ.
      Bell Davis & Pitt, PA
      227 W. Trade Street
      Charlotte, North Carolina  28202

On Behalf of Defendant Steven Matthew Good:

      Steven Matthew Good, Appearing Pro Se

I N D E X

| | PAGE |
|---|---|
| OPENING STATEMENT BY MS. MATESIC | 48 |
| OPENING STATEMENT BY MR. GUSTAFSON | 20 |
| OPENING STATEMENT BY MR. SPENGLER | 45 |
| OPENING STATEMENT BY MR. GOOD | 45 |
| PLAINTIFFS REST | 115 |
| CLOSING ARGUMENT BY MR. TYSON | 133 |
| CLOSING ARGUMENT BY MR. GUSTAFSON | 138 |
| REBUTTAL CLOSING ARGUMENT BY MR. TYSON | 140 |

PLAINTIFFS' WITNESSES

ERIC KINSINGER

| | |
|---|---|
| Direct Examination by Ms. Matesic | 47 |
| Cross-Examination by Mr. Gustafson | 64 |
| Cross-Examination by Mr. Good | 83 |
| Redirect Examination by Ms. Matesic | 83 |
| Further Recross-Examination by Mr. Gustafson | 87 |
| Further Redirect Examination by Ms. Matesic | 88 |

PLAINTIFFS' EXHIBITS

| NO. | ENTERED |
|---|---|
| A through T | 48 |

1          (Court called to order on Tuesday, June 4, 2019,
2     commencing at 9:05 a.m.)
3                    P R O C E E D I N G S
4          THE COURT:  Good morning.
5          ALL COUNSEL:  Good morning.
6          THE COURT:  We're here in Kinsinger, et al., versus
7     SmartCore, LLC, et al., case 3:17-CV-643, for a bench trial.
8     The Court has had a pretrial hearing on this matter and set a
9     schedule of three hours per side, so a total of six hours.
10    Opening -- it includes opening statement, direct,
11    cross-examination.  If there is a lengthy dispute over an
12    evidentiary issue, that will probably not be included in the
13    clock time.  However, if a party starts to abuse that, then I
14    will assess the time against the party that's abusing that.
15    And that also includes closing argument.
16          So each side has three hours.  And it's each side.
17    It's not each party.  It's each side.
18          So we'll start -- let's see.  Mr. Tyson.
19          MS. MATESIC:  Matesic.  It's okay.
20          THE COURT:  So Mr. Tyson is not here?
21          MR. TYSON:  I'm here.
22          THE COURT:  Oh, you are here.  I'm thinking who --
23    well, welcome back both of you.
24          MR. TYSON:  Thank you.
25          THE COURT:  Are you-all going to be shifting back

```
 1   and forth as lead counsel?
 2              MS. MATESIC:  Yes.
 3              MR. TYSON:  Yes.
 4              THE COURT:  But both of you-all represent both of
 5   the Kinsingers, right?
 6              MS. MATESIC:  Correct.
 7              MR. TYSON:  Yes.
 8              THE COURT:  Just want to make sure.
 9              Then the entities.  Mr. Spengler, it's good to see
10   you again twice in 24 hours.
11              MR. SPENGLER:  Thank you, Your Honor.
12              THE COURT:  You represent just -- well, who exactly
13   -- which entities do you present?
14              MR. SPENGLER:  Each of the SmartCore entities.
15   There's four of them.
16              THE COURT:  Now, the plan itself is, I guess, is a
17   legal entity because it's effectively a trust.
18              MR. SPENGLER:  That's --
19              THE COURT:  Or is the plan a subsidiary?
20              MR. TYSON:  If I may, Your Honor.
21              THE COURT:  Yeah.
22              MR. TYSON:  The plan is a separate legal entity
23   under the ERISA statute.  Yes, you're correct.
24              THE COURT:  So, Mr. Spengler, you represent the
25   plan?
```

1           MR. SPENGLER:  Yes.

2           THE COURT:  And you also represent the other

3   entities?

4           MR. SPENGLER:  That's correct.

5           THE COURT:  All right.  So just to be clear on the

6   record.  There's a little bit of a conflict of interest there,

7   but it's waivable.  Would you agree?

8           MR. SPENGLER:  The conflict of interest?

9           THE COURT:  Because the plan is kind of a legal

10  separate entity under ERISA, it -- well, you -- since -- since

11  you're representing the three -- the other entities, you can

12  -- you can say we waive the fact that the plan could be

13  pursuing money against the other entities.  Or is that not

14  going to happen?

15          MR. GUSTAFSON:  Mr. Winn has indicated he's okay

16  waiving that, Your Honor.

17          MR. SPENGLER:  To the extent the other corporate

18  entities they have a conflict, they would waive that as well.

19          THE COURT:  Excellent.  Thank you.  I appreciate

20  that.

21          And Mr. Gustafson, right?

22          MR. GUSTAFSON:  I say Gustafson.

23          THE COURT:  You're the right way.

24          MR. GUSTAFSON:  I'm not sure I'm an authority on it,

25  but that's the way I say it.  So --

1          THE COURT:  I apologize.

2          MR. GUSTAFSON:  That's quite all right.  I'm

3 terrible with names.  And thank you.

4          THE COURT:  You're in Greensboro?

5          MR. GUSTAFSON:  No.  I'm here.  I'm with Bell Davis

6 & Pitt.

7          THE COURT:  Right.  In the Charlotte office?

8          MR. GUSTAFSON:  Yes, sir.

9          THE COURT:  All right.  Thank you.

10         And then I understand Mr. Good is here.

11         MR. GOOD:  Yes, sir.

12         THE COURT:  So, Mr. Good, you're proceeding without

13 counsel?

14         MR. GOOD:  Yes, sir.

15         THE COURT:  All right.  And let me clarify some

16 things here.  We're delighted you're here.  We wanted you to

17 be here.  However, your failure to be involved in the last

18 several weeks with the parties putting together whatever

19 submissions they had to for the Court, including stipulations,

20 I think as a legal matter you are bound by those stipulations,

21 even though you didn't participate in drafting them.  And that

22 is because you're bound by them because you chose not to be

23 involved in participation.

24         MR. GOOD:  That's okay, Your Honor.

25         THE COURT:  All right.  So I appreciate that.  So

1   you are, then, today acknowledging you agree to all of those
2   stipulations?
3           MR. GOOD:  I do.
4           THE COURT:  All right.  Thank you.
5           You're comfortable proceeding without counsel?  If
6   it's a financial issue, I understand it.
7           MR. GOOD:  It is what it is, Your Honor.
8           THE COURT:  It is what it is.  Okay.
9           All right.  Does that assist other counsel,
10  particularly plaintiffs, that Mr. Good has agreed to the
11  stipulations the parties have submitted thus far?
12          MS. MATESIC:  Yes, Your Honor.
13          THE COURT:  Does that help move this case a little
14  faster too?
15          MS. MATESIC:  I think so.  And in light of that,
16  given that all the parties have stipulated that our exhibits,
17  A through T, are authentic and admissible, I would just
18  confirm in the stipulations do we need to do anything else to
19  get those as part of the trial record?  We have courtesy
20  copies of those today.  If we could enter those today and
21  reference as needed.  We have limited the testimony
22  substantially because of the stipulations.
23          THE COURT:  Yeah.  Is it -- you're talking about the
24  exhibits that include all of the stipulations?  Or are you
25  just talking about all exhibits?

1          MS. MATESIC:  We have the stipulations and then on

2    the proposed pretrial order listed Exhibits A through T, which

3    all the parties agreed to.

4          THE COURT:  Okay.

5          MS. MATESIC:  So we have courtesy copies of those

6    for everyone.  I thought if we could do that up front --

7          THE COURT:  I agree.  So why don't -- once -- let's

8    have openings and then you start presenting evidence and just

9    throw all that out at once right up front very quickly since

10   it's stipulated to.

11         MS. MATESIC:  Okay.  And then, also, given that the

12   Court asked us to keep our testimony to three hours today, we

13   took the liberty of limiting some of the video, editing some

14   of the video deposition transcripts.  So we'll play those

15   excerpts today but just wanted to be up front.

16         THE COURT:  And I want to add that if we get to the

17   -- to your time limit, if we get close to it and you feel like

18   you're going to run over in closing argument, you can submit

19   documents and things like that, but they still have to comply

20   with the rules of evidence.  If there's no objection from the

21   defendants, you can throw all that in at the end and the Court

22   can consider it.

23         MS. MATESIC:  Okay.

24         THE COURT:  But I do have to -- this is a bench

25   trial, which means it's the exact same as a trial except no

1    jury.  Instead, it's a judge who has to make findings of fact.

2    But because I have to make those written findings of fact,

3    things that are submitted just quickly without argument I can

4    -- I still have them, and I can use them in making findings of

5    fact.

6            All right.  So anything else we need to discuss

7    before we have opening statements?

8            MS. MATESIC:  We would just ask to sequester.  I

9    think the only non-party witness is Mr. Crook.  Any witnesses

10   they're offering we'd ask to sequester.

11           THE COURT:  Right.  If you're here on a jury summons

12   or you're here on behalf of the party to testify and you are

13   not the party itself, the individual, the corporate entity

14   through counsel, you have to stay outside the courtroom until

15   you are called to testify.

16           So if that applies to you, I'd ask you to leave the

17   courtroom and just you can stay in one of the witness rooms.

18   There's two of them just in the little hall there that leads

19   into this courtroom.  You can stay in there.  And, of course,

20   you can stay in the courthouse area.  You don't have to stand

21   out there all the time, but that's where you need to be when

22   you think you are going to be called to testify.

23           So anyone need to leave?

24           MS. MATESIC:  Yes.

25           THE COURT:  All right.  Thank you.

1    With that said, I'll look to plaintiffs and say,
2    please, give an opening statement.
3        MS. MATESIC:  Good morning, Your Honor.  As the
4    Court is well aware, the parties in this case have stipulated
5    to the overwhelming majority of relevant facts in this case.
6    I'd like to take this opportunity to present the Court with a
7    brief review of those stipulations and to explain in context
8    some of the additional testimony that you'll hear today.
9        My client, Eric Kinsinger, came to work for Mr. Winn
10   and Mr. Good, who goes by "Matt" -- you may see some reference
11   to him -- at their company, SmartCore, LLC.
12       Eric will tell you that he often joked that he only
13   went to work there for the health insurance.  His wife Denise,
14   who is also here today, was working as a contractor at the
15   time.  So they needed a job that had health insurance to
16   insure their family.
17       Eric signed up on the SmartCore group health benefit
18   plan and everything seemed to be going well.  The company grew
19   quickly, really quickly.  And at some point Winn and Good
20   decided they needed to change their plan to a self-funded
21   insurance plan.  They established that self-funded insurance
22   plan with Starmark, a third-party plan administrator, in
23   December of 2015.  At that time at the end of December 2015,
24   there were 89 participants on the plan.
25       Eric's portions -- when they switched over to the

1   self-funded plan, Eric's portions of the premiums that he was
2   responsible for increased substantially.  Nonetheless, the
3   health insurance was so important to him he didn't question
4   it, and he continued to participate in the Starmark health
5   plan -- or in the SmartCore health plan.  Excuse me.
6           SmartCore hired a third-party claims administrator
7   called Starmark to help them administer this self-funded plan,
8   even though SmartCore was still responsible for paying the
9   actual benefits under the plan.  You'll hear testimony today
10  from two Starmark employees about their role in the plan.
11          In exchange for monthly payments, Starmark agreed to
12  administer the plan to make eligibility determinations for
13  whether or not certain services were covered under the plan,
14  and they also helped manage the administration and billing of
15  certain payments for SmartCore.
16          For many health benefit claims the approval was a
17  two step process.  First, before the surgery -- or before a
18  claim was made, the plan asked that the participants get the
19  operation be pre-certified.  So a Starmark representative
20  would review the proposed operation, determine whether or not
21  it was medically necessary.  Then after the service or
22  treatment was performed, they would -- assuming that the
23  treatment performed was the same that was pre-certified and
24  everything met the plan, they would approve the claim.
25          For Denise Kinsinger's hysterectomy, the

1    pre-approval request was submitted and everything seemed to be
2    moving along.  She had her surgery in January 2016.
3          The parties have stipulated that Starmark's medical
4    director, Matt Zawelinski, pre-approved the claim and
5    determined that the surgery was medically necessary at that
6    time.
7          Unfortunately, unbeknownst to the Kinsingers, at the
8    same time SmartCore was failing to remit its payments to
9    Starmark for the administration of the plan.
10          Eric and Denise first found out that Starmark had
11    stopped its claims processing services through one of their
12    other doctors when they were going to a different doctor's
13    appointment.  Eric confronted Mr. Winn about it, and then
14    shortly after that Mr. Winn and Mr. Good informed their
15    employees that they weren't going to be able to make payroll.
16          Now with Starmark out of the picture, SmartCore,
17    Winn and Good, appointed Mr. Winn and Mr. Good to be the
18    benefits committee at SmartCore and they became the plan
19    administrators.  They were now responsible for making all
20    decisions under the plan and, of course, still paying for
21    those benefits under the plan.
22          THE COURT:  And all of that is in the stipulations,
23    right?
24          MS. MATESIC:  Correct.
25          Eric left SmartCore towards the end of February 2016

1    and started a new job, but he continued to receive
2    communications from SmartCore.  He received a letter that said
3    SmartCore intends to pay for any medical benefits incurred
4    between January and the end of February.  Then on March 31st
5    he received another letter from Winn and Good, which they've
6    stipulated to, saying that they still hadn't decided his
7    claim.

8            Eric tried to get information about the status of
9    his claim.  He requested a copy of the plan documents.  He
10   requested a copy of the claim file and never heard anything
11   back.  In fact, after that March 31st letter saying they were
12   still reviewing the claim, Winn and Good did not respond to
13   him until after we filed this lawsuit.

14           They didn't follow-up to try to return Eric's
15   missing payroll checks after the -- after he left.  They
16   didn't follow-up with him to try to return the premiums that
17   they had withheld from his paycheck and taken from him and not
18   used for the health plans.

19           Now, one of their two main defenses tries to accuse
20   Eric of not following ERISA's plan regulations.  As we
21   detailed in our trial brief with the Court, that defense is
22   without merit.  Eric had no obligation to appeal because his
23   claim was never actually denied.  Denial is a specific term
24   under ERISA under what it needs to include to trigger an
25   appeal, and Eric never received a denial.  And now we are

1   three-and-a-half years later we still don't have an
2   adjudication on whether or not these claims are covered.
3   That's what we're here to ask the Court to do.  We need the
4   Court to affirm what Starmark's doctor did and Denise's doctor
5   did was that the hysterectomy was medically necessarily.

6          I'd like to briefly talk about why that surgery was
7   medically necessary.  There are two doctors involved in this
8   case, as we mentioned, Zawelinski with Starmark and
9   Dr. Pillai, who is Denise's treating physician.  Dr. Pillai's
10  test- -- we also have deposition testimony from Dr. Pillai
11  which will explain in more detail why the hysterectomy was
12  more medically necessary.

13         The plan specifically defines medically necessary,
14  and it doesn't mean necessary in the sense of necessary to
15  survive, necessary to continue living.  The plan says that it
16  must be appropriate treatment for the diagnosis or of the
17  treatment of sickness in accordance with the standards of
18  medical practice in the United States.

19         Dr. Pillai testified that the American College of
20  Obstetricians and Gynecologists directs that physicians should
21  medically intervene for a patient when their symptoms are
22  interfering with their daily life.

23         Prior to the hysterectomy, Dr. Pillai found physical
24  abnormalities in Denise's uterus and diagnosed her with
25  adenomyosis and menorrhagia.  Dr. Pillai testified explicitly

that the hysterectomy was necessary and appropriate for the
treatment of these diagnoses.

In layman's terms, Denise was suffering from
incredibly heavy and painful periods.  You'll hear Denise
testify that her periods often lasted two weeks per month.
During this time she had to frequent the restroom sometimes
every 30 minutes to deal with the excessive bleeding.  Despite
being on pain medicine for unrelated medical issues, she would
be doubled over in pain from the cramping from her periods.
She had irritation on her genital area from the sanitary
products.  And despite -- she would have to miss work to deal
with her -- the heavy bleeding, had to change her clothes,
couldn't go out and act -- perform her normal activities in
the community.

Before the hysterectomy, Denise tried two different
regimens of birth control pills to control the periods, but it
did not fix the problem.  As Dr. Pillai will explain because
of the medications failed to resolve the problem, the next
step -- the next appropriate treatment step was a
hysterectomy.  Denise had a few different treatment options;
each carried risks of failure and complications.  Therefore,
Denise and her doctor made the decision that the hysterectomy
was the next appropriate treatment.

So as I just explained, we have five claims today.

Our first is the claim for benefits.  As I just

1    explained, all the parties have stipulated that Eric and
2    Denise were covered under the plan and that this service would
3    be covered if it's medically necessary.  And the records --
4    and the evidence is going to clearly show that it was
5    medically necessary.
6         Our second claim is for a breach of fiduciary duty.
7    This claim, based on the stipulations, has been stipulated to
8    as a matter of law.  All of the defendants have stipulated
9    that Good and Winn were fiduciaries to the plan, that they
10   directed money that was withheld from the plan, plan assets be
11   used for purpose other than the plan, and that they used it
12   for other purposes.
13        Eric will also testify today about that they
14   withheld premiums from his paycheck for health care expenses.
15   And you'll hear Starmark's employee explain that they did not
16   remit any payment for those -- for the health plan expenses.
17   So they admit that they took plan assets and used them for a
18   purpose not for the plan.  That's a clear breach of fiduciary
19   duty.
20        As Your Honor may be aware, the Department of Labor
21   has also recently filed a lawsuit against the defendants in
22   this courtroom for the same action and they're in early stages
23   of pleading.  We have also brought this claim on behalf of all
24   plan participants.  So we're asking today, similarly to what
25   the Department of Labor is asking for, for an equitable order

1    that would order them -- we could resolve that whole issue

2    today, given that they've admitted to it, that the order be

3    ordered to return those premiums -- withheld premiums and also

4    for an equitable accounting so that we can all affirm that was

5    accurate.

6          Our third claim for relief is a claim for other

7    equitable relief.  That's detailed in the brief.  That's an

8    alternative legal theory of relief.  I think given the clear

9    facts and stipulations, it's not going to be necessary today.

10          Our final claim is for failure to provide the plan

11   documents.  The defendants stipulate there were four documents

12   that govern the plan:  The plan, the summary of the plan

13   description, the administrative services agreement, and

14   stop-loss contract.  They've stipulated that Eric requested

15   them, that they received the request, and that they didn't

16   respond for over two years.

17          They still have not provided a copy of the stop-loss

18   contract, but they provided the other three documents in

19   discovery in this case about two years after the request.

20          Eric also requested an administrative record -- a

21   copy of the administrative record, and they never responded to

22   that.

23          The only remaining issue today on that plan was for

24   the Court to decide the amount of statutory damages that the

25   Court wants to give, and for that you can look to their

1    bad-faith action, as well as the prejudice to the parties.

2              THE COURT:  But that's -- that doesn't have to be

3    part of this trial record, though, right?

4              MS. MATESIC:  I think the Court can make a

5    determination -- a factual finding today.

6              THE COURT:  I mean, that's a sanction that is --

7    well, you're right.  The Court -- some of the Court's findings

8    of fact could justify.

9              MS. MATESIC:  Yeah, I think the stipulations justify

10   the liability, and then the Court can make the legal

11   determination of the amount of penalties that it wants to

12   impose.

13             THE COURT:  All right.

14             MS. MATESIC:  And then our final is attorney's fees.

15   Plaintiffs are clearly going to be the prevailing party, as

16   the parties already stipulated to the fiduciary breach as well

17   as the liability on failure to provide plan documents.  And as

18   I just explained, I think the claim for benefits is going to

19   be very clear-cut.  So in keeping with local custom, we'd ask

20   that you order -- enter an order awarding us attorney's fees

21   and set a briefing schedule to determine the exact amount of

22   those fees.

23             And with that, we're ready to present our evidence.

24             THE COURT:  Thank you.

25             So we'll start with Mr. Gustafson.  Did I say -- am

1  I getting better?

2          MR. GUSTAFSON:  That's perfect.

3          THE COURT:  You'll go first this time.  Then,

4  Mr. Spengler, you'll go second this time.  And, Mr. Good,

5  you'll go third for opening statements.  But the next time we

6  come to you for cross-examination of the first witness, we're

7  going to then rotate over to the next attorney who will be the

8  starting attorney for that round.  I'm just trying to make

9  sure that one attorney is not always the first attorney to

10  speak on the side of the defense.  So we'll just rotate around

11  who goes first.

12          Does that make sense?

13          MR. GUSTAFSON:  Sounds great.

14          THE COURT:  Okay.  Great.

15          So you may give an opening at this point.

16          MR. GUSTAFSON:  Thank you, Your Honor.

17          As you know, I'm very late to this game.  You might

18  not remember, but I was sitting in the courtroom the day that

19  Heath Gilbert and Mr. Norris withdrew from the case.

20          THE COURT:  Um-hum.

21          MR. GUSTAFSON:  In fact, when I was sitting there, I

22  didn't even know that a trial was scheduled.  It's when I

23  heard that one was coming up in a couple of weeks, you can

24  imagine my reaction.

25          I also take responsibility for Mr. Spengler being

1   here today, because one of the things I heard very clearly

2   that day was that he wanted -- you wanted the company

3   represented.

4            THE COURT:  Well, the law requires it.

5            MR. GUSTAFSON:  Yes, the company cannot be pro se

6   and that someone needed to be here.  So I recruited him.  And

7   he's a very good lawyer, as you know.  I would be taking the

8   responsibility for most of the questioning and opening.  So I

9   just don't want to put any pressure on him.  He's in for more

10  the --

11           Your Honor, being late to this case, frankly, I have

12  to say I'm not sure why this case hasn't settled.  You might

13  have that same question.

14           THE COURT:  No comment.

15           MR. GUSTAFSON:  I have my theories, and I'm sure you

16  do too, and I'll address those later.

17           But as you know, Matt and Will -- no offense to

18  first names.  It's easier that way.  If the Court would like

19  different, I'm happy to that as well.

20           Matt and Will have already agreed to the unpaid

21  wages, and you've enter an order that $6,250 to be double and

22  attorney's fees assessed.  So we're talking about $12,500 plus

23  attorney's fees there.

24           The last number I saw on the medical bills, there's

25  a lot -- as you know with medical bills, you see a whole lot

of different numbers.  That if you've been through any
procedure, it starts with a really high number.  But the
latest number that I saw and heard was just under $20,000.
And that's even been taken care of, and we'll talk about that
in a bit.

But from the best I can tell with regard to
settlement, I guess that there's blame on all sides.  That's
sometimes why we end up with you.  That the parties just can't
reach agreement.  I certainly think they should have.  And, in
fact, I tried to settle as late as last week, and I'm
surprised that we're here.

As you've acknowledged and we've stipulated in the
facts, there are very few issues in dispute here.  I actually
don't think we're going to use the full six hours.  Now we
may, but I'm not sure that we will.

But getting back to why we're here today.  I think
that Mr. Good and Mr. Winn and the companies think they do
have good defenses and thought they had good defenses all
along here.  Some of those were briefed in summary judgment.
Your Honor, some of those were fact disputes, and we believe
we will resolve some of those today.

As Ms. Matesic said, we think the first issue here
is the medical necessity of all of this.  Mr. Winn believes,
at least in part upon things that Mr. Kinsinger told him and
other employees at SmartCore, that the procedure was not, in

fact, necessary.  That this was something that was elective
and done for Ms. Kinsinger's convenience.  And Mr. Kinsinger
even told them that the claim had been denied by Starmark when
Starmark was still the plan administrator.  Maybe that's what
started all of this was that, you know, they're relying upon
his statements.  If that's what he said, then that's what they
believed.

You're also going to see the treating doctor's
testimony, and Ms. Matestic talked about some of that.  But
Dr. Pillai clearly said there was no cancer, no
life-threatening condition.  And you're going to see in black
and white in that deposition transcript that she says very
clearly this was an elective procedure that Ms. Kinsinger
chose from a variety of options.  So, yes, she took birth
control.  There's Depo-Provera, a birth control shot.  There's
a Mirena, an IUD.  There's a plain IUD.  There are multiple
kinds of hysterectomies.  And so Dr. Pillai is going to
testify -- or did testify very clearly Ms. Kinsinger is the
one who made that decision.

Now, they obviously, counsel on the other side, went
back and tried to clean that as best they could, but I think
you're going to be confronted with very clear testimony that
this was an elected procedure and that Ms. Kinsinger chose
from the options.  And that's what Mr. Winn believed, that
this was not medically necessary -- a medical necessity or

1    medically necessary.

2           But notwithstanding all of that and the defenses we

3    think they have, Mr. Winn has gone ahead and paid the medical

4    bill.  So he went to Carolina Health -- Atrium, I guess, it is

5    now.  Went down to Carolina Health Care, inquired about the

6    balance and paid it.  He's going to explain to you why he did

7    that.  I think part of that relates to settlement, attempts to

8    settle this matter.  That we shouldn't be here today spending

9    thousands of legal fees to resolve things that have

10   essentially been resolved at this point.

11          Ms. Matesic kind of raised this issue as well, Your

12   Honor.  There's an exhaustion of administrative remedies

13   defense here.  Ms. Kinsinger had her procedure in January,

14   early January of 2016.  There's an exchange of emails, and

15   that's in the record, from February 2016 where SmartCore tells

16   all of its employees -- Ms. Matesic is correct.  I mean, this

17   company -- one of the reasons we're here today is this company

18   failed and failed quickly and it's sometimes the case when the

19   money goes, it's gone.  And SmartCore communicated that very

20   clearly to all of their employees that we're going to try, but

21   our plan has been terminated.  Starmark has sent everybody a

22   notice of that, and there's -- there's not much we can do

23   about that.

24          Mr. Winn tried, and that's the communication he had

25   with Mr. Kinsinger.  We're trying.  We're desperately trying

1    to raise funds.  And that's what Mr. Winn was doing out there

2    in the community, trying to raise funds to get money to make

3    payroll and pay these health care expenses.

4          And it's our by waiting until September, more than

5    180 days after that, that they did fail to exhaust their

6    administrative remedies, they are out of time, and that the

7    claim should be dismissed based upon that.

8          As you know, Your Honor, you were just speaking

9    about that.  There's a statutory penalty here for failing to

10   provide plan documents under ERISA.  Mr. Winn believed that

11   everybody -- so just to back up on the timing.

12         So this company is accelerating, hiring contractors

13   employees as quick as they can do.  Health care plan expenses

14   get way too high.  They shift plans.  That's December of 2015.

15   So all this starts in December 2015.  As part of that when

16   they roll out of this new plan, everyone gets the documents.

17   They don't just start a new health care plan and say, "Hey,

18   here are your benefits."  Everybody gets copies of the plan.

19   So that's December of 2015 when everybody got all of the plan

20   documents as part of this.  So Mr. Winn believed that people

21   already had the documents.

22         Even so -- and this is what Ms. Matesic said --

23   March 31st he sends a letter to everybody talking about what's

24   going on in the company, telling them we're trying and here's

25   a summary of the plan.  So it wasn't they completely ignored

this. They said we know this is a new plan. We know there are questions about this. Here's a summary of the plan.

You know, then in June, at the direction of I'm assuming Mr. Tyson's firm, knowing that there are these statutory penalties, they send a letter. Mr. Kinsinger sends a letter requesting these five different documents.

Then you can see why Mr. Winn might be confused by that. December the plan rolls out. Everybody gets copies of the documents in March. He says here's a summary of the plan. So he thought he had fulfilled his obligation.

And to the extent the documents weren't provided, you can imagine, at this point Starmark's not around anymore. Starmark is not willing to help too much. In fact, they were a defendant in this case, and we'll talk about that at some point.

But Starmark wasn't helping here. Mr. Winn and Mr. Good's position is going to be they didn't have the document and couldn't request them from Starmark. In any event, they thought they provided the documents.

So back to my initial question, you know, why hasn't this matter settled?

Well, Your Honor, I serve as a mediator, and what I find sometimes the biggest impediment of matters settling it's statutory damages. And usually where I find that is unfair and deceptive trade practices. So someone raises an unfair

1    and deceptive trade practices and then they're banging them

2    over the head saying we're going to get trebled damages and

3    the other one is attorney's fees.  That's generally what I

4    find -- well, not generally.  But that's a very good reason

5    that I find that cases don't settle.

6           Well, so here I think that may be part of the

7    problem.  That the plaintiffs are seeking $110 per day for

8    these plan documents not being provided.  I'm sure you saw in

9    the trial brief that that number they submit is $410,000.  I

10   think all of our hearts stop beating when you see a number

11   like $410,000.

12          THE COURT:  But those numbers were tied into legal

13   conclusions.

14          MR. GUSTAFSON:  Okay.

15          THE COURT:  Not factually, right?  I mean, there's a

16   dispute as to the $110 fee applying just once per day or to

17   every document per day.  That's a legal issue, wouldn't you

18   agree, not a factual issue?

19          MR. GUSTAFSON:  Yes, sir.  I think that is right,

20   and I think that's something for you to determine.

21          And I think that -- I'm not a math major.  When I

22   saw that number, like I said, I stopped.  And that's the

23   issue.  It's not that they're asking for the $110 per day.

24   It's they're asking $110 per day per document and that's how

25   you got 400 --

1          THE COURT:  For a long period.

2          MR. GUSTAFSON:  For -- right.

3          THE COURT:  All the way until discovery.  The

4    documents aren't turned over until discovery.

5          MR. GUSTAFSON:  746 days.  But even when I do that

6    math, that comes to $75,000.

7          And then when we get to the cases -- and even the

8    cases they've cited no one comes anywhere here, and they're

9    Fourth Circuit cases all over the place that say $20, $25.  So

10   when you whittle that down, if you get towards $20 or $25 per

11   day and it's one time, the numbers get a lot lower.

12         And the reason I bring this is why didn't we settle

13   this case, and I think that may be an impediment to Matt.

14         THE COURT:  I don't want to be out of turn here, but

15   is there -- is there room for settlement from the plaintiffs?

16   We could recess the trial for 30 minutes and see if that could

17   be resolved?  Or -- or it's the plaintiffs, it's your choice.

18   Or do you want to go ahead and pursue everything you're

19   pursuing?

20         There are -- I -- I think I -- I believe the

21   sanctions for the failure to turn over the plan documents is

22   really a legal issue, because there's no dispute as to the how

23   many days, right?  There's no dispute there.  It's really it's

24   a legal issue as to the Court can go up to $110 per day,

25   right?  It can't go over that.  And the Court -- and the $110

1  a day, though -- you know, I think it's really a legal
2  dispute.  Is it for one document or per document or is it for
3  just failing to turn over all the documents?
4            MR. GUSTAFSON:  And that question --
5            THE COURT:  Isn't it really a legal issue?
6            MR. GUSTAFSON:  Well --
7            MS. MATESIC:  I think it's a legal determine- --
8  it's a statutory penalty.  The penalty can be I think in cases
9  are clear that the Court has discretion to award --
10           THE COURT:  Yeah.
11           MS. MATESIC:  -- for 110 per document.  Of course,
12 that's within the Court's discretion.
13           THE COURT:  But if that's -- if that's what sending
14 us to trial -- it's really a trial is a fact finding place and
15 those facts are really all agreed to, except for the legal
16 issue is it $110.00 one time or $110 times every missing
17 document.
18           MS. MATESIC:  I think that's a separate legal issue.
19 And I don't want this to devolve into kind of who said -- he
20 said, she said about the settlement.  But, frankly, Your
21 Honor, we sent an email at the beginning of this case and said
22 these medical bills are not high and we have ten attorneys
23 litigating this case.  Can we please do an early mediation?
24 And here we are a year and a half later.  They canceled the
25 last trial the week before.  They sent a settlement offer last

1  night that was not acceptable.  So I don't think it would be
2  fruitful.
3          THE COURT:  So both sides have been discussing.
4  Okay.  That's fine.  I'm just throwing it out there to save
5  time, which is saving attorney's fees.  And to clarify that, I
6  think it's a legal issue.  It doesn't need to be the focus of
7  this trial.
8          MS. MATESIC:  I think -- and then the other
9  question, just Mr. Gustafson informed us yesterday that
10  Mr. Winn had paid the bills.  We tried to clarify that or
11  confirm that --
12          THE COURT:  Yeah, I was going to ask that.
13          MS. MATESIC:  And they showed records of inquiry but
14  no records of payment.  I don't know if they have that today,
15  or if they want to stipulate to the EOB claim so we don't need
16  to litigate the medical necessity.  I'm not sure what the
17  position is.
18          MR. GUSTAFSON:  I don't have evidence today, but
19  Mr. Winn can testify to that fact.
20          THE COURT:  That he paid the outstanding bill?
21          MR. GUSTAFSON:  Yes.
22          MR. WINN:  Correct, Your Honor.
23          THE COURT:  But is there a receipt from Atrium?
24          MR. WINN:  Your Honor, they wouldn't give me access
25  to it.  I asked.  They said that they could only mail it to

1    the patient.

2            MR. GUSTAFSON:  There's HIPAA problems.

3            MR. WINN:  Right.

4            MR. GUSTAFSON:  And part of our problem was even

5    finding out what the bill amount was.

6            THE COURT:  You said 20,000.  I thought it was in

7    the stipulation it was 39,000?

8            MS. MATESIC:  The original bill to the plan was

9    39,000.  The plaintiffs have been trying to resolve their

10   credit score and negotiate that down, but I'm not sure that

11   that windfall should enter into the plan.  But, nonetheless,

12   the plans have been negotiated -- or there is an open

13   negotiation as to what the actual amount of the final -- what

14   it would take to resolve that debt with CHS.

15           MR. TYSON:  As Your Honor knows, CHS filed suit

16   against our clients in South Carolina.  So as Ms. Matesic

17   mentioned, we did call their lawyer yesterday, and he said the

18   bills have not been paid that they're aware.

19           THE COURT:  He couldn't tell you.

20           MS. MATESIC:  He said they inquired and they were

21   showing an inquiry, but they were still showing a current

22   balance.  There was no issue to anything --

23           THE COURT:  He didn't say how much or anything?

24           MS. MATESIC:  No.  I mean, I think -- I think the

25   most current for the -- they gave an individual payment

1    discount of like $19,000.  So the total would be 19,000 now
2    for the individual payment.
3              MR. TYSON:  That's what they got sued for in South
4    Carolina.
5              THE COURT:  So the 20,000 would only cover the 19.
6    The 39,000 is really --
7              MR. TYSON:  That was the original, Your Honor,
8    amount.
9              MS. MATESIC:  That was the original bill billed to
10   the plan.
11             THE COURT:  Well, can one of your clients make a
12   phone call since and ask, find out?
13             MR. TYSON:  I'd be happy to ask them.
14             THE COURT:  Well, I mean, I'm not -- I'm not trying
15   to interrupt the trial here.  I'm trying to save time.
16             MS. MATESIC:  Yeah.  I mean, and that's why we went
17   because technically our clients are being sued by the
18   hospital.  So we called the attorney in that lawsuit and he
19   was not able to confirm.  I mean, if Mr. Winn has a credit
20   card account or some type of bank account that can show the
21   balance, I think that might do it, or show the withdrawal.
22             MR. TYSON:  And I guess that's all it would be,
23   Your Honor, if --
24             MS. MATESIC:  Or we could just enter an order
25   stipulating he's going to pay that.  And once it's satisfied,

1   we can file a satisfaction with the Court and resolve that
2   claim.
3           MR. TYSON:  Because that would take away probably
4   about 80 to 90 percent of what we anticipated doing today.
5   Since the (a)(2) -- I'm sorry.  Yeah, the (a)(2) claim has
6   been stipulated to, and as Your Honor noted, the (c) claim is
7   just a legal determination as to discretion and amount.
8           THE COURT:  Well, okay.  I mean, I really do want to
9   finish this trial today, but I think if we interrupt things
10  for 15 or 20 minutes in an attempt to resolve that issue, it
11  will -- even if it doesn't get resolved, that's not too much
12  time adding to the end of the day to get this trial finished.
13  If it succeeds, we've saved everyone a lot of time.
14          MS. MATESIC:  Sure.
15          THE COURT:  Can we try to do that and take a recess
16  until 10:00?
17          MS. MATESIC:  Sure.
18          THE COURT:  See if we can get that confirmation of
19  that $20,000 payment.  That's great.  That's wonderful.  So
20  we'll recess for 15 minutes.
21          MR. TYSON:  Thank you, Your Honor.
22          MR. GUSTAFSON:  Thank you, Your Honor.
23          (The proceedings were recessed at 9:44 a.m. and
24  reconvened at 10:15 a.m.)
25          THE COURT:  So what happened in the last 25 minutes?

1          MR. GUSTAFSON:  We are flabbered by our modern
2   health care system and can't get confirmation from anyone that
3   it's actually been paid off.
4          MS. MATESIC:  They had no success going through
5   CHS's hospital lines.  The attorney for CHS had his client
6   look it up, and they confirmed there was no change in the
7   system from yesterday.  They're still not showing a payment
8   going through.  So I'm not sure.  I think --
9          MR. GUSTAFSON:  Yeah.  And I think part it is when
10  Visa is somewhat floating all of our payments, that's
11  commentary on our financial system --
12         THE COURT:  No.  You're right.  There's a float out
13  there and it --
14         MR. GUSTAFSON:  There is.  And I happened to this
15  weekend I paid a bunch bills on Friday, because I got paid on
16  Friday, and I know how it works.
17         THE COURT:  Right.
18         MR. GUSTAFSON:  So I think we would stipulate the
19  payment of that amount or the balance and --
20         THE COURT:  Is the stipulation good enough for you,
21  knowing that if it hadn't -- if you found out later it hadn't
22  been paid, you can resolve that?  Or some form of judgment on
23  that.
24         MS. MATESIC:  I think we're looking for a judgment
25  here today.

1          Do you want to --

2          MR. TYSON:  Yes, Your Honor.  I think we'd like to

3    have a judgment here today.  Obviously, if it has been paid,

4    you know, taking them at their word --

5          THE COURT:  Right.

6          MR. TYSON:  -- file a satisfaction of judgment at

7    that time.

8          THE COURT:  Yeah.

9          MR. TYSON:  And our primary concern here is that,

10   you know, Mr. Gustafson talked a lot about the settlement.  We

11   have -- we have tried to settle this case a long time.  Part

12   of the problem is that the defendants kept throwing bankruptcy

13   every time we start talking about settlement.

14         THE COURT:  Sure.

15         MR. TYSON:  So I'm a little concerned about taking

16   people at their word and then the bills don't get paid.  My

17   clients are still sitting down in South Carolina getting sued.

18   If there's something to protect our clients from that

19   perspective, we'd be happy.  It would great if they actually

20   paid the bill.

21         THE COURT:  So I need to actually call my colleagues

22   in the bankruptcy court.  But if you have a judgment --

23         MS. MATESIC:  I think given that most of this

24   judgment or all of it would arise out of their fraudulent

25   conduct --

1    THE COURT:  Right.

2    MS. MATESIC:  -- it should be exempt from

3    bankruptcy.  But that's, obviously, a determination --

4    THE COURT:  Well, I do know fraud would -- a

5    judgment based on fraud is not dischargeable.  You probably

6    don't want to stipulate to a fraud.

7    MR. GUSTAFSON:  No.

8    THE COURT:  But --

9    MR. GUSTAFSON:  And I don't want to get into too

10    much of jurisprudence, but you have the ability so that if we

11    did go into bankruptcy, you'd have the ability to pull that

12    out.

13    THE COURT:  Oh, yeah.  That's the ultimate power of

14    a district court judge is that we can unrefer matters that we

15    refer to bankruptcy and magistrate judges.  Yes, it's really

16    they're my cases.  So that's true.

17    MR. GUSTAFSON:  Yeah.  And I don't -- there's not

18    intent as of now to, and I don't want to overcondition that.

19    This matter has been paid.  The matter was to resolve it.  The

20    matter was to put it to bed.  And so --

21    THE COURT:  But a consent judgment is not a problem

22    but a fraud stipulation is?  Or how -- what do you -- what's

23    your position on that?

24    MR. GUSTAFSON:  I don't think that we want to admit

25    to fraud.  I mean, that's going to be our defenses or mere

1  defenses that all of this was done in good faith to the best
2  of their abilities.  So I don't -- I understand the need for
3  protection.  A lot of this is academic, but I get the anxiety.
4  So, I mean, I think a judgment, you know -- I think you can
5  protect them in the bankruptcy.

6           THE COURT:  I can.  I still have to -- I'm still
7  subject to the automatic stay but only for a short amount of
8  time because I -- the case would come to me.

9           MR. GUSTAFSON:  Yes, sir.

10          THE COURT:  If it's -- if this case goes into
11 bankruptcy, then the Court usually does unrefer it and it
12 comes back from the bankruptcy court to the district court.
13 But I -- but I -- I still know -- well, is that -- is that --
14          Can we put that into a judgment?

15          MS. MATESIC:  I mean, I think that given the facts
16 that were stipulated to, we have some additional things we
17 could add to our proposed findings of fact and stipulations of
18 law.  I mean, we're not asking them to agree that they
19 committed fraud.  I think the bankruptcy judge can take that
20 from the facts that they've already stipulated to.

21          THE COURT:  Right.  Would it be helpful?
22          And as to the medical expenses, it might be resolved
23 in 24, 48 hours anyway.  As soon as you get confirmation.

24          MR. TYSON:  Just our experience working with medical
25 debt, it takes -- I have one still two years later we're still

getting collection calls, even though the defendant agreed to
pay it all and paid it all.  It's just one of those things we
need to have some ongoing indemnification form.

THE COURT:  That could be a written consent
judgment.

MS. MATESIC:  Correct.  Yes.

THE COURT:  Well, do we want to put that issue on
the back burner and during the lunch break you-all try to work
out the consent judgment on the issue of medical expenses?

MS. MATESIC:  Did you want to hear testimony today?
Then are we agreeing as to --

THE COURT:  That's what I'm saying, defer evidence
on medical necessity and medical costs --

MR. TYSON:  Okay.

THE COURT:  -- until the afternoon and see if
you-all can get -- address whatever else we can address this
morning before lunch.  Or is there -- do we have to address
that first before we start addressing issues of sanctions for
documents or attorney fees or.

MR. TYSON:  I -- I might want to confer real quick.
I'm not sure what else there is to address.

THE COURT:  Well, it's document sanctions and
attorney's fees.

MS. MATESIC:  Like, we have the fiduciary breach,
which I think that, you know, they agreed they withheld the

money. Eric was going to testify as to the exact amounts, but those are in the paychecks. Then we're asking the Court to do an equitable order. We're not able to receive the identification of each of the plan participants but an equitable accounting for those plan participants. And then also the plan documents claimed. If we could admit the liability, I don't think we need any -- you know, those are the only issues of fact outstanding. The rest will be for the Court's legal determinations.

THE COURT: Let me quickly turn to Mr. Good.

Mr. Good, you're following all of this?

MR. GOOD: Yes, Your Honor.

THE COURT: I know you're not an attorney, but I know you're a sophisticated individual.

Do you generally agree with your fellow defendants --

MR. GOOD: Yes, sir.

THE COURT: -- about what has happened?

MR. GOOD: Yes, Your Honor.

THE COURT: I just want to make sure if you have any questions as we kind of have this unusual discussion here.

MR. GOOD: I won't be shy and certainly don't want to get in the way of resolving this.

THE COURT: Excellent. Thank you.

So what should we do right now? Should we finish

1    opening statements of the defense?

2             MR. GUSTAFSON:  That was going to be my proposal

3    that let's -- I have a third of the page of an opening left.

4             THE COURT:  Okay.

5             MR. GUSTAFSON:  And it's not going to shock the

6    world.  Maybe we'd take some time to then figure out what

7    issues the Court would like to resolve from there.

8             THE COURT:  Okay.

9             MR. GUSTAFSON:  And then we kind of maybe limit

10   testimony to that.  And either break now and try to resolve

11   the judgment issue or wait until lunch.

12            THE COURT:  So let's just -- right, let's finish

13   openings.  And once we finish openings, we'll see where we are

14   then.  Opening might take 15 more minutes; it might take 30

15   more minutes.  We'll see.

16            So we'll turn back to you and pick up where you left

17   off in openings knowing on the side we have these issues we

18   can maybe resolve at lunch.

19            MR. GUSTAFSON:  Great.  And to -- thank you, Your

20   Honor.  And I appreciate your latitude in discussing this

21   openly and trying to work out a resolution to it.  I think

22   that's after all what we're supposed to do.

23            But getting back to this sanctions issue.  You know,

24   it's come my view as a bit of an outsider that's why this

25   thing hasn't settled.

1          THE COURT:  The documents sanctions.

2          MR. GUSTAFSON:  Yes, sir.

3          THE COURT:  Okay.

4          MR. GUSTAFSON:  And, you know, you had this

5   questions of fact and law.

6          THE COURT:  Right.

7          MR. GUSTAFSON:  You know, it's not a -- you don't --

8   it's not contingent upon their being prejudiced.  The

9   prejudice factors into the amount of sanctions.  And we're

10  going to -- we're going to -- well, our testimony is going to

11  be that there isn't prejudice to that.

12          And the other comment is the amount of the damages

13  -- the amount of the sanctions, excuse me, is the bad faith

14  and to proffer testimony on the bad faith element of that.

15          THE COURT:  You mean up to $110?

16          MR. GUSTAFSON:  Right.

17          THE COURT:  Is that what you mean?

18          MR. GUSTAFSON:  I think what courts do and cases we

19  see that's out there.  But the cases we've cited from the

20  Fourth Circuit --

21          THE COURT:  Right.  The max is $110.

22          MR. GUSTAFSON:  That's the max.

23          THE COURT:  The legal issue is --

24          MR. GUSTAFSON:  It's in your discretion.

25          THE COURT:  It's a once a day or is it five times a

1    day if there's five documents, I think?

2            MR. GUSTAFSON:  Yeah.  I think primarily it's your

3    discretion.  So we say in your discretion it's zero.  And then

4    there's a question is it a per document per day, and then it's

5    a question of, you know, what is the amount.

6            You know, getting way into the argument, you know,

7    the purpose of that is a penalty to punish someone for not

8    doing something and discourage them from doing it again.

9    These guys aren't ever doing this again.  I'm confident in

10   that.

11           Even in those cases where you see there's a 20- or

12   $25 per day for all of the documents case, that's against

13   Pan American.  That's against these big companies.  The goal

14   there is, you know, we want ERISA claims to be resolved by the

15   parties out of court, and we want, of course, the

16   administrators to do what they're supposed to do.  Well, these

17   guys are never going to have a self-funded health care plan

18   again.  So I don't know how much punishment they need.  But

19   that's a second element of this, you know.

20           And then, Your Honor, I think the other issue that's

21   going to, you know, just alluded to it, is the attorney's fees

22   issue.

23           THE COURT:  Yeah.

24           MR. GUSTAFSON:  You saw in their bill of costs

25   pretrial they had $15,000 in that.  That's -- I mean, if you

extrapolate out, that's as much as anything that's kept this thing from settling. And it's not that 15,000. It's the fee of the bigger number.

And so those are the defenses. If we try to narrow what the issues are about, those are the defenses that, you know, we'd like the opportunity to put on is whether we believe the Kinsingers were prejudiced by this; did Mr. Good and Mr. Winn -- in my case, Mr. Winn -- act in bad faith such that the sanctions should be greatly reduced; and the attorney's fees as well.

As far as the liability, you know, we -- we still contend this was not a medical necessity. We're going to put on testimony to that fact. We're going to point to Dr. Pillai, the treating doctor's testimony on that. That's still the defense.

There's still the administrative remedies defense here. And then, you know, getting back to, you know, it's the defense of the penalties and attorney's fees. But -- so issues I think there would be testimony on. And the Court may not even want that. I mean, those are both soundly within your discretion. If you say, "I don't need to hear anyone on any of those issues," then you're not going to hear from us. But I think those are the remaining issues.

I guess what I'd say as far as the fiduciary duty claim, I'm not sure how they can try to recover from all of

1    the plan participants under that claim.  They may have a claim
2    that Mr. Kinsinger paid money into the health care plan that
3    he should have gotten out.  But if we -- if he pays in, for
4    example, $1,000 and gets $19,000 medical expense, it can be
5    hard-pressed to say you're damaged in that scenario.  I
6    remember this plan was only around for two, three months, and
7    I don't know what they said.  They can show their paystubs.
8    We're going to look to see what he paid in.  It's far less
9    than what they took out.  So from an equitable standpoint, you
10   can't say I want my -- you know, for example, $1,000 got paid
11   into your plan and the 19,000 that's to be paid to my medical
12   expense.  I just think there's an issue with that.
13           THE COURT:  I mean, but the 19 -- the 19,000 was
14   earned, right?
15           MR. GUSTAFSON:  Yes, but --
16           THE COURT:  It was part of their employment package.
17           MR. GUSTAFSON:  Yeah.  So if you buy your health
18   insurance and the health insurance pays and you don't get your
19   money back for buying the health insurance, right?
20           THE COURT:  Right.
21           MR. GUSTAFSON:  I wish it worked that way.  You
22   know, get a whole lot of money back.  But, yeah, I think my
23   point is you don't get to get a refund on your payment into
24   the plan and get paid.  Does that make sense?
25           THE COURT:  Anything else on your opening?

1          MR. GUSTAFSON:  That's all I have, Your Honor.  I
2    appreciate it very much.
3          THE COURT:  Mr. Spengler, you've quietly sat there.
4          MR. SPENGLER:  Yes, Your Honor.
5          THE COURT:  So it's your opportunity to make an
6    opening statement if you want to add anything.
7          MR. SPENGLER:  The SmartCore defendants will
8    reiterate and incorporate into our statement the statement put
9    forward by Mr. Gustafson and have no further statement at this
10   time.
11         THE COURT:  Thank you.
12         Mr. Good, you have an opportunity to make an opening
13   statement if you'd like.
14         MR. GOOD:  The only thing I'd add to Mr. Guftson's
15   statement is never in a million years did I think we'd be here
16   trying this case.  I was very optimistic that we would settle
17   during our mediation in November.  I was even more optimistic
18   about settling in January when things blew up over a seven-day
19   paper period.  Again, I wish nothing more than to resolve
20   this.
21         THE COURT:  Okay.  Thank you.  Put on the back
22   burner medical necessity and anything related.
23         MS. MATESIC:  Well, Your Honor --
24         THE COURT:  What factual presentation do you want to
25   do on the other stuff?

1      MS. MATESIC:  I think given that Mr. Gustafson said

2   that they're still contesting the medical necessity, as well

3   as the fact that part of our -- part of the bad faith is that

4   there's zero evidence that this wasn't medically necessary

5   except, you know, ERISA requires medical necessity to be made

6   by a doctor.  So part of our -- you know, three and a half

7   years ago two doctors determined this was medically necessary,

8   and now here we are today and all of sudden they're willing to

9   pay the bills at the second scheduled trial.  That's part of

10  the bad faith they've done in this case through their delays

11  and denials.

12      THE COURT:  Sure.  Well, I was just trying to save

13  everyone time.

14      MS. MATESIC:  Yes.

15      THE COURT:  You still can do medical necessity, but

16  do it after lunch to see if you can get it resolved during

17  lunch on that issue.

18      MR. TYSON:  I was planning to call Eric first.  He

19  had some knowledge of Denise's condition, what would be a few

20  minutes, and Starmark people, and have the medical necessity

21  at the end.  We can go ahead and start with Mr. Kinsinger.

22      THE COURT:  That would be perfect.  Thank you.

23

24

25

1        ERIC KINSINGER, PLAINTIFFS' WITNESS, SWORN

2              DIRECT EXAMINATION

3  BY MS. MATESIC:

4  Q.   Can you state and spell your name for the record?

5  A.   Yes.  Eric Kinsinger.  E-r-i-c K-i-n-s-i-n-g-e-r.

6  Q.   And, Mr. Kinsinger, you're married?

7  A.   Yes, I am.

8  Q.   And is this your wife back here?

9  A.   Yes.

10  Q.   How long have you been married?

11  A.   Sixteen years.

12  Q.   And do you guys have children?

13  A.   Yes.  I have a daughter who's 24 and we have a stepson

14  who is also 24.

15  Q.   And what do you do for a living?

16  A.   I do computer networking design, access controls similar

17  to the badge that everybody has been using to get in and out

18  to the courtroom, and some AV design similar to the TV and

19  touch panels and everything in the courtroom.

20  Q.   And you used to work at SmartCore, correct?

21  A.   Yes.

22  Q.   When did you start working there?

23  A.   As I recall, it was either September or October 2014.

24         MS. MATESIC:  I apologize, Your Honor.  We had

25  discussed before that -- before testimony starting about

1  moving to just have all the exhibits admitted.  Did we still
2  want to do that, A through T?
3         THE COURT:  There's no objections to any of those,
4  right?
5         MR. GUSTAFSON:  There are not.
6         THE COURT:  And you don't need a foundation laid for
7  them since they're stipulated to.  So Exhibits A through?
8         MR. TYSON:  T, as in "Thomas."
9         THE COURT:  T are admitted and may be published.
10        And the stipulations, the Court is aware of the
11 stipulations.  The stipulations are before the Court.  They're
12 already in the record, so you can refer to the stipulations
13 whenever you want.  Since they are in the record, we don't
14 have to have any presentation to a jury.
15        (Plaintiffs' Exhibits A through T were received into
16 evidence.)
17        MS. MATESIC:  And would the Court like a copy of the
18 exhibits as well?
19        THE COURT:  Yeah.  Actually, I would.  Thank you.
20        MS. MATESIC:  Thank you.  Sorry for the delay.
21 Q.  So, Mr. Kinsinger, when did you start working at
22 SmartCore?
23 A.  It was September or October of 2014.  I can't remember
24 which exactly was my start date.
25 Q.  And who was your manager at SmartCore?

KINSINGER - DIRECT

1   A.   Matt Good.

2   Q.   Is that Defendant Good who is sitting right here?

3   A.   Yes.

4   Q.   And were there any other managers of SmartCore?

5   A.   Will Winn.

6   Q.   And that's Defendant Winn who is sitting here behind me?

7   A.   Yes.

8   Q.   How many -- or how many employees did SmartCore have?

9   A.   When I started I think there were between 10 and 15 of us

10  in our first smaller office before we moved to the larger

11  office.

12  Q.   Okay.  And then how many employees were there when you

13  left?

14  A.   When I -- what I recall, there was about 40 or 50.

15  Q.   Okay.  So that's a big growth in a short time period?

16  A.   Yes.

17  Q.   And did you -- did SmartCore offer health insurance?

18  A.   Yes.

19  Q.   And were you always a participant of it?

20  A.   Yes, as soon as it was available to me as an employee.

21  Q.   Okay.  And did you have your family insured through

22  SmartCore?

23  A.   Yes, I did.  Just myself and my stepson.

24  Q.   Okay.

25  A.   Since my daughter does not live locally here.

1  Q.    Okay.  And did you contribute to the premiums for your
2  health insurance?
3  A.    Yes.
4  Q.    Okay.  And I'm going to show you a document that's been
5  marked as Exhibit G on the screen.  Do you recognize this
6  document?
7  A.    Yes.  This is my paystub.  Payment date is Christmas Eve
8  2015.
9  Q.    Okay.  So what pay period is this paycheck from?
10 A.    This is from December 5th through December 18th, I think.
11 Q.    And that says what where I'm pointing to right there?
12 A.    Yes.  I think that's 16th or 18th.  I do need glasses, so
13 I can't tell if it's 18th.
14 Q.    I think it's the 18th --
15 A.    We'll go with the 18th.
16 Q.    -- that's on the screen.
17       Okay.  And then do you see where on that paycheck it
18 shows the withdrawals for your medical insurance?
19 A.    Yes.  Yeah, under deductions it says medical 125, the
20 495.59.
21 Q.    Okay.  So that's the 493 --
22 A.    Or 493.59.  Sorry about that.
23 Q.    That's okay.
24       And then in the column to the right, this 11,763.89, do
25 you know what that is?

KINSINGER - DIRECT

1  A.   That was my year to date of what I paid in for my
2  medical.
3  Q.   For 2015?
4  A.   Yes.
5  Q.   Okay.  And then I'm going to show you the next page.  Do
6  you recognize this document?
7  A.   Yes.  This is the next pay period of 2019 or 20/19 -- or
8  December 19, 2015 to January 1, 2016.
9  Q.   Okay.  And then the health insurance premiums were
10  similarly withheld from this one?
11  A.   Yes.
12  Q.   And what was the amount withheld from this two-week
13  paycheck?
14  A.   $767.87.
15  Q.   So that went up substantially in December of 2015?
16  A.   Yes.  There was a change in policy between the previous
17  one and this one.
18  Q.   Okay.  And then just to confirm this last page, I believe
19  the same paycheck dated for the period of January 2 through
20  the 15th; is that correct?
21  A.   That is correct.
22  Q.   Okay.  And then there's the similar --
23  A.   Similar amount.
24  Q.   -- withholding?
25  A.   Yes.

1   Q.    Okay.  767.87?

2   A.    Correct.

3   Q.    Okay.  And were you paid every two weeks?

4   A.    Yes, we were paid every two weeks.

5   Q.    And how were you paid?  By check or direct deposit?

6   A.    Direct deposit.

7   Q.    And then how were your paystubs?  Were they emailed to

8   you or did you have to access them from a computer system?

9   A.    We could access them online if we wanted to.  But my

10  paychecks were fairly standard, so I didn't really need to

11  look at them unless I wanted to grab them.

12  Q.    And you said that the amount that was withheld from your

13  premiums changed while you worked there?

14  A.    Yes.

15  Q.    When -- when did those -- those changed in December of

16  2015?

17  A.    Yes.  We had an open enrollment period, and we went from

18  the CIGNA health care to the Starmark care was my

19  understanding and the premiums went up.  Obviously, I needed

20  to have medical insurance.  That was one of the reasons why I

21  was there, obviously, other than to work for covering everyone

22  in my family.

23  Q.    And do you remember when they established the new plan if

24  they talked to you about what was in the plan?

25  A.    As I recall, there was Jennifer, who was the HR woman

1    that SmartCore had, she came in and gave a presentation on,

2    you know, the basics of the plan.  Other than that, that's all

3    I really recall.  I mean, we are going back three plus years

4    at this point.

5    Q.   It sounds like just like a normal staff meeting?

6    A.   It was a normal staff meeting.  I mean, it was, you know,

7    standard medical insurance.  You need it, you sign it, you do

8    your thing.

9    Q.   And so I'd like to turn now and talk about the medical

10   problems that Denise was having kind of in that same time in

11   the fall of 2015.  Do you remember those?

12   A.   Yes.

13   Q.   Okay.  What was happening to her?

14   A.   Denise had been having very difficult periods and she was

15   in substantial amounts of pain.  Her life between work and

16   home was difficult.  I mean, she would go to work.  She would

17   have difficult periods from just talking to her.  She'd

18   sometimes have to run out of the room during meetings,

19   embarrassing moments, having to wear black pants all the time.

20   It would be very difficult for her to function at work.  She

21   found a different doctor for her, Dr. Pillai, and started

22   going to see her to change some of the things with how her

23   periods were.

24   Q.   And did --

25   A.   But her life was just difficult.

1    Q.   And what about the pain levels?  What did you notice
2    about Denise?
3    A.   She was pretty much nonfunctional.  I mean, she would
4    come home, sit there with heating pads, the ThermaCare patches
5    on her, really not wanting to do anything at all.
6    Q.   Is that a normal behavior for Denise?
7    A.   Not at all.
8    Q.   What's your experience of her pain tolerance?
9    A.   Denise has a fairly high pain tolerance, and this was
10   very unusual for her.  She's not a person that normally
11   complains about pain and this was different.
12   Q.   And you said that Denise started treating with
13   Dr. Pillai.  Did you attend those?
14   A.   Yes, I attended all of those.
15   Q.   Why did you attend those appointments?
16   A.   Because something was obviously seriously wrong at this
17   point, and I was concerned for her well-being.
18   Q.   Okay.  And so what were Dr. Pillai's treatment
19   recommendations for Denise?
20   A.   As I recall, she changed her birth control, which we
21   tried at one point for a couple of months.  She did recommend
22   a couple other options, which were not really options for
23   Denise.  But she did recommend a hysterectomy, which seemed
24   like the best option for Denise because it would get rid of
25   her having difficult periods because there was no way for her

KINSINGER - DIRECT

1  to have her period anymore.

2  Q.   Okay.  And so is that the treatment that Dr. Pillai and

3  Denise chose?

4  A.   Yes.

5  Q.   And then before she had that surgery, you had to have it

6  pre-approved; is that correct?

7  A.   I didn't have to have it pre-approved.  Typically for any

8  surgery I would assume the doctor would be the one that

9  handled the pre-approval.

10  Q.   Showing what's been part of the administrative record

11  that's labeled as Exhibit A as a whole.  We have tabbed

12  A(iii), a portion of A(iii), and that's this letter.

13      Mr. Kinsinger, do you recognize this letter?

14  A.   Yes.

15  Q.   And what is this?

16  A.   This was the pre-approval letter that we received stating

17  that the outpatient procedure would be approved and those

18  procedure codes, which Dr. Pillai has told us were the codes

19  for her hysterectomy.

20  Q.   Okay.  And can you read for me the first -- or the first

21  line in the second paragraph?

22  A.   "Based on the information submitted we feel the patient

23  meets the criteria for this service.  The pre-authorization is

24  valid for 60 days."

25  Q.   What did it mean to you when you found out that the

KINSINGER - DIRECT

1   surgery was pre-approved?

2   A.   That everything would be covered.

3   Q.   Okay.  And this pre-approval letter is dated January 8,

4   2016; is that correct?

5   A.   Correct.

6   Q.   And that's the date that Denise had the hysterectomy

7   performed, correct?

8   A.   Yes.

9   Q.   And so you went to the hospital to have the surgery.  Can

10  you tell me a little bit about what happened?

11  A.   We had to be at the hospital early in the morning on the

12  8th.  Per part of the policy, there was $1,000 deductible that

13  we had to pay for for any surgeries.  We double-checked that

14  everything was approved that morning, paid our $1,000

15  deductible, and the hospital performed the surgery.

16  Obviously, if it wasn't approved the hospital wouldn't have

17  done the surgery.

18  Q.   And the surgery went well?  No complications?

19  A.   No complications.

20  Q.   Okay.  And how did Denise's condition improve?

21  A.   After her certain recovery period, she was 100 percent

22  better.  She was back to normal, willing to go out, do things,

23  live life.  No more running to the bathroom out of the

24  meetings, embarrassing moments or anything like that.

25  Q.   Okay.  So Denise starts working on recovering from

1    surgery.  I assume you went back to work?

2    A.    Yes.

3    Q.    So this is January 2016.  When did you first realize

4    there was a problem with the health insurance?

5    A.    We got a call from a different doctor that our insurance

6    was not covered or we no longer had insurance.  The doctor

7    called us and said we'd have to pay for the appointment out of

8    pocket because for some reason our insurance wasn't going

9    through.

10   Q.    And that was an appointment -- do you remember when

11   around that appointment was?

12   A.    Middle of February.  I don't remember if it was the

13   13th, 14th or 15th.

14   Q.    Okay.

15   A.    Sometime around then.

16   Q.    And so -- and that's not -- you paid that bill, and

17   that's not something we're here to discuss today, correct?

18   A.    No.

19   Q.    Okay.  So what did you do next?  You realized there was

20   an issue going on and that your insurance had been -- the

21   doctor's office was not accepting your insurance in

22   mid-February.

23   A.    So I sent an email to Will questioning what was going on

24   at that point.

25   Q.    And this is the second page of Exhibit I, Exhibit 502.

KINSINGER - DIRECT

1  Is this the email that you sent?

2  A.    Yes.

3  Q.    And what was Will's response?

4  A.    Will said to come see him, which is on the next page of

5  the email.

6  Q.    This is actually the first page.

7  A.    Or the first page of the email.  Just the way email

8  works, usually replies are the first page.  Said come see me.

9  He was trying to get everything worked out, and he apologized

10  for the lack of transparency.

11  Q.    But you understood at that time that Mr. Winn was

12  responsible or was accepting responsibility?

13  A.    I didn't know exactly who was responsible, but I knew

14  that SmartCore or Will and Matt were trying to get everything

15  worked out with the medical benefits.

16  Q.    Okay.  And then do you remember what happened next?

17  A.    A few days later Jennifer sent an email out to the entire

18  company and that the medical insurance was canceled and to

19  notify everybody that was in the field and the letter from

20  Starmark saying it was canceled.

21  Q.    And this is Exhibit J.  Is this that email that you

22  received from Jennifer?

23  A.    Yes.

24  Q.    Okay.  And this says, "Many of you have asked about

25  receiving notification of cancellation so you can sign up on

1    other insurance."

2        Is that what you understood the purpose of that email to

3    be?

4    A.    Correct.

5    Q.    So it would allow employees to get different insurance?

6    A.    Um-hum.  Yes.

7    Q.    And then is this letter dated February 19th, is this the

8    attachment that was with that email?

9    A.    Yes, that was the attachment.

10   Q.    Okay.  And do you remember what your reaction was to this

11   letter?

12   A.    I mean, I was fairly angry.  I know other people in the

13   company were very upset too, because everybody was concerned

14   that, you know, SmartCore hadn't paid the bill.

15   Q.    Okay.  And this letter is signed by SmartCore leadership.

16   Who did you believe that was when you saw that?

17   A.    Will and Matt.

18   Q.    So Will and Matt, those were the only two leaders of

19   SmartCore?

20   A.    Yes.

21   Q.    Okay.  Then shortly -- this is February 19th.  You

22   resigned from SmartCore shortly after that, correct?

23   A.    Yes.  I knew at this point this was not a good sign.  I

24   needed to get out.  I saw the beginning at the end, and I

25   needed to find another job.

1  Q.   So you found a new job at a different company?

2  A.   Yes.

3  Q.   Okay.  What communications did you receive then, if any?

4  A.   There was some other communications that we received from

5  SmartCore that they were going to cover everything from

6  January 1st to this cancellation notice.

7  Q.   Okay.  Is this that communication?  This is what's been

8  labeled as Exhibit K.

9  A.   Yes.

10 Q.   And this first paragraph -- or the second paragraph under

11 the second heading where it says, "SmartCore intends to pay

12 for any medical expense or benefit covered under the medical

13 plan for which the services were provided between January 1,

14 2016 and February 29, 2016."  That's what you were talking

15 about a minute ago when you said they promised to pay?

16 A.   Sure.

17 Q.   When you read this did you feel like, okay, maybe --

18 A.   I figured, okay, you know, surgery still would be covered

19 because I had the approval letter.  We should be in good

20 shape.  I did my part.  I paid my medical benefits -- or out

21 of my check.  You know, I did everything on my part as an

22 employee.  I figured we were good to go.

23 Q.   Okay.  And did you -- do you remember when you received

24 this?  This letter is undated.

25 A.   It was sometime near the end of February.

1  Q.   So shortly after you left SmartCore?

2  A.   Yes.   I know it was mailed to me.

3  Q.   Yeah.   I think is this first page of the exhibit that's

4  the envelope copy that -- or the cover page?

5  A.   Yes.

6  Q.   Okay.   And what communication did you receive after that?

7  A.   Sometime after this I received another letter from

8  SmartCore that they wanted some different information, and it

9  just didn't make any sense.

10 Q.   Okay.   Is that this letter as part of the administrative

11 record, but it's noted as A(vii)?   Is this that letter, this

12 March 31st?

13 A.   Correct.

14 Q.   Okay.   And this letter says that they, in the first

15 paragraph, that they're still evaluating your claim for

16 benefits; is that correct?

17 A.   Correct.

18 Q.   Okay.

19 A.   And it doesn't even have the correct date on it.

20 Q.   What do you mean?   Oh, because of the date of the surgery

21 isn't correct?

22 A.   The date of the surgery was January 8.   So it just seemed

23 very odd.   And I, at this point, I didn't know what to do.

24 Q.   Okay.

25 A.   But it's confusing.

1  Q.   Okay.  So what did you do next?

2  A.   At this point I reached out to you guys and tried to find

3  out what we needed to do because it just -- things didn't make

4  sense.

5  Q.   Okay.  Were you starting to feel worried that things

6  weren't going to be resolved?

7  A.   I was very worried things weren't going to be covered and

8  just didn't know.

9  Q.   Do you remember what happened next?

10  A.   Not entirely.  I was on another job.  Kind of figured,

11  you know, between the previous letter and this one some things

12  would get worked out, but there were concerns.

13  Q.   Okay.  And before we move on, this March 31st letter is

14  signed for like this (indicating).  Did you recognize that

15  signature?

16  A.   I made the assumption that was Will because I know Matt's

17  signature, but it appears as though it's Will's signature.

18  Q.   Okay.  Okay.  So then after you got this letter, you went

19  and met with an attorney at our office.

20       Do you remember requesting a copy of the claim file?

21  A.   Yes.

22  Q.   Okay.  So is this -- do you remember seeing this letter?

23  This is part of the administrative record marked A(viii).

24  A.   Yes.

25  Q.   Okay.  And is this that request for the claim file?

KINSINGER - DIRECT

1   A.   Yes, it is.

2   Q.   And this was signed for by -- is that Brian Tyson,

3   correct?

4   A.   Yes.

5   Q.   But you had seen a copy of that.  You know about it?

6   A.   Yes, I have.

7   Q.   Do you know if Mr. Winn or Mr. Good ever responded to

8   that letter?

9   A.   Not that I know of.

10  Q.   Okay.  And so at that point did the hospital start --

11  when did the hospital start trying to collect the money from

12  you?

13  A.   It was soon after this we got a bill, we got a bill from

14  the hospital or right before this we got a bill from the

15  hospital for a substantial amount of money, which was

16  shocking.

17  Q.   Do you remember what the approximate amount of that bill

18  was?

19  A.   It was close to $40,000.  It might have even been more

20  than that.  But it was very shocking that I owed that based

21  upon the information of how SmartCore was going to handle

22  things.  So I was just a little surprised.

23  Q.   And the hospital eventually filed suit against you for

24  that bill, correct?

25  A.   Yes.

1   Q.   And to the best of your knowledge, that suit is still

2   outstanding?

3   A.   Very outstanding.  Has not been good for our credit

4   report.

5            MS. MATESIC:  I think that's all the questions that

6   I have, Your Honor.

7            THE COURT:  Let's start with Mr. Spengler.

8            MR. SPENGLER:  I'll defer to Mr. Gustafson.

9            THE COURT:  Mr. Good, do you have any questions?

10           MR. GOOD:  I'd like to defer to Mr. Gustafson to go

11  first, but I'd like to reserve the right to add anything after

12  his examination.

13           THE COURT:  That would be fine.

14                       CROSS-EXAMINATION

15  BY MR. GUSTAFSON:

16  Q.   Mr. Kinsinger, my name is Marc Gustafson, and I represent

17  Will Winn today.

18       I want to refer you back to Exhibit G that you have there

19  in front of you.

20  A.   Okay.

21  Q.   And you said the first page of this, which is Kinsinger

22  23.  Do you see that Bates number in the bottom right corner

23  of that?

24  A.   I actually don't see it.  If one of you could put it up,

25  that would be great.

1    MS. MATESIC:  Is that the paychecks?

2    MR. GUSTAFSON:  Yes.  I thought you had a copy.

3    Q.   You testified, I think, earlier -- I'm referring to the

4    medical 125 line -- that 493.59, that's from a prior health

5    care plan, correct?

6    A.   Yes.  I think that was from a Cigna plan.

7    Q.   And the total in that year to date column of 11,763.89 is

8    part of that Cigna plan; is that correct?

9    A.   Yes.

10   Q.   And so am I correct in saying that the next two stubs

11   that show the 767.87 payment and the second one showing year

12   to date of 15,035.74 is all you paid on this group health care

13   plan; is that correct?

14   A.   Yes.

15   Q.   That Starmark plan; is that correct?

16   A.   That is correct.

17   Q.   And you didn't pay any more under that plan because you

18   resigned; is that correct?

19   A.   That is correct.

20   Q.   You said -- you testified earlier, I believe, that it was

21   about December when that new plan started; is that correct?

22   A.   Yes.  I think it kicked in sometime in the middle of

23   December.  Or I don't remember if it was December 15th that it

24   started or if it was January 1 start.

25   Q.   And you said you participated in open enrollment; is that

1  correct?

2  A.   Yes.  Typically, you know, they have the company meeting,

3  everybody comes in, sits down.  And I just signed up because I

4  needed to sign up.

5  Q.   And when you signed up, were you given anything?

6  A.   Possibly.  It was more sign up.  I was more concerned

7  about sign up, how much is it.

8  Q.   Do you remember if you were given a copy of the health

9  care plan at that time?

10  A.   I don't remember.

11  Q.   Okay.  But you could have been given one then?

12  A.   Possibly.

13  Q.   I have to flip exhibits.  If you'll just bear with me.

14       And you testified earlier that you -- let's do it this

15  way.

16       MR. GUSTAFSON:  Ms. Clerk, what do I need to get to

17  have it show for everyone?

18       THE COURT:  You're talking about the courtroom

19  screen?

20       MR. GUSTAFSON:  Yes, sir.

21       THE COURT:  Yeah.

22       MR. GUSTAFSON:  I'm not like Ms. Matesic on this

23  technology.

24  Q.   So you testified earlier that you attended the

25  appointments with Dr. Pillai; is that correct?

KINSINGER - CROSS

1  A.  Yes.

2  Q.  And I'm showing you what's marked as Exhibit A, A(ii).

3  And I've highlighted a portion there.  What does that -- are

4  those different treatment options?  You said that Dr. Pillai

5  discussed different treatment options with your wife.  Are

6  those the different treatment options?

7  A.  Yes.  Yes.  But she also did say hysterectomy is what she

8  recommended.

9  Q.  So she discussed Motrin?  Do you know what Motrin is?

10 A.  Yes.  But Motrin was not anything that would work for

11 what she was dealing with for pain.  She did say that the

12 ablation would not work.  It would only come back in a short

13 period of time.  She said a hysterectomy would be the only

14 thing that would solve all of her problems.

15 Q.  And the Mirena IUD, do you know what that is?

16 A.  Never heard of that particular product, but I am aware of

17 what an IUD is.

18 Q.  What's an IUD?

19 A.  It's an intrauterine device.  But then, again, I'm not a

20 medical doctor.  So --

21     I didn't know what the product is, but that was not

22 another product that she said would work.

23 Q.  And then -- who said would work?

24 A.  Dr. Pillai.

25 Q.  And Depo-Provera, do you know what that is?

KINSINGER - CROSS

1  A.   Yes.  It's a shot and it has some serious side effects

2  from what I heard.

3  Q.   It's a birth control shot; is that correct?

4  A.   Yes.

5  Q.   And all of these things were discussed as treatment

6  options for your wife with Dr. Pillai; is that correct?

7  A.   According to this, yes.  But, once again, she said

8  hysterectomy is what would be the best course of action and

9  what she recommended.

10  Q.   I'm going to show you another page from that same

11  exhibit.

12      And there were multiple meetings with Dr. Pillai; is that

13  correct?

14  A.   Yes.

15  Q.   And here's another.  If you look at the highlighted

16  section it says, Discussed Depo-Provera, which is again is the

17  birth control shot.  Mirena, and that's Mirena IUD, and the

18  ablation, and the hysterectomy.  And the doctor gave your wife

19  the packet information on all of those --

20  A.   Okay.

21  Q.   -- is that correct?

22  A.   Yes.

23  Q.   Do you remember that conversation?

24  A.   We're going back four years.  But, once again, I mean,

25  she did say that the hysterectomy was the best course of

1  action.

2  Q.   This is the final report and this is the last visit.  I

3  think that date is January 6.

4       Do you remember going to meet with Dr. Pillai with your

5  wife on January 6th?

6  A.   Yes.  That was her pre-surgical appointment.

7  Q.   And it says "Declined Mirena IUD."  Who would be the

8  person that declined that?

9  A.   Obviously, that wouldn't be me.  That would be my wife.

10 Q.   And Mirena IUD is one that releases hormones.  Do you

11 remember discussion about that?

12 A.   I don't remember that discussion but --

13 Q.   And the next part is where it's talking about ablation

14 where you said wouldn't work.  That's what Dr. Pillai said?

15 A.   Correct.

16 Q.   But your wife declined the Mirena IUD, correct?

17 A.   Correct.

18 Q.   I'm not going to -- go to what was called the

19 pre-approval letter.  I'll show that to you.  That's Exhibit

20 A(iii).  The part that Ms. Matesic focused on with you was the

21 second paragraph there.  I'm going to focus you on the third

22 paragraph and in particular the first sentence where it says,

23 "This letter is not a guarantee of benefits.  It's based on

24 the patient's eligibility at the time the services is

25 rendered."  Do you see that there?

KINSINGER - CROSS

1  A.   Yes.

2  Q.   What did that mean to you?

3  A.   Well, according to the letter, the second paragraph says,

4  "We feel patient meets the criteria for this service.  The

5  pre-authorization is valid for 60 days."

6       Yes, the letter does say there's no guarantee of

7  benefits, but it also says I have to wear a seat belt when I

8  get in my car.  So it's just something -- I mean, we did

9  double-check that morning of the surgery, paid our $1,000.

10  So, obviously, CMS and the doctor would not have performed the

11  surgery if it wasn't approved.

12  Q.   Make sure.  Those are two separate processes, correct?

13  Whether it's approved and whether Carolina Health Care

14  provides the services are two separate processes, correct?

15  A.   Yes.  I do also understand that we wouldn't be sitting

16  here today if the medical insurance was paid for.

17  Q.   You testified earlier, I think, that you went to see

18  another doctor, and that doctor said that you were no longer

19  covered under your health insurance plan, correct?

20  A.   Correct.

21  Q.   Did you tell anyone about that conversation?

22  A.   Not that -- other than Will saying -- other than the

23  email to Will.

24  Q.   Did you talk to any of your coworkers about your wife's

25  treatment?

1 A.   Not that I recall, other than she was having surgery and
2 I needed a day off for it to take care of her.  And SmartCore
3 never had a problem with me taking care of family.
4 Q.   Who's -- who's Deborah Good?
5 A.   Matt's wife.
6 Q.   And does she work at SmartCore?
7 A.   Yes.
8 Q.   Did you talk to her about your wife's treatment?
9 A.   Not that I really recall.
10 Q.   Did you ever tell Ms. Good that Starmark was denying
11 coverage for that procedure?
12 A.   Not that I recall.  I mean, I had the approval letter.
13 Q.   Do you recall telling Ms. Good that you planned with the
14 procedure, even though you know it wouldn't be covered by
15 SmartCore's insurance policy?
16 A.   No.
17 Q.   Do you remember telling your wife -- or do you remember
18 telling Ms. Good that your wife was, quote, "getting a
19 hysterectomy so she wouldn't be so bitchy every month"?
20 A.   You know, there's -- I might have said something that to
21 coworkers because she was in a lot of pain and she was
22 probably irritable, but I don't recall the conversation.  I
23 mean, I don't think you recall every conversation you've had
24 for the last four years.
25 Q.   But you would have had conversations, and you're not

1  denying that one happened?

2  A.   I might have said that, but I can't recall.  But she did

3  need a hysterectomy, according to Dr. Pillai.

4  Q.   And who is Jared Crook?

5  A.   Jared was the gentlemen that was excused earlier.  He was

6  one of my coworkers.

7  Q.   What was his job at SmartCore?

8  A.   He was in charge of purchasing.

9  Q.   Did you ever talk to him about your wife's treatment?

10  A.   Not that I recall.

11  Q.   Did you ever tell Mr. Crook that the hysterectomy

12  procedure would not be covered by SmartCore's health insurance

13  plan?

14  A.   Not that I recall.

15  Q.   Do you recall receiving a call from Starmark telling you

16  it was not approved?

17  A.   No.

18  Q.   Do you remember telling Mr. Crook that you would pay out

19  of pocket for the procedure anyway?

20  A.   No.

21  Q.   I'm going to refer you to Exhibit I.  It was the second

22  page Ms. Matesic turned your attention to.  I'm going to ask

23  you just generally what was your purpose in sending this to --

24  did you testify you sent this to Mr. Winn; is that correct?

25  A.   Yes.

KINSINGER - CROSS

1  Q.   And what was the purpose in sending this to him?

2  A.   To find out what was going on with the medical insurance

3  because I was told that we don't have medical insurance.

4  Q.   So at the time you sent this you didn't think that you

5  had medical insurance; is that correct?

6  A.   Correct.  But I found that out from an outside party, not

7  my employer.

8  Q.   And before I take that down, that's dated February 15th;

9  is that correct?

10  A.   Correct.  I know it's dated the 15th.  I know it's dated

11  that.  Even though it's fuzzy, I will agree with you it's

12  dated the 15th.

13  Q.   I appreciate that.

14       I'm going to turn your attention now to Exhibit J, which

15  is the letter from SmartCore leadership.  And this is dated

16  February 19th.  The subject of that is "Cancellation of

17  Medical Insurance Policy."

18       Did you understand that as of February 19th your policy

19  -- your insurance policy had been canceled?

20  A.   Yes, of February 19th it was.

21  Q.   And what did that mean for the payment on your wife's

22  hysterectomy procedure?

23  A.   Well, it should have been covered.

24  Q.   But if it's canceled, does it mean it's covered?

25  A.   Well, if it was canceled on the 19th and the surgery was

1  the 8th, it seems as though it should have been covered.  And

2  it states this was canceled for nonpayment.  So what happened

3  to the money?

4  Q.   I missed that last part.

5  A.   What happened to the money coming out of my check?

6  Q.   But you understood cancellation of the insurance policy,

7  claims would not be paid according to the policy, correct?

8  A.   According to this letter, I don't understand it

9  completely because I had an authorization letter saying it was

10 authorized.

11 Q.   And that's dated February 19th of 2016, correct?

12 A.   Correct.

13 Q.   You testified that towards the end of February 2016 that

14 the company was reaching the beginning of the end.  What did

15 you mean by that?

16 A.   The company was not able to purchase products from its

17 suppliers due to some financial difficulties.  We were on

18 credit hold, which means that suppliers were not allowing us

19 to purchase anything.

20 Q.   When did you first become aware that SmartCore was

21 reaching the end?

22 A.   Right around the middle of February.

23 Q.   What did you know about its financial statement before

24 then?

25 A.   There were some odd choices that the company had made

KINSINGER - CROSS

1    with personnel.

2    Q.    What do you mean by that?

3    A.    They hired some gentlemen from the company Adams

4    Electric, which was their largest customer at the time, and it

5    created some financial strain on the company.

6    Q.    And when was that?

7    A.    I think they started in the beginning of January.   I

8    can't remember if it was beginning of January or the middle of

9    January.

10   Q.    So at that point you knew that there was financial

11   problems they had or had some sense there were some financial

12   problems for the company?

13   A.    The outlook when they hired him was good, but it created

14   some other financial issues.

15   Q.    I'm sorry?

16   A.    That's --

17   Q.    I'm sorry?

18   A.    That spiraled into February.

19   Q.    And did you learn about that before or after your wife's

20   procedure?

21   A.    After.

22   Q.    I'm going to refer you to Exhibit K, and Ms. Matesic

23   discussed this document with you as well.   And this letter you

24   said was sent from Mr. Winn.   Or at least you thought that was

25   his signature; is that right?

KINSINGER - CROSS

1    A.    Yes, I think that's Will's signature.

2    Q.    It says in the third paragraph, that one sentence, "A

3    copy of the summary plan description is included with this

4    letter."

5    A.    Did not include in that letter.  That's all that was with

6    that letter.

7    Q.    So your testimony is there wasn't a plan included with

8    that?

9    A.    No.

10   Q.    And how do you know that?

11   A.    That was the only thing that came in that letter was that

12   and the other page that was with that letter.

13   Q.    Did you follow up with anyone at SmartCore to say, Hey,

14   this letter references a copy of a document that's not

15   included in the letter?

16   A.    Not that I recall.

17   Q.    You said that the hospital is trying to collect on this

18   amount.  What is the last time you spoke with someone from the

19   hospital?

20   A.    I have not spoken with the hospital.  Due to it becoming

21   a legal case, I have let the attorneys help us out with that.

22   Q.    Have you -- when -- have you ever made a payment to the

23   hospital on this procedure?

24   A.    No, because it should have been covered.

25   Q.    Did you originally sue Starmark in this case?

KINSINGER - CROSS

1          MS. MATESIC:  Objection.  Relevance.
2          MR. TYSON:  I'll object, Your Honor.  I'm not sure
3    how this is relevant.  Not a party in this case and none of
4    the issues outlined in our pretrial order have to do with
5    Starmark.
6          THE COURT:  Where are you heading?
7          MR. GUSTAFSON:  Sure.  The issue is what's been paid
8    on the plan and whether he settled with Starmark and whether
9    that money has been paid to the bill.
10         THE COURT:  But why -- why is that relevant?
11         MR. GUSTAFSON:  Well, I think if they paid him money
12   and it hasn't been paid to the health care bill and it's in
13   settlement of this matter, we're now trying to hold my client
14   on the hook for it.
15         THE COURT:  So you're saying Starmark paid the
16   plaintiff?
17         MR. GUSTAFSON:  That's what I'm trying to find out.
18         THE COURT:  Why don't you just ask him that
19   question.
20         MR. GUSTAFSON:  Sure.
21   Q.   Did you settle with Starmark?
22         MR. TYSON:  Again, we'll object, Your Honor, based
23   on settlement negotiations.
24         THE COURT:  Yeah, I don't want to get into
25   settlement.

KINSINGER - CROSS

1          Did Starmark ever pay you anything?

2          THE WITNESS:  Yes, sir.

3          THE COURT:  Does that lead to settlement?  I'm

4     asking.

5          MR. GUSTAFSON:  I'm trying.

6          THE COURT:  Did that lead to settlement discussions?

7          MR. GUSTAFSON:  I will not go there, Your Honor.  If

8     I get near where you think it's offensive, then that's not

9     going to be my next question.

10          MS. MATESIC:  It was actually Mr. Gustafson was not

11     there at the time.  It was actually part of a joint offer.

12     But, nonetheless, we settled with Starmark.  We had various

13     claims and various theories that are unrelated to the theory

14     that the plan says that SmartCore, Winn and Good, are supposed

15     to pay that surgery.

16          THE COURT:  Right.

17          MS. MATESIC:  And I would also note that all of the

18     defendants also had a case against Starmark and they dismissed

19     them from the lawsuit.  So I'm really not sure how or what the

20     exact details of what that settlement was with Starmark.  I

21     don't think they're relevant to whether or not the defendants

22     are responsible under the plain language of the plan.

23          THE COURT:  And I agree.  I don't see how it's

24     relevant to the defendants' responsibility.

25          MR. GUSTAFSON:  I -- I -- he said he got money from

1  Starmark and that money hasn't been applied to this.  That's
2  the only --
3          THE COURT:  But it's part of a settlement that has a
4  lot of other elements to it, I presume.  It's not really
5  relevant to obligations of the defendant.  How does the
6  defendant benefit from a third party resolving disputes
7  against that third party?
8          MR. GUSTAFSON:  I mean, the claim is for unpayment
9  of benefits.  And if he got money for not paying the benefits
10 and now he's trying to recover on the benefits, I mean, I
11 think it is relevant.  But I've made the point.  It's a bench
12 trial.  You -- you --
13         THE COURT:  I mean, I understand what you're saying,
14 but -- but there's -- I can't presume anything that's not in
15 the record.  It seems logical to me there's more to it than
16 just a check.  And we'd have to suddenly open up a review of
17 those documents and they would probably have to be in camera,
18 maybe.  I'm not sure.
19         MR. GUSTAFSON:  I don't even want to go that far,
20 Your Honor.
21         THE COURT:  Yeah.
22         MR. GUSTAFSON:  As far as I want to go is to say
23 that, you know, without -- knowing there's a settlement and
24 Starmark has paid money, Mr. Winn still went down there and
25 paid the full bill.  That's my point I'm trying to make here.

1          THE COURT:  All right.  What I'll do, because it is

2     a bench trial, I'll -- I'll allow -- I'll allow a little bit

3     of examination in this area, but it's because a bench trial I

4     have the ability to determine what's relevant and what's not

5     relevant, which in the case of the jury they're not supposed

6     to make that determination.

7          MR. GUSTAFSON:  And that's about as far as I'll go.

8          THE COURT:  Go ahead and ask your questions.

9          MR. GUSTAFSON:  Yeah.

10    BY MR. GUSTAFSON:

11    Q.   Sir, you testified that Starmark paid you something in

12    settlement.  Don't tell me how much or what the terms were.

13    That is correct?

14    A.   Right.

15    Q.   And you didn't pay any of those funds towards your health

16    care bills?

17          MS. MATESIC:  I'm going to just object also to the

18    extent that any of his questioning calls for attorney-client

19    communications or asks -- you don't need to disclose anything

20    that we've discussed between the two of us.

21          THE COURT:  Right.

22          MR. GUSTAFSON:  You can answer.

23          THE WITNESS:  At this point, I don't know exactly

24    where everything is.

25    Q.   What do you mean by that?

KINSINGER - CROSS

1  A.   I don't know where -- where all the funds -- where all

2  the financial aspects of that are.

3  Q.   Do you have the money?

4  A.   I do not.

5  Q.   I'm sorry.  I can't --

6  A.   I currently do not.

7  Q.   You do not.  Okay.

8       But as best you know, none of that money has been paid to

9  Carolina Health Care for this procedure; is that correct?

10 A.   Best that I know, I do not.

11 Q.   I'm sorry?

12 A.   I do not.

13 Q.   Thank you.

14          THE COURT:  Can you lean closer to the microphone?

15          THE WITNESS:  Sure.

16          MR. GUSTAFSON:  I'm not trying to be -- I just

17 honestly can't hear you.

18          THE WITNESS:  No problem.

19 Q.   If you can't hear me, let me know that.

20 A.   Okay.

21 Q.   I mumble.  My mom will tell you.  If I mumble and you

22 can't understand me, just tell me.  I won't be offended.

23      One of your claims in this case, Mr. Kinsinger, is that

24 you requested health care benefit plan documents; is that

25 correct?

KINSINGER - CROSS

1  A.    Yes.

2  Q.    And we talked about that.  In June, it's a June 3rd

3  letter where you made that request?

4  A.    Yes.

5  Q.    And you were represented by counsel at that time; is that

6  correct?

7  A.    Yes.

8  Q.    And your claim is that you hadn't received those plan

9  documents; is that right?

10 A.    No.

11 Q.    So you hadn't received them?

12 A.    Not that I'm aware of.

13 Q.    And if you would have received them, what would you have

14 done with them?

15 A.    I can't answer that question.  There's more information

16 that I would need to know.

17 Q.    There's more information that you would need to know?

18 A.    Yes.

19 Q.    Would you -- would you -- would you read them?

20 A.    Oh, I would have definitely read them.

21 Q.    But you don't know what you would have done with them?

22 A.    I would have read the documents.  But, once again, we

23 shouldn't be sitting here today because SmartCore took the

24 money out of my check and never paid the bill, which was

25 canceled, and I have an approval letter.

KINSINGER - REDIRECT

1  Q.   And you -- do you know the current balance?  I know you
2  said you were shocked when you got a bill for $40,000.  Do you
3  know what the present balance is?
4  A.   Last I've heard, it's somewhere 19,000-ish range.  I'm
5  not exactly sure the true dollar amount.
6          MR. GUSTAFSON:  That's all I have at this time, Your
7  Honor.  Thank you.
8          Thank you, Mr. Kinsinger.
9          THE WITNESS:  Thank you.
10         THE COURT:  We'll come back.  Well, we've gone --
11 I'm sorry.
12         MR. GOOD:  I'll like to ask one question.
13         Mr. Good, questions?
14                    CROSS-EXAMINATION
15 BY MR. GOOD:
16 Q.   Mr. Kinsinger, at any point do you recall in early 2016
17 making a comment to me directly about the reason why your wife
18 was going to have a procedure?
19 A.   No.
20         MR. GOOD:  Thank you.
21         MR. SPENGLER:  No.
22         THE COURT:  Redirect?
23                  REDIRECT EXAMINATION
24 BY MS. MATESIC:
25 Q.   Eric, Mr. Gustafson asked you about your paychecks and

1  that this last one was dated through pay period January 15,
2  2016; is that correct?
3  A.   Yes.
4  Q.   And you worked you stated until mid to late February; is
5  that correct?
6  A.   Correct.
7  Q.   But this paycheck dated January 22nd, that's the last one
8  you ever received from SmartCore; is that correct?
9  A.   As I recall.
10 Q.   So the reason that they didn't withhold additional
11 premiums was because you weren't being paid after that point
12 period?
13 A.   Correct.
14 Q.   Okay.  With respect to the February 15th email,
15 Mr. Gustafson was asking you about that a little bit.  That's
16 the Exhibit I, I believe.
17      You -- the last paragraph, the first sentence, you say,
18 "We, the employees, of SmartCore need to know when this is
19 going to be fixed."
20      So did you write that you understood you wanted them to
21 fix the situation, right?
22 A.   Yes.  I mean, I wrote it more as me but -- I mean, they
23 weren't very transparent to everybody.  So I wrote it as
24 myself, but I was kind of speaking for everybody at the time
25 too.

KINSINGER - REDIRECT

1  Q.   So you knew the doctor's office was saying your insurance

2  isn't going through, but that shouldn't interfere with the

3  insurance you had on January 8th, right?

4  A.   Correct.

5  Q.   And by "this," you wanted Matt and Will to do something

6  and fix it?

7  A.   Yes.

8  Q.   And then with respect to the conversations Mr. Gustafson

9  was asking you about with coworkers.  You had testified

10 earlier that you went to Denise's appointments with

11 Dr. Pillai; is that correct?

12 A.   Yes.

13 Q.   And you and Denise have been married for 16 years?

14 A.   Correct.

15 Q.   And did you normally go to all of her gynecologist

16 appointments with her?

17 A.   Usually I don't think I would appear at all of her

18 gynecologist appointments.  It's not the most comfortable

19 appointment in the room to be in, but this was a serious

20 enough appointment with everything that was going on.

21 Q.   So you knew this was a serious medical condition going on

22 with Denise?

23 A.   Yes.  And SmartCore's policy was always take care of

24 family first.

25 Q.   And you were -- I'm sure you were concerned when Denise

KINSINGER - REDIRECT

1 had surgery about her well-being?

2 A.   Of course.

3 Q.   So, I mean, even though there might have been jokes, this

4 was a serious matter?

5 A.   Yes.

6 Q.   And then, finally, do you recall -- and this is Exhibit

7 A(ix), part of the administrative record.  Is this your

8 signature here?

9 A.   Yes.

10 Q.   Do you remember this letter?

11 A.   Yes, I do.

12 Q.   Okay.  And what's this letter?

13 A.   This is a letter to request all of the documents.

14 Q.   For the health care plan?

15 A.   Yes.

16 Q.   Okay.  And you signed this letter on or around June 3rd,

17 2016?

18 A.   Yes, I did.

19 Q.   Okay.  And this letter was sent to request a copy of the

20 plan from Matt and Will?

21 A.   Correct.

22 Q.   And this letter, June 3rd, 2016, was after you had

23 received that March 31st letter from them, correct?

24 A.   Correct.

25 Q.   And did they ever give you any documents in response to

KINSINGER - REDIRECT

1  that letter?

2  A.   Not that I'm aware of.

3         MS. MATESIC:  I think that's everything that we

4  have.

5         THE COURT:  Recross?

6                FURTHER RECROSS EXAMINATION

7  BY MR. GUSTAFSON:

8  Q.   I'm just going to point you there to that final paragraph

9  where you said, "We, the employees of SmartCore, need to know

10  when this is going to be fixed, when the lines of

11  communications are going to be open again and when as a

12  company we can purchase the supplies again."

13        You weren't talking about fixing the health care.  This

14  was talking about purchasing supplies and credit holds; is

15  that correct?

16  A.   Yes.

17  Q.   Thank you.  That's all I've got.

18         MR. GUSTAFSON:  Thank you, Your Honor.  Thank you,

19  Mr. Kinsinger.

20         THE COURT:  Any other questions from the other

21  defendants?

22         MR. SPENGLER:  No, sir.

23         MR. GOOD:  No, sir.

24         THE COURT:  Any re-redirect?

25                FURTHER REDIRECT EXAMINATION

1  BY MS. MATESIC:

2  Q.  I guess just to clarify.  Part of what you were asking

3  when you said "when is this going to be fixed," that was the

4  issues with the company, but also the issues with the health

5  insurance or just the issues with the credit holds?

6  A.  More with the health insurance because that was more of

7  my main concern at that point.

8          MS. MATESIC:  That's it, Your Honor.  Thank you.

9          MR. GUSTAFSON:  Nothing more, Your Honor.

10          THE COURT:  All right.  Mr. Kinsinger, you may step

11  down.  Thank you.

12          THE WITNESS:  Thank you.

13          MS. MATESIC:  At this time, Your Honor, I'd like to

14  play two video depositions from the Starmark employees.

15          THE COURT:  Okay.

16          MS. MATESIC:  I believe the first one --

17          MR. GUSTAFSON:  And, Your Honor, might I request a

18  brief recess before we get into that?

19          THE COURT:  All right.  Because we had a long break,

20  let's have a short recess of five minutes.  Is that enough?

21  Okay.  And we'll -- then we'll restart and we'll see the

22  videos.

23          MS. MATESIC:  Thank you, Your Honor.

24          (The proceedings were recessed at 11:30 a.m. and

25  reconvened at 11:36 .)

1          THE COURT:  Before we see the videos and start

2     running the chess clock, I've been thinking over this issue of

3     resolving medical necessity and medical fees.

4          Did the plaintiffs -- plaintiffs want some comfort,

5     particularly trying to prevent a rush to bankruptcy.  If we

6     put in two provisions in the consent judgment that, one,

7     defendants -- all defendants would agree to a motion to -- a

8     consent motion to withdraw the referral, that would be one

9     provision.  And then another provision would say the

10    undersigned judge -- since it's a consent judgment, I'd be

11    signing it -- the undersigned judge agrees to accept this case

12    because it's a related case and then it would -- so when the

13    referral was withdrawn, it would be assigned directly to me.

14    So those would be the two provisions.

15         Would those two provisions resolve the medical

16    necessity and medical fees issues?

17         MR. TYSON:  I think that would help provide comfort.

18    We would still want the consent judgment, though, on liability

19    or some ongoing indemnification because we still have the

20    pending lawsuit in South Carolina --

21         THE COURT:  Right.

22         MS. MATESIC:  -- we need to resolve against those

23    claims.

24         THE COURT:  What about that requirement?

25         MR. GUSTAFSON:  I don't -- I don't think there's a

1  problem with that.  Let me make sure -- if I can translate?

2          THE COURT:  Right.

3          MR. GUSTAFSON:  So what the judge -- tell me if I'm

4  wrong -- enters a consent judgment that says you're going to

5  pay an amount that's owed to the hospital.  That if you

6  declare bankruptcy, that he's going to immediately consent to

7  move it to his court, he'll have jurisdiction over that.  And

8  then they're asking is that you indemnify in case there's some

9  reason the collection action in South Carolina isn't resolved

10 by payment of this.  Am I --

11         MS. MATESIC:  I think -- and I'm just -- I mean, as

12 a matter of as far as an exact language on the liability.  But

13 just, also, then we're still prevailing party and want to

14 maintain our claims for either appropriate judgment, interest

15 and attorney's fees related to those claims.  I don't -- if

16 it's a settlement offer to resolve those portions of the

17 claims in exchange for the medical benefits, I don't think

18 that's something we've discussed but --

19         THE COURT:  The attorney fees I think are a separate

20 issue.  The prejudgment issue I think is not if that's part of

21 damages, but you have to show --

22         MS. MATESIC:  I mean, there are --

23         THE COURT:  If the medical fees are paid, why do you

24 need the prejudgment interest?

25         MS. MATESIC:  There are cases, and we can get them,

1  but I think they're in our brief, but about how -- and
2  especially in the ERISA context.  Just because my clients have
3  not paid them, the weight of the credit was still on them and
4  defendants have the windfall of having access to that money
5  for the last three and a half years and the prejudgment
6  interest is also met that they shouldn't have the windfall of
7  having access to that money.  The courts have awarded in
8  similar cases prejudgment --
9         THE COURT:  So it sounds more punitive than
10 remedial.
11        MR. TYSON:  It's supposed to prevent them from
12 receiving a windfall.  Otherwise, they could have an incentive
13 not to pay claims and keep the money and accrue the interest.
14        THE COURT:  I see what you're saying.
15        MR. TYSON:  And, also, since they have the credit
16 ruling and they're getting sued.
17        THE COURT:  All right.
18        MR. TYSON:  It's part of the equitable --
19        THE COURT:  I would -- I would have to say the
20 attorney's fees are a separate issue.  They can be resolved,
21 but I don't think that -- they're a separate issue.  The
22 pre-judgment interest might be a -- that's maybe something
23 you-all would need to negotiate for this little consent
24 judgment package, unless this were to turn into a total
25 resolution, but I don't think we're there.

1          MR. GUSTAFSON:  Well, we're not far from it, though,
2     I don't think.
3          THE COURT:  A total resolution?
4          MR. GUSTAFSON:  Yeah.  I don't think we're far from
5     that.  If he's paid $19,000, are we really going to quibble
6     about the pre-judgment interest when there actually is --
7          THE COURT:  Pre-judgment on 19,000 -- well,
8     pre-judgment interest, as I understand, is more a deterrence
9     factor, not so much actual injury to the plaintiffs.
10          MR. GUSTAFSON:  And I -- and I part of our case is
11     there's no bad faith on this side.  I think that -- that's
12     part of our case.  What are you deterring I guess is the --
13          THE COURT:  I think it's deterring other insurance
14     companies or benefits plans --
15          MR. GUSTAFSON:  And these guys --
16          THE COURT:  -- I guess.
17          MR. GUSTAFSON:  These guys suffer for that?  I mean,
18     they're not --
19          THE COURT:  I think it's supposed --
20          If that's what the -- I mean, if courts have said or
21     Congress have said that's why you have pre-judgment interest.
22     So that if one side -- if one side is going to get a benefit
23     of that, it should be the prevailing party generally, or it
24     would be the plaintiff, because one side is going to be the
25     beneficiary.  If it's more than just damages, it's some form

1    of quasi punitive deterrence factor.

2              MR. GUSTAFSON:  Well, I think there was just

3    testimony he recovered money from Starmark already.  We're

4    paying for both.  And so, I mean, if we're going to talk

5    equity --

6              THE COURT:  Well --

7              MR. GUSTAFSON:  And I stayed away from it.

8              THE COURT:  Well, I don't want to get into

9    speculation.

10             MR. GUSTAFSON:  I don't either.

11             THE COURT:  Somehow we got from 39 down to 19,000.

12             MR. TYSON:  Because of the work that we've done to

13   help negotiate those bills down.

14             THE COURT:  Yeah.

15             MS. MATESIC:  And that negotiation stalled.

16   Obviously, it has an interest in what --

17             THE COURT:  So that goes both ways.  If 39,000 is

18   down to 19,000, you get a benefit of that.

19             MR. GUSTAFSON:  I don't mean to laugh at that.

20             THE COURT:  Yeah.

21             MR. GUSTAFSON:  I laugh at -- I deal with the

22   medical system a lot.  My brother has got $800,000 of unpaid

23   medical expenses.  It doesn't get delayed for work that

24   someone does.  It gets reduced because the hospital gets tired

25   of collecting.  That's a stretch to say that this thing has

1   been reduced because of any legal work done in this case.  I
2   did not probe into what he's been paid by Starmark and where
3   that money is, where he's double recovering on this, and I
4   don't know.

5           THE COURT:  Well, I mean, he did mention that it's
6   hurt his credit.  That's -- that's an injury.

7           MR. GUSTAFSON:  It is.  It can't -- it may have hurt
8   their credit.  He didn't say, I couldn't get a house, I
9   couldn't get a car.

10          THE COURT:  Anyway, let's just -- let's focus back.
11  Narrow it on medical necessity and medical fees.

12          Do we have -- do we have a quasi agreement there?
13  It will cut everyone's --

14          MR. GUSTAFSON:  Yes.

15          THE COURT:  -- case down a lot.

16          MS. MATESIC:  I mean, I think do we want to consent,
17  Judge, that the underlying liability and leave it for the
18  Court to determine both pre and post and as well as attorney's
19  fees?

20          THE COURT:  Would that work?  Because I think those
21  are legal issues.  I really think those are legal issues.

22          MR. GUSTAFSON:  Sure.  And I -- I have to explain it
23  to Mr. Winn.

24          THE COURT:  Okay.

25          MR. GUSTAFSON:  Can we have two minutes outside to

1   do that?

2           THE COURT:  Sure.  Well, can we hold off on the

3   videos?

4           MS. MATESIC:  Sure.

5           THE COURT:  And let's take a 45-minute lunch break.

6           MS. MATESIC:  Okay.

7           THE COURT:  That takes us to 12:30.  See if with the

8   things I proposed you-all can work out a consent agreement on

9   as much as possible.  But it does sound like, you know,

10  interest and attorney's fees, sanctions, those are really --

11  you really don't need a bench trial.  They are really on

12  paper.

13          You know, attorney's fees, I'm sure there will be a

14  lot of argument over attorney's fees.  We might have a modest

15  evidentiary hearing on attorney's fees.  Pre-judgment interest

16  is yes or no.  That's a legal decision.

17          I think the amount is fixed, right?  Everyone agrees

18  on that?

19          MR. GUSTAFSON:  Um-hum.

20          THE COURT:  And so the sanctions issue I think is

21  truly tied up in a legal determination of whether you get $110

22  once versus as many documents as there are each day, as well

23  as I think you probably agree on the time frame, though, 700

24  something days.

25          MS. MATESIC:  I think it's actually been a little

1  bit more than that, but we agreed for purposes of stipulation
2  just to say --
3         THE COURT:  Yeah.
4         MR. GUSTAFSON:  Well, I'm scared to go too far down
5  the road but --
6         And I only say that -- go ahead.
7         THE COURT:  No, no.  You go ahead.
8         MR. GUSTAFSON:  I -- I don't want to make the
9  argument here.  But I think with the final case there's a
10 sliding scale more days than less per dollar.  And so --
11        THE COURT:  But see, that's a legal --
12        MR. GUSTAFSON:  Yes.
13        THE COURT:  That's a legal issue.
14        MR. GUSTAFSON:  I agree.
15        THE COURT:  Anything that can be left for the Court.
16        MR. GUSTAFSON:  Absolutely agree.  Yeah, absolutely
17 agree.
18        THE COURT:  So let's take a 45-minute lunch break,
19 and let's see if we can get something agreed to that narrows
20 this case for everybody.  And who knows how far we go after
21 you get some core agreements.  And we can -- we can put it on
22 the record orally to be followed up with a written consent
23 judgment on that that the Court will produce maybe in 24 hours
24 for you.  Yeah, that's probably best.  Or maybe we can put it
25 together in writing today.  We'll see.  But let's -- let's

```
1   take a 45-minute lunch break and see if we can work out
2   something.
3            MR. GUSTAFSON:  Thank you.
4            THE COURT:  All right.  Thanks.
5            (The proceedings were recessed at 11:46 a.m. and
6   reconvened at 12:32 p.m.)
7            THE COURT:  I hope you had a meaningful lunch.  Did
8   you work out anything?
9            MR. GUSTAFSON:  We haven't really talked.  We're --
10  we're okay accepting the liability indemnifying in the
11  South Carolina matter as long as the acceptance of liability
12  is kind of limited to the medical benefit --
13           THE COURT:  Right.
14           MR. GUSTAFSON:  -- claim.  And it doesn't prejudice
15  attorney's fees, penalties, any of that.
16           THE COURT:  So do we dare take 25 minutes and see if
17  you-all can put this in writing?
18           MS. MATESIC:  We've been working through lunch.
19  We're just finishing up to come up with a draft consent order.
20           THE COURT:  Perfect.  Let's recess for ten minutes
21  and come back and see what you-all have worked out if you are
22  that close.
23           MR. GUSTAFSON:  If you are proposing doing it
24  orally, we're fine with that if we can't get that.
25           THE COURT:  Well, we can do that, but the written
```

1    would be better.  So let's spend ten minutes trying to get a
2    written draft.

3              You have in there the two provisions I was talking
4    about?

5              MR. TYSON:  Yes, sir.

6              THE COURT:  All defendants consent to a motion to
7    withdraw the referral and I direct that -- that the case is to
8    be -- if -- when the withdrawal is referred, the case is
9    referred back to me, because it's not ordinarily assigned to a
10   district judge until the referral is withdrawn and it is a
11   related case.  You use that term "related case" and that means
12   under our local rules you come to me.  Put in there explicitly
13   that "I, the undersigned Chief Judge, agree the case is
14   referred back to me," and --

15             Oh, the other thing is on the first paragraph you're
16   agreeing to withdraw the consent.  You also consent to the
17   automatic stay being lifted as to the judgment.  So the
18   automatic stay it kicks in.  It has to as a matter of law, but
19   then it can be unpeeled layer by layer by who the judge is.

20             So, for example, automatic stay might kick in on a
21   foreclosure but a bankruptcy normally lists it against the
22   foreclosure because it's an attached asset.  We do the same
23   thing there.  That the automatic stay would be lifted upon
24   consent motion of the parties.

25             Okay.  So ten minutes.  Let's see if we can get it

1    in writing.

2          MR. GUSTAFSON:  That's great.

3          (The proceedings were recessed at 12:35 p.m. and

4    reconvened at 12:55 p.m.)

5          THE COURT:  So do we have an oral agreement on

6    something?

7          MR. GUSTAFSON:  We don't have a written agreement,

8    Your Honor.

9          THE COURT:  Okay.

10          MR. GUSTAFSON:  And the offer is just to hash out

11    orally the way that you kind of described.  I think it's just

12    a different understanding of what we've proposed.  We thought

13    that you wanted something fairly simple that says we accept

14    liability, we'll indemnify, we'll separate out all of these

15    other things and --

16          THE COURT:  Well, no.  The stuff I'm adding

17    shouldn't be that long.  It's just -- it's just giving the

18    assurance that plaintiffs are asking for that, you know, the

19    defense doesn't run off to bankruptcy court and undo whatever

20    agreement there is.

21          MR. GUSTAFSON:  That's what we thought.  That was

22    our admission to you.

23          MS. MATESIC:  And, Your Honor, we did the same

24    thing.  We pulled from the stipulations of fact and law the

25    relevant facts and legal conclusions that they've already

1  stipulated to.  I think Mr. Gustafson doesn't want to spend
2  the time to go through those.  I understand it's a lot, a long
3  document.

4          THE COURT:  Well, okay.  If you pull -- if you pull
5  the stipulations out, the stipulations are done.  You can't
6  undo the stipulations.  They're a matter of public record, and
7  I -- I -- I'm thinking there's res judicata that you can't go
8  against that elsewhere with a Department of Labor case or a
9  case in South Carolina.  I'm just saying that off the top of
10 my head, doing something I'm not supposed to do, an advisory
11 opinion.

12         But I do know the stipulations are of record.
13 They're public.  And so there would be -- if they don't have
14 res judicata or collateral estoppel effect, they certainly are
15 strong for impeachment.  You could use them to impeach any
16 witness to say, "Well, the parties agreed that you did this;
17 isn't that correct?"

18         So with that said, if -- if just adding the
19 stipulations into the order causes them concern, why do you
20 need them if you've got what you want?

21         MR. TYSON:  The reason we want to do that is because
22 we're not going to have any more testimony on that issue.  We
23 thought we'd be able to memorialize that within that -- within
24 the Court's order since we are dealing with having this
25 entered as a judgment.  That was our thought.

1           THE COURT:  Okay.  What if instead of having
2   specific stipulations, what if you just agree in the consent
3   agreement that the stipulations remain in full effect?
4           MR. GUSTAFSON:  Yeah, incorporate by reference I
5   think is another way.
6           THE COURT:  Or by reference.
7           MR. GUSTAFSON:  However you -- however you think it
8   should sound.
9           THE COURT:  It's not me.  It's how --
10          MR. GUSTAFSON:  Understand.
11          THE COURT:  -- what you-all agree to.
12          MR. GUSTAFSON:  Yeah.
13          MS. MATESIC:  I think that's fine.
14          MR. GUSTAFSON:  You're right.  The stipulation of
15  facts is the stipulation of facts.
16          THE COURT:  Yes.
17          MR. GUSTAFSON:  Whether it's res judicata or
18  impeachment or whatever it is.
19          THE COURT:  Collateral estoppel.  I don't think you
20  can undo them.  So if you reference that the stipulation of
21  facts previously filed in this case still apply.
22          MR. GUSTAFSON:  And that gets the same with
23  conclusions of law.
24          THE COURT:  Well, I don't think we need conclusions
25  of law here.

1        MR. GUSTAFSON:  I'm agreeing.

2        THE COURT:  Right.

3        MR. GUSTAFSON:  So what we -- what we had in mind --

4   you were saying was four or five paragraphs and they have 16

5   pages.

6        THE COURT:  That's pretty impressive you put that

7   together so fast.

8        MR. TYSON:  Cut and pasting, Your Honor.

9        MS. MATESIC:  We actually kind of cut it from the

10  stipulations.

11       MR. TYSON:  We were trying to include those so more

12  comprehensive.

13       THE COURT:  So take those out and say, "The parties'

14  stipulations of fact remain in full force and effect."  Is

15  that good?

16       MR. TYSON:  That's good.

17       THE COURT:  If you do that, that will shorten the

18  document.  Maybe we can get it executed in the next 10 to 15

19  minutes, and we can decide what other things are necessary to

20  be discussed in the bench trial versus the Court taking stuff

21  under advisement to make legal conclusions on facts that are

22  probably not in dispute, but we can discuss that.

23       So you don't have a printer, I presume?

24       MS. MATESIC:  I do not.

25       THE COURT:  Okay.  Email it to Mr. Zhao.  You

1 probably have his email.

2        MS. MATESIC:  I don't know if I have your direct

3 email.

4        THE LAW CLERK:  I'll give it to you.

5        THE COURT:  We've got a copier and printer right

6 here.  It just needs to get in our system.

7        MS. MATESIC:  Okay.

8        THE COURT:  You can only get Attorney Net.  The

9 Attorney Net does not have access to our printers, but our

10 Court Net obviously does.

11        We'll be in recess.

12        (The proceedings were recessed at 12:59 p.m and

13 reconvened at 1:24 p.m.)

14        THE COURT:  So they're reading it as we speak also?

15        MR. TYSON:  Yes.

16        THE COURT:  So we'll just be in recess in place so

17 when they finish, we can pick up.  But you can go tell them if

18 you'd like.

19        MS. MATESIC:  Okay.

20        THE COURT:  So you-all need some time to discuss

21 some modest changes?

22        MR. GUSTAFSON:  Yeah, we could do it that way or

23 part of -- I've got a markup.  I want them to make changes and

24 then you say, oh, but I do want that.  So we can give you the

25 markup and you can say, "This is what I intended," or we can

1    try to get you a cleaner version.

2          THE COURT:  Let's get a cleaner version.  The more

3    you-all agree to --

4          MR. GUSTAFSON:  Sure.

5          THE COURT:  -- the easier it's going to be for all

6    of us later.

7          MR. GUSTAFSON:  That's absolutely correct.  Sorry

8    it's taking so long.

9          THE COURT:  So that's fine, because what you appear

10   to be agreeing to covers everything we really need to do today

11   except for maybe is there -- there's a bad-faith issue.  And I

12   guess that requires evidence and argument from both sides.  Is

13   there any other factual issue that we can think of that's not

14   ordinarily -- like attorney's fees is a factual issue, but

15   it's always committed to the Court and it's done on paper.  We

16   rarely have an evidentiary hearing on attorney's fees.

17         MS. MATESIC:  I think there's documentary evidence

18   of it, but one of the Starmark representatives explained these

19   are the bills that we sent them, this is what this meant, this

20   is what they paid us, this is what they didn't pay us, and

21   those types of things.  Her video deposition I have is about

22   35 minutes.

23         THE COURT:  So we're -- in my mind we're here until

24   5:00.  So that's -- that's fine, but that's assuming that we

25   get most of this document or all of this document signed.

1   Then whatever is left we can -- we can deal with.  But the

2   brunt of the bench trial goes away with this document.

3            MR. GUSTAFSON:  Absolutely.

4            THE COURT:  All right.

5            MR. TYSON:  Thank you, sir.

6            THE COURT:  So back in recess.

7            (The proceedings were recessed at 1:27 p.m. and

8   reconvened at 1:45 p.m.)

9            MR. GUSTAFSON:  I've got two changes.  I think we're

10  15 seconds away.  Sorry.  We might have miscommunicated.

11           THE COURT:  We'll be in recess in place.

12           (Pause in proceedings.)

13           MS. MATESIC:  I just sent a third version.

14           THE COURT:  I should have told you a couple of

15  things before you did that.  We're trying to figure out what's

16  the best thing to do with this one on page 2.  There was a

17  paragraph one and a paragraph two.  Now there's just a

18  paragraph one, right?  You took out -- you-all took out

19  paragraph two.

20           MR. GUSTAFSON:  I think you just take out one.

21           THE COURT:  And that's what I was saying.  Take out

22  the one and then take that sentence the stipulations of fact

23  and put that after the "as follows."

24           MS. MATESIC:  Okay.

25           THE COURT:  Now, then for the foregoing reasons,

1    count three, do -- is do we need the count three because the

2    reasons behind that go beyond count three.  They talk about,

3    you know, the attorney's fees and stuff like that.

4              MS. MATESIC:  Oh, okay.

5              THE COURT:  Or do you think you need the count

6    three?

7              MR. TYSON:  We're just trying to be clear.

8              MS. MATESIC:  So we'll just take out "defendant's

9    jointly and severally on for wrongful denial of benefits on

10   their claim for"?

11             THE COURT:  No, no.  Leave that paragraph in.  Just

12   take out the phrase "count three."

13             MS. MATESIC:  Oh, okay.  Got it.

14             THE COURT:  Because I think the following paragraphs

15   apply to more than just count three.

16             MS. MATESIC:  Correct.

17             THE COURT:  The way that appears, it looks like it's

18   only for count three.

19             MR. TYSON:  Okay.

20             THE COURT:  Now with those changes is it finished?

21             MS. MATESIC:  I think so.  I'll mark this as

22   "Version 4."

23             THE COURT:  We need how many copies?

24             MR. GUSTAFSON:  Your Honor, Mr. Good and I -- I have

25   not been conversing with Mr. Good on this.  He might want to

1  see.
2          THE COURT:  Yes.  Mr. Good, you certainly have a
3  right to be a local --
4          MR. GOOD:  I'd just like to see the last version.
5          THE COURT:  Sure.  Absolutely.
6          MR. GUSTAFSON:  We'll give him the more recent,
7  Kevin?
8          THE COURT:  Yes.
9          MR. GUSTAFSON:  Thank you.
10         THE COURT:  All right.  It's supposed to be Steven
11 with a "v," not a "p-h"?
12         MR. GOOD:  Yes.
13         THE COURT:  So one last reading.  This should be it,
14 right?
15         MR. GUSTAFSON:  And all you did was his name and
16 just spacing?
17         THE LAW CLERK:  And I believe I added the date.
18         MR. GUSTAFSON:  Filled in the date.
19         THE LAW CLERK:  Yes.
20         THE COURT:  I'm thinking -- and you tell me -- do we
21 need counsels' names or just the parties specifically?  You
22 know, the corporate parties have got to have counsel or
23 individual.  We don't need counsels' names?
24         MR. GUSTAFSON:  I don't think so.  I think I added
25 that all the parties were represented by counsel before the

1    hearing.  And so I think that we're all acknowledging that

2    they are represented by counsel before you.  I don't know that

3    we need to sign.

4            THE COURT:  What do you-all think?

5            MS. MATESIC:  I don't know that we need to sign it

6    unless the Court would like us to.  And then for the entities,

7    I guess we should have done a representation that Matt will

8    sign on behalf of the companies.  Or do we want Eric to sign

9    on behalf of the companies too?

10           MR. TYSON:  We're happy to sign it, more formal.

11           THE COURT:  I should have caught this.  Ordinarily

12   in a consent judgment the Court signs it, counsel signs it,

13   and the party or parties, but there's no set rule.

14           MS. MATESIC:  We can add it.

15           THE COURT:  Let's -- let's add it because that way

16   we don't have to decide whether we did something wrong or not.

17   It doesn't become an issue later on.  I'm sorry about that one

18   addition.  I should have noted that earlier.

19           (Discussion held off the record.)

20           THE COURT:  Everyone email in Microsoft Word a

21   signature block to Mr. Zhao or signature blocks.  Wouldn't

22   that be easiest?

23           THE LAW CLERK:  Yes.

24           THE COURT:  And I think it actually would have been

25   required for SmartCore.  I think Mr. Spengler really is the

1    agent more than the owners, but we don't have to do that if we

2    have Mr. Spengler signing as well as Messrs. Winn and Good.

3            What was it?

4            MS. MATESIC:  Just on page 2, the second next

5    paragraph, it should say "plaintiffs" instead of "plaintiff."

6            Your Honor, while we put the finishing touches on

7    that, now that we sort of resolved that, we had subpoenaed a

8    witness, Jared Crook.  I don't think we need him now.

9            MR. GUSTAFSON:  We certainly don't.

10           MS. MATESIC:  Is it okay if I release him and let

11   him go?

12           THE COURT:  If you don't need him for whatever

13   presentation you need for the rest of the afternoon, that's

14   fine.

15           MS. MATESIC:  Okay.

16           THE COURT:  Is it possible that he could be called

17   or she could be called for anything?

18           MS. MATESIC:  I don't intend to call him.

19           MR. GUSTAFSON:  I do not.

20           MS. MATESIC:  I don't think we have many factual

21   issues left.

22           THE COURT:  Okay.  Great.

23           MS. MATESIC:  Okay.

24           MR. GUSTAFSON:  May I be excused to use the

25   restroom?

1    THE COURT:  Oh, of course.

2         (Pause in proceedings.)

3    THE COURT:  We have the last draft.  Everyone review

4 it real quickly.  If you agree to it, Mr. Zhao is going to

5 walk through the well of the courtroom and get everyone to

6 sign it, I'll sign it last and give it to the Clerk of Court

7 to file.

8         So does everyone agree?

9    MR. GUSTAFSON:  We're good.

10   THE COURT:  Excellent.  Get your pens out.

11   MR. GUSTAFSON:  Sign one version?

12   THE COURT:  We're going to sign one copy.  We're all

13 going to sign it and I'm going to hand it to the Clerk of

14 Court, and once she gets it she will stamp it.  It will be a

15 manual stamp, hand stamp.  She'll stamp it and that's it.

16        All right.  The Court has now signed it, so it's

17 official.  And now I'll give it to the clerk, and she will

18 file it and put it in the public record.  It's filed.

19   MR. GUSTAFSON:  There we go.

20   THE COURT:  All right.  Where do we go from here?

21 How much more does the plaintiffs like to present?

22   MS. MATESIC:  I think probably just one more -- show

23 the video deposition of one of the Starmark employees who can

24 talk about Starmark's billing and the fact that the defendants

25 didn't remit those premiums.  I'm going to explain some of

1   these documents for the Court.

2            THE COURT:  All right.  And this will be for

3   purposes of the Court -- what's the Court going to do with

4   this evidence specifically?

5            MS. MATESIC:  This is the trial deposition

6   testimony.

7            THE COURT:  Yes.

8            MS. MATESIC:  So, like, substitute for the live

9   testimony.

10           THE COURT:  No.  I understand that.  But what is it

11  being introduced for?

12           MS. MATESIC:  For purposes of fiduciary breach claim

13  to demonstrate that they withheld the premiums.

14           THE COURT:  All right.  I just want to know because

15  that's -- we've got to make sure we understand what are the

16  narrow factual issues left because the Court is going to have

17  to rule on them after we all brief them.

18           So go ahead with your evidence.

19           MR. GUSTAFSON:  I'm sorry to interrupt.  I think

20  we've stipulated.  Have we not stipulated to that fact?

21           MS. MATESIC:  I mean, she testifies in here to the

22  exact amount that Starmark did not pay December -- or

23  SmartCore did not pay the December or January bill.  To

24  clarify that, you know, because Eric testified earlier that

25  they withheld the premiums.  She would testify to that.  I

1    mean, if they went -- you said that you used the money for
2    other purposes.  Part of what we're asking for is the
3    equitable order ordering to remit the contributions they
4    withheld and provide an accounting for that.  So if we don't
5    need it --
6              THE COURT:  I'm a little nervous about my legal
7    authority on the equitable order because what -- what -- it's
8    your alternative theory.
9              MS. MATESIC:  No, that's not the -- that's a
10   separate and distinct legal theory for those premiums.
11             THE COURT:  Okay.
12             MS. MATESIC:  The alternative was the other
13   equitable relief --
14             THE COURT:  Okay.
15             MS. MATESIC:  -- which is no longer necessary.
16             THE COURT:  All right.  So we'll let you present
17   whatever evidence you want to, and you'll be allowed to
18   present whatever you want.  I'm guessing, though, it's not a
19   lot because I think we've resolved the brunt of the factual
20   stuff with this consent agreement.
21             So you may proceed.
22             MS. MATESIC:  Okay.
23             THE COURT:  This is 35 minutes?  How long is it?
24             MS. MATESIC:  Yeah, 25 minutes.
25             THE COURT:  I'm sorry?

| | |
|---|---|
| 1 | MS. MATESIC: It's probably faster than me trying to |
| 2 | find the exact portions. |
| 3 | THE COURT: Right. And the court reporter will not |
| 4 | be transcribing the video deposition. The video deposition |
| 5 | itself will be the transcription. |
| 6 | MS. MATESIC: Okay. |
| 7 | THE COURT: So you need to put on the record your |
| 8 | designations or what -- what portion of the deposition this is |
| 9 | for the record, right? |
| 10 | MS. MATESIC: Okay. So I have -- would it be easier |
| 11 | to submit the transcript version of what -- |
| 12 | THE COURT: Oh, yes. |
| 13 | MS. MATESIC: There were like three different |
| 14 | videos. I can submit the transcript. The portions I'm not |
| 15 | showing are redacted in gray. |
| 16 | THE COURT: Transcripts are much better. |
| 17 | MS. MATESIC: Right. Yeah. The entire transcript |
| 18 | has been submitted for the Court. But to clarify which |
| 19 | portions are being played today -- |
| 20 | THE COURT: Yeah. |
| 21 | MS. MATESIC: -- we can submit this as an exhibit? |
| 22 | THE COURT: Yes. |
| 23 | (Exhibit published.) |
| 24 | MS. MATESIC: And this document now will be |
| 25 | Exhibit B that she's looking at. |

1          (Exhibit published.)

2          MS. MATESIC:  And that's Exhibit 6 to the deposition

3  labeled as Exhibit A(i) in this case.

4          THE COURT:  All right.

5          (Exhibit published.)

6          MS. MATESIC:  And Exhibit 7 is Exhibit C, the

7  stop-loss insurance contract.

8          (Exhibit published.)

9          MS. MATESIC:  And this Exhibit 8 refers to Exhibit D

10  that's in this case, the bills that Starmark had sent to

11  SmartCore.

12          (Exhibit published.)

13          MS. MATESIC:  And this document, I don't know if --

14  this was Document I, which was part of the pretrial filings.

15  If anyone wants a courtesy copy.  It's not the same as

16  Exhibit I.

17          THE COURT:  Do you think that the written transcript

18  is sufficient?

19          MS. MATESIC:  Yeah, I think that's fine.  We just

20  wanted to highlight that if the Court wanted to see that

21  today.

22          THE COURT:  Well, since it's in the record, I

23  don't -- I don't think it's necessary that the Court see the

24  video.  It's not like she's not a credible witness and the

25  Court is trying to make some credibility determinations where

1  a video is very helpful.  She appears to be a very credible
2  witness.
3          I don't think the defense is really contesting her
4  testimony; is that fair?
5          MR. GUSTAFSON:  Yes.  Yes, sir.
6          MS. MATESIC:  Yeah.  I think we wanted to present
7  her to show that she affirmed that they did not make the
8  payments and then, also, she affirmed that SmartCore signed
9  the plan.  So they obviously had a copy of that because I know
10 that was raised at one point as a statutory damages claim.
11         THE COURT:  And that you see all in the record
12 through the transcriptions.
13         MS. MATESIC:  Um-hum.
14         THE COURT:  There's no objections to the transcript
15 being admitted in the whole?
16         MR. GUSTAFSON:  No, sir.
17         THE COURT:  You understand what I'm saying,
18 Mr. Good?
19         MR. GOOD:  Yes, sir.
20         THE COURT:  All right.  So I think what the record
21 needs on the record is now on the record.  Anything -- any
22 other evidence you want to present?
23         MS. MATESIC:  I think we're ready to rest then.
24         THE COURT:  All right.  Thank you.
25         Any evidence from the defense?

1          MR. GUSTAFSON:  I don't have any evidence.  I
2    guess -- if I could ask the Court.  Is there any evidence you
3    want on this?  I mean, it's --
4          THE COURT:  I can't think of any factual evidence we
5    need that has to be presented in a bench trial versus the
6    evidence of the dollar amount of attorney's fees and things
7    like that.  That's a factual dispute, but that ordinarily is
8    just done in chambers and there's not -- I'm not so much a
9    trier of fact.  I'm more doing the lodestar analysis of what
10   is the prevailing rate and what seems to be reasonable hours.
11   Those are all legal issues.
12         MR. GUSTAFSON:  You know, I thought the claim we
13   were talking about there was that they want back all of the
14   funds paid into the plan on behalf of employees.  I could have
15   --
16         THE COURT:  Well, not all employees.
17         MS. MATESIC:  We're not asking for a check written
18   to the Kinsingers for all of the amount.  We're asking that
19   they write checks to each of the plan participants from whom
20   they withheld money and perform an accounting demonstrates to
21   the Court that they did that.  ERISA gives plan participants
22   an opportunity under the civil statute to bring a claim on
23   behalf of the plan to seek relief for the plan.
24         THE COURT:  Right.
25         MS. MATESIC:  That's what differentiates --

1      THE COURT:  I know -- I know you can bring it on
2  behalf of the plan, but I didn't -- well, I didn't know you
3  were going that far.
4      MS. MATESIC:  That's what our complaint and in our
5  briefing we've asked for an equitable order ordering them.  I
6  have -- I mean, we've been in contact.  The Department of
7  Labor has better information than we have because we were
8  stonewalled in discovery.
9      THE COURT:  Sure.
10      MS. MATESIC:  But I think it's about 14,000 -- close
11  to $15,000 that were withheld from all of the plan
12  participants that need to be returned to those plan
13  participants.  But that's what we would be looking for, an
14  accounting and an order ordering them to return whatever it is
15  that they withheld.
16      MR. GUSTAFSON:  And, Your Honor, to the extent that
17  the Department of Labor is seeking that, that's a precedent
18  pending case before you.
19      THE COURT:  Yeah, I know it's before me.
20      MR. GUSTAFSON:  And so, you know --
21      THE COURT:  We only learned about it -- what? --
22  last week.  It was only filed last week or two weeks ago.
23      MR. GUSTAFSON:  It was filed before.  I think
24  service has taken a while.
25      THE COURT:  Okay.

1          MS. MATESIC:  We brought this while the Department
2     of Labor was still doing their investigation.  I mean, we
3     thought that given that they've already admitted they took
4     that money and did not use it, an entry of an equitable order
5     would hopefully facilitate the resolution of that case as well
6     if they're able to resolve any of the outstanding liability to
7     the plan participants.
8          From what I understand from in speaking with the
9     Department of Labor, our claims --
10         THE COURT:  Where does that 15,000 go?  You have to
11    seek out all of the employees?
12         MS. MATESIC:  And contact them.
13         THE COURT:  So you're kind of -- I -- I agree you
14    definitely have this in your pleadings, but I just didn't
15    conceptualize it.  It's kind of turning it into a collective
16    action or class action.
17         MR. GUSTAFSON:  Your Honor, I mean, I think it's
18    better litigated there.  We're going to raise a whole set of
19    defenses to that.  There was issues about what was collected
20    and what was paid out.
21         THE COURT:  Yeah.
22         MR. GUSTAFSON:  I think that's covered.  I don't
23    think you -- I would argue that I don't think you need to go
24    that far here.  The Department of Labor --
25         THE COURT:  Well, I mean, I -- well, it makes a

1   little sense to me.  I'm just thinking out loud, which is
2   probably not a good thing, but is that it would be better to
3   get the Department of Labor in here and we have all the
4   parties on this final part.  So we've taken care of the
5   individual injuries through the Kinsingers, but we kind of
6   semi consolidate cases.  I don't know.

7           MS. MATESIC:  Given the time frame when the
8   Department of Labor was finally able to file its lawsuit.  I
9   mean, we had filed this claim before we even knew the
10  Department of Labor was investigating this.

11          THE COURT:  Yeah.

12          MS. MATESIC:  The case law is clear that we can do
13  it.  We -- when defendants -- you know, they rejected our
14  discovery requests to find out that information.  Given the
15  value at issue, we thought we can prove that they took Eric's
16  money and did not use it to fund the plan purposes.  So I
17  think we've proven liability.  They've stipulated to
18  liability.  So an order that they will return that money and
19  provide us with an accounting, an unredacted version of the
20  discovery documents to demonstrate who they are, and then I
21  would imagine it could easily be resolved with --

22          THE COURT:  I understand where you're coming.  I'd
23  like to have labor in here.  And I guess are they -- they're
24  represented by their own solicitor, right?  Not the U.S.
25  Attorney's Office.

1         MR. GUSTAFSON:  Yes, sir.

2         MS. MATESIC:  Yes, sir.

3         THE COURT:  I'd like to get one of those solicitors

4 in here so this is all collectively done.  I don't want two

5 lawsuits kind of competing who gets to the finish line first

6 when they're both seeking the same relief effectively, right?

7 What you're seeking today is really what labor is seeking;

8 that is, an accounting and a recovery for all the employees.

9         MR. TYSON:  I think -- just a quick review of their

10 complaint, I think they're actually seeking additional relief.

11         THE COURT:  Additional.

12         MR. TYSON:  Well, I think they're seeking removal or

13 and barring them for being fiduciaries.  You know, I don't

14 know if there's any criminal or anything else like that.

15         THE COURT:  I shouldn't -- it's coming from the

16 Department of Labor.  It's not coming from the Department of

17 Justice.

18         MR. TYSON:  Right.

19         THE COURT:  So I don't know if there's any criminal

20 liability either, but there's certainly none alleged at this

21 point because labor really can't do that.  They don't have the

22 jurisdiction.

23         MS. MATESIC:  They can refer it to the Department of

24 Justice, but exactly what the status of that referral is we

25 don't know and they won't share that information.

1        MR. TYSON:  They're seeking additional remedies.  I
2   believe the secretary does have additional powers under the
3   U.S. statute beyond what we could do.  But we are -- we were
4   seeking it on behalf of the plan as an entitlement under 502
5   and 202, a restitution of that to the plan participants.
6        THE COURT:  You collect it, but you don't -- your
7   clients don't get it, right?
8        MR. TYSON:  I think it would go back to the plan and
9   then it would somehow be disbursed from there.  They may -- I
10  would imagine the Department of Labor would ultimately appoint
11  a --
12       THE COURT:  And that's a little my concern is if it
13  goes back to the plan, we have a plan counsel here.  And so
14  does plan counsel do the distribution and, I guess, plan
15  counsel gets paid out of that?  I don't know.  That's why I'm
16  a little nervous -- I'm a little bit more comfortable with the
17  labor department's case than yours because it's easier to
18  figure out -- labor does this all the time and -- and we
19  don't, so I'm a little uncomfortable.
20       I mean, we're taking this case that's focused on
21  your clients and properly legally you're asking to represent
22  all of the employees, but then I have to -- I'm the one
23  supervising counsel that's figuring out where to send all the
24  money.  So it's administration is where I'm a little bit more
25  concerned where labor should have it.  They do this everyday.

1   They should be able to do that pretty easily.

2           MS. MATESIC:  Yeah.  I mean, I think --

3           THE COURT:  Assuming we get over factual hurdles.

4           MS. MATESIC:  Yeah.  Given that the factual hurdles

5   are proven, I don't -- I think an equitable order ordering

6   that payment take place, that counsel for the plan, ourselves,

7   and the Department of Labor can facilitate that happening if

8   the Court orders to make that happen and that would likely

9   spur the resolution of the DOL action given that that's the

10  majority of their claim.

11          You know, Mark said we haven't gone that far.  We've

12  gone three and a half years of discovery disputes and

13  briefing.  We've gone way further than this ever needed to go

14  for $15,000.

15          THE COURT:  Sure.  Yeah.

16          MS. MATESIC:  And the Court, I think, could make

17  that finding that they withheld the money, did not return it

18  and order them to return it.  And between us we should be able

19  to distribute that.

20          THE COURT:  Okay.  Let me throw this out there:  So

21  why don't we let both sides brief that issue.  And, one, in

22  this particular thing do the defendants concede that issue

23  factually today?  Not the administration process, but do you

24  concede that there's about 15,000 should go to the employees?

25          MR. GOOD:  Your Honor, there were benefits that were

1  paid to some employees that may be part of that --

2          THE COURT:  Okay.

3          MR. GOOD:  -- $15,000.

4          THE COURT:  So -- so it's less than 15 is what

5  you're saying?

6          MR. GOOD:  Yes.  Yes, Your Honor.

7          THE COURT:  But are you conceding the rest?

8          MR. GOOD:  I think I'm probably a little bit out of

9  my skis --

10          THE COURT:  Yeah.  Okay.

11          MR. GOOD:  -- to answer that question.

12          THE COURT:  Um-hum.

13          MR. GUSTAFSON:  Your Honor, I think you were right.

14  The Department of Labor has this.  I think they're the place

15  -- I mean, we're going to go down a hole -- evidentiary hole

16  on this.  Maybe I --

17          THE COURT:  Honestly, though, my concern is

18  administration.

19          MR. GUSTAFSON:  Yeah.

20          THE COURT:  And I'm -- when I don't have a U.S.

21  government agency that's used to doing this all the time, then

22  I'm having attorneys do it, and I'm ultimately really the

23  decision-maker versus the labor department.  I have a higher

24  degree of confidence in that we turn this factual record over

25  to the labor department and they do what they do with that and

1  the defendants can contest that.  But, ultimately, if there's
2  money to be paid, it's under a labor department process that's
3  pretty routine, I think.

4        MS. MATESIC:  To the extent that there's not a
5  contesting of the fact that they withheld that money and did
6  not pay it to the plan, I think -- I don't think there is
7  that's it's in the stipulations, an order ordering them to
8  return that.  And we would be happy to work with the
9  Department of Labor and distribute the money, you know, in
10 accordance with the Department of Labor or give it to the
11 Department of Labor to distribute to the plan participants.

12       THE COURT:  That might be an answer too.  It goes to
13 the Department of Labor.

14       MR. TYSON:  Right.  Or even maybe, I mean, Your
15 Honor I think could issue the order and we just stay the, I
16 don't know, actual payment of the monies to allow the
17 Department of Labor to come in and solve that problem.  In
18 other words, like a trustee or someone that may have been a
19 trustee and distribute the money out to the plan participants.

20       We do have a communication from the Department of
21 Labor stating that the amount of contributions is $14,363.53,
22 and that the total medical expenses from the plan was
23 $53,044.22.  It sounds like they may be seeking also --

24       MS. MATESIC:  Thirty-nine thousand of those unpaid
25 medical expenses were our clients.  So --

1          MR. TYSON:  I think our clients were part of that
2    from the original medical bills.
3              (Discussion held off the record with the Court and
4    law clerk.)
5          THE COURT:  Let me ask the parties on this issue to
6    brief, brief whether there's, you know, the findings of fact
7    address that or we need to have another kind of evidentiary
8    hearing on that; and, two, what -- what is the best --
9    assuming we have -- well, once we -- once we have the number,
10   if we ever do get a number because the plaintiff -- defense
11   isn't conceding to all of that, only a portion, what is the
12   best method to handle the distribution of that money, through
13   this case or through labor.  And maybe plaintiffs can talk to
14   the labor department to see if labor just wants to jump on
15   board and there would be a motion to consolidate cases.
16         MS. MATESIC:  Okay.
17         MR. GOOD:  Your Honor, if I may offer.  Because I
18   never dreamed that this case would come to trial, I was able
19   to cobble together enough funds for counsel in the DOL matter.
20   If this gets combined here, I feel like that's going to --
21         THE COURT:  Hurt you there or help you?  Wouldn't it
22   help you to have an attorney and that attorney kind of moves
23   into this case at the same time?
24         MR. GOOD:  I'm torn on that.
25         THE COURT:  Sure.

1          MR. GOOD:  Just because of all of the history of
2     this case that --
3          THE COURT:  Yeah.
4          MR. GOOD:  -- they'd then have to come up to speed
5     with.  So I just wanted to offer that information to you.
6          THE COURT:  No, I appreciate that.  But can -- let's
7     do the briefing, though, as to where to go from here.  Do we
8     need additional evidence, or do we have sufficient evidence
9     and we can move to a process of determining how to distribute
10    the money to the employees?
11         MS. MATESIC:  Okay.
12         THE COURT:  I think -- I don't know what else to
13    say, because I have these now two kind of competing cases that
14    aren't really competing but they're clearly about the same
15    subject matter and we want -- at the end of the day, you want
16    one -- one resolution.  You don't want two different
17    resolutions that might have different dollar amounts or
18    whatever.  That's -- that would be a problem.
19         So that's the only thing I can think of right now,
20    that the parties brief that issue.  And then what other issues
21    do we have out there other than document sanctions, attorney's
22    fees and interest?  That's are all legal issues, and I want
23    you to brief those also.  I don't want to overload you on
24    work, but, I mean, don't you -- do we have -- well, we don't
25    have attorney's fees.

1          MS. MATESIC:  We briefed those issues in the trial
2     brief when asked for the anticipated conclusions of law or,
3     you know, issues of law besides the approximate amount of
4     attorney's fees.
5          THE COURT:  So you don't think there needs to be
6     further briefing?
7          Does defense want to respond to those issues, the
8     legal issue?
9          MR. GUSTAFSON:  Yeah.  The only question is whether,
10    you know, if -- if the components of documents sanctions are
11    good faith and prejudiced, do you want testimony or evidence
12    on, you know, the good faith response of these guys?
13         THE COURT:  Well, we have a record now.
14         MR. GUSTAFSON:  Yeah.
15         THE COURT:  So -- so if there's still some factual
16    issues, you know, and you had this pretty, pretty complete
17    record, in my opinion, you can submit proposed findings of
18    fact and conclusions of law based on the record.
19         MR. GUSTAFSON:  Okay.
20         THE COURT:  But I think it's -- you know, like I
21    said, so we don't have to do -- we don't have to have the
22    formality of a trial for interest or for attorney's fees or
23    for sanctions.  That doesn't require a trial, I don't think.
24    Because ordinarily all other factual those are ordinarily
25    inside chambers-types of issues.

1          MR. GUSTAFSON:  Do you have a schedule on the
2     briefing on the first issue?
3          THE COURT:  Yes.
4          MR. GUSTAFSON:  And then do you have -- is there
5     anything -- is there anything -- let me ask the first question
6     first.
7          THE COURT:  No.  I was thinking two weeks, but you
8     might need more than two weeks.  What do you-all think?
9          MR. TYSON:  If it's the attorney's fees --
10         THE COURT:  Well, if you're -- I'm sorry.  Go ahead.
11         MR. TYSON:  I'm sorry.  Go ahead, Your Honor.
12         THE COURT:  No.  We're just -- let's -- is three
13    weeks enough or too much on the first issue of figuring out
14    what to do with the parallel litigation and the labor
15    department case?
16         MR. GUSTAFSON:  I've got some vacation that's coming
17    up.
18         THE COURT:  Sure.
19         MR. GUSTAFSON:  This is a trial.
20         THE COURT:  This is vacation season.
21         MR. GUSTAFSON:  Yeah.  So three weeks is good by me.
22         THE COURT:  Three weeks is good or not enough?
23         MR. GUSTAFSON:  Three weeks is good.
24         THE COURT:  Is three weeks all right?
25         MR. TYSON:  Would 30 -- 30 days?

1  THE COURT:  It's the summer.  I know how things
2  happen.  Thirty days is fine.
3  MR. TYSON:  It's just the two issues that Your Honor
4  mentioned earlier?
5  THE COURT:  Right.  Now, what were you going to say
6  about the attorney's fees issue?
7  MR. TYSON:  Oh, I'm sorry.  You were saying there
8  would be briefing on that, but I just wanted to be sure that,
9  now that we've done the judgment, I also thought, well, we're
10  supposed to brief on the attorney's fees for that, but do we
11  need to actually wait for the Court's ruling on everything so
12  that there's one briefing on attorney's fees; in other words,
13  not parsing it out.
14  THE COURT:  Yeah.  That perfectly makes sense.  Hold
15  off on briefing attorney's fees until pretty much both cases
16  are over with.  So I'll leave it up to you to file in a
17  reasonable amount of time.  I don't need to set a date.  When
18  we ultimately get a final judgment, you'd be filing it at that
19  point or near, you know, near final judgment.
20  (Discussion held off the record with the Court and
21  law clerk.)
22  THE COURT:  If either side thinks they need some
23  additional findings of facts then -- of course, the record is
24  full right now.  I'm not intending to reopen the record, but I
25  think I could if I wanted to.  I'm not because we have this

consent judgment. But if you do think for remaining issues there are some findings of facts that are necessary, you can propose them, but you need to point directly to the record in this case where it is in the trial record. So as long as it's in the trial record, I can still make findings of fact. But I'm not saying you need to do it. I'm just saying if you think you need to do it, you can. Oh, and 30 days on that.

MS. MATESIC: So we're going to do 30 days to brief the outstanding issues and submit any supplementary findings of fact?

THE COURT: Yes. And hold off on attorney's fees. And is there anything else that needs to be submitted on the documents?

MS. MATESIC: I think that the Court has everything.

THE COURT: I think we have everything on the documents and on the interest. I think we have everything also. So there doesn't need to be -- at this point there doesn't need to be any further briefing or submission of the documents on those two issues.

MS. MATESIC: Okay.

THE COURT: And attorney's fees will come towards the end.

MS. MATESIC: And then do we need to set a time frame? Are we doing responses to that supplemental briefing?

THE COURT: Yes.

1          MS. MATESIC:  To two weeks?

2          THE COURT:  What, two weeks?  No replies but, yes,

3    responses.  So 30 days and two weeks with no replies, just

4    responses.

5          Okay.  Anything else?

6          MR. TYSON:  Well, with the Court's indulgence, I'd

7    like to take a bathroom break.

8          Are we going to do closing statements?  Would that

9    be appropriate at this point?

10          THE COURT:  I'm not sure.

11          MR. TYSON:  I would like to if Your Honor --

12          THE COURT:  Well, if you want to.  I don't -- I

13    don't think they're necessary.

14          MR. TYSON:  Okay.

15          THE COURT:  Because we've -- we've got the

16    stipulations in there that they're in the consent judgment.

17          What would you be arguing about other than the issue

18    what we just discussed in the last few minutes?  Which doesn't

19    need any additional, I think -- I don't think needs any

20    additional factual findings, but there could be some more

21    needed.  As I said, you can submit those.

22          MR. TYSON:  Yeah.  I guess what I wanted to -- I

23    guess I wanted to make a couple of points with respect to the

24    fiduciary breach issue.  I know we have some outstanding

25    issues with respect to that, but there were one or two points,

1    and we did want a chance to talk about the statutory plan

2    damages because, you know, one of the issues that was raised

3    was --

4            THE COURT:  But that's -- but the statutory damages

5    are all a matter of law, right, at this point?

6            MR. TYSON:  I think -- I think they are.  They've

7    stipulated that they never responded to the request.  They've

8    stipulated as a legal matter that actually you don't have to

9    find there is no requirement of bad faith.  There is no

10   requirement -- the courts have said there is no requirement of

11   bad faith and prejudice.  It's in the court's discretion.  I

12   just wanted to argue a couple of points, if you will, about

13   that.

14           THE COURT:  So you want a 10-minute recess and then

15   you want to make some argument?

16           MR. TYSON:  If the Court would be willing to hear.

17           THE COURT:  No.

18           MR. TYSON:  I will keep them brief.  I understand.

19           THE COURT:  Okay.  That's fine.  We'll hear them and

20   just keep it brief.

21           MR. TYSON:  Okay.  Thank you.

22           THE COURT:  We'll, of course, allow the defense to

23   make some closing if defense wants.

24           MR. TYSON:  Thank you.

25           THE COURT:  We'll break for ten minutes and come

1   back in here and hear closing arguments.

2          MR. TYSON:  Thank you.

3          (The proceedings were recessed at 2:58 p.m. and

4   reconvened at 3:07 p.m.)

5          THE COURT:  All right.  Mr. Tyson, you may proceed.

6          MR. TYSON:  Thank you, Your Honor.

7          And keeping with what I just said, I will try to be

8   brief.  I just want to bring a few things to the Court's

9   attention that I thought were important with respect to the

10  decision -- your decision ultimately on the E plan documents

11  statutory fees.

12         We filed our original complaint in this case on

13  November 1, 2017.  We have been litigating this case against

14  defendant for a year and a half now.  Your Honor is well aware

15  of the history of the case.  We had the breach claims, which

16  Your Honor has already granted summary judgment on.  The

17  defendant fought us on that until they actually stipulated

18  that they did act in bad faith with respect to at least that

19  claim, failing to pay the wages for that and we sought

20  attorney's fees outstanding for that.

21         With respect to the claim for benefits, you know,

22  Denise has been waiting for having her benefits paid for three

23  and a half years now and we've finally gotten that today.  It

24  took them until a couple days ago to actually agree to pay

25  that.

1        With respect to the fiduciary breach claim, we still
2  have some additional briefing on.

3        Again, with respect to the bad faith overall and
4  defendants' actions, that claim is that they stole money from
5  their employees.  They stipulated to that.  They took money
6  from people who were supposed to get health insurance and they
7  still haven't returned it to them.  And what I'm trying to --
8  what I'm trying to express here is the delay and the deny the
9  defendants have done throughout this entire litigation that
10  has ended up in us being here.  And that's part of the reason,
11  too, with respect to the plan documents.  I'll kind of turn
12  now and just specifically talk about those.

13        But there's two sections of ERISA, 29
14  U.S.C. 1024(b)(1) requires that a plan administrator, which is
15  Mr. Winn and Mr. Good, had stipulated that they are, and
16  admitted that in the letter, they're supposed to provide plan
17  participants with a copy of the summary plan description
18  within 30 days of when they become a plan participant.

19        There is an entirely separate section of ERISA,
20  1024(b)(4), that says that you, as a plan administrator, must
21  respond to verbal requests for plan documents, that is the
22  subject line description, the plan document, and any other
23  plan documents under which the plan is established or
24  operated.

25        As we are stipulating again, Eric wrote the letter,

1   copied the very language out of the statute.  The issue there
2   is they never responded at all.  There's a very good reason
3   why Eric wrote the letter and why he wanted those plan
4   documents.

5           At the time he wrote that letter in June, the entire
6   June 2016, this is after the -- after the surgery in January,
7   after he was originally told, well, now you don't have
8   insurance by the third-party doctor we have testimony on,
9   after then Winn and Good come back and said, no, no, no, we're
10  going to take care of everything and them coming back with a
11  second letter in March saying, well, now we're -- no, we're
12  actually going to take over instead of Starmark and we need
13  more information.  So he writes them, What information do you
14  need?  Crickets.  Doesn't get anything.

15          Okay.  Well, what are the plan documents; who are
16  the plan administrator; who is actually doing what; what is it
17  I'm supposed to do?  They followed the rules.  They asked for
18  this information and said tell me what you need, tell me what
19  you want.  They never responded.  They don't deny that.
20  Instead, I think they will want to argue at some point
21  previously we provided you something, but they were supposed
22  to provide that afterwards.

23          And we had cited a couple cases in our trial briefs
24  that specifically discuss this and say if it was some kind of
25  chaotic process, especially they're supposed to provide that

just because the statute says.  But, number two, any kind of
process like this you would want to provide that, especially
so the participant has the most up-to-date information and
understands what is going on and has all of the information,
including the administrative services agreement and the
stop-loss, so you would understand it's a self-funded plan,
who is responsible, who is doing the funding, and where the
money should have been going.

        And, again, same we also asked for this with respect
to the administrative record because that's the claim file.
We asked for the claim file so we know where the information
they considered to adjudicate this.  They never did.  What
information did you have, what information don't you have.
Let us know so we can get it to you.  They never responded,
and that's why we ultimately ended up filing an appeal and
creating the administrative record ourself.

        And, again, as with all the other claims delayed by
never responding, never brought any information.

        And we've talked about the Department of Labor
filing, and I guess that's kind of ultimately what got me was
in the Department of Labor case -- so we entered the
stipulations here that specifically said, yes, we're plan
fiduciaries; yes, we withheld the money for the plan; we did
not actually use it for plan purposes; we stole money from our
employees.

1       The delay in the deny is best exemplified by their

2   answer to the DOL complaint, which is actually denied the same

3   allegations DOL after stipulating to it five days before.  And

4   that's been the entire pattern the defendants have used in

5   this litigation is simply to drag this on and dragging this

6   on.

7       They did the same thing with the plan documents.

8   They never provided these.  When we actually filed our

9   lawsuit, of course, we put the plan document claim in there.

10  Why wouldn't you respond then?  Why wouldn't you have said,

11  "Wait a minute.  You're saying you want documents.  What do

12  you need?"

13      The standard that the Fourth Circuit has followed

14  for fiduciary conduct is you have to act with an eye single to

15  the best interest of the participant.  Even if they thought

16  they had done right, if you were a fiduciary acting in

17  someone's best interest, wouldn't you have picked up the phone

18  and called them and say, "Do you not have this?"

19      And then you said, "No."

20      You ask counsel what additional information you

21  need, we would have responded in some way, not just totally

22  blown it off.

23      So that's why we believe that plan -- that Your

24  Honor should exercise its discretion and order statutory

25  damages.  Obviously, it's within the Court's discretion and

1    we're aware of that, but they've talked a lot about bad faith.
2    It's not necessary for the Court to make those, to make the
3    determination on damages, it's not required.  The Fourth
4    Circuit has been very clear about that.  But there is bad
5    faith here, and we believe that those facts substantially show
6    that.  And that you should feel comfortable given their delay,
7    given their denials, given their actions in this case overall
8    and award whatever damages you choose for that claim.
9              Thank you.
10             THE COURT:  Thank you.
11             We'll hear from whomever wants to speak on behalf of
12   the defense.  All three.
13             MR. GUSTAFSON:  Sorry.  I stood up first and have
14   not given the other people the opportunity.
15             A couple just very quick points I'd make is that I
16   take issue with two things.
17             That these defendants stole money.  These defendants
18   didn't stole money -- steal money.  This is a company that's
19   going out of business and they're taking money and trying to
20   pay payroll.
21             THE COURT:  I figured you'd disagree with the verb
22   "stole."
23             MR. GUSTAFSON:  Yeah.
24             THE COURT:  But would you disagree with the word
25   "taken"?  Stole has a criminal --

1          MR. GUSTAFSON:  You know, if you're -- if you're --
2     sorry.  I apologize.
3          THE COURT:  Well, I mean, stole does have a criminal
4     sense; taken does not necessarily.
5          MR. GUSTAFSON:  Taken to make payroll or taken to
6     pay creditors.  I mean, there's more to it than that.  I don't
7     think that anybody under any circumstance would just take
8     people's money and not pay it back.  Something else was going
9     on.  Otherwise, it would be criminal.  And so I take a little
10    bit of issue with that.
11         And I do take issue with that all they've done is
12    delay.  Since I've been involved in the case, we've made
13    attempts to settle it.  this case was settled months ago.  We
14    would not be here if the parties followed through on the
15    settlement.  We can brief that more at the attorney's fee
16    stage of things, but Mr. Winn paid the bill.  I -- I take
17    issue with all they've done is dragged and delay
18         And then all I have left, Your Honor, is just a pass
19    up of cases I referred to you earlier on the statutory
20    penalties on the plan
21         THE COURT:  Right.
22         MR. GUSTAFSON:  They both Fourth Circuit cases.  And
23    I'll give opposing counsel copies as well.
24         The only thing I'll point out from these cases --
25    thank you very much.

1          The only thing I'll point out about those cases,

2    Your Honor, is that in those cases -- again, the purpose of

3    these things are punitive to keep people from ever doing this

4    again.

5          THE COURT:  Right.

6          MR. GUSTAFSON:  If you look at the defendants,

7    they're both corporate defendants, not individual defendants.

8    I think the Court should take that into consideration.

9          And then it was here it was $25 per day, $20 per

10   day, $10,000 to $18,000 against AT&T.  So somewhere in the

11   Fourth Circuit a judge says, "AT&T, I'm going to punish you by

12   charging you $18,000 for not providing those plans."  Not two

13   individuals that are at the end of their rope on a company

14   that's out of business and they've done nothing but hemorrhage

15   money.

16          That's all I have, Your Honor.  I appreciate your

17   time today and willingness to work with us.

18          THE COURT:  Thank you.  From either counsel or

19   Mr. Good, Mr. Spengler?

20          MR. SPENGLER:  Nothing further.

21          MR. GOOD:  Nothing further, Your Honor.

22          THE COURT:  No rebuttal or one-minute rebuttal?

23          MR. TYSON:  Sure.  Yes.  Absolutely.  Always give a

24   lawyer a chance to talk.

25          So I have not read these two cases, Your Honor.  But

1  yes, the Court's been clear the purpose is to punish, and they

2  should be punished.  If you want to use the word "taken," they

3  took -- two individuals took people's money.  It's taken us to

4  have to sue them and go through three years.  It's taken us to

5  go to court and produce plan documents.  They still haven't

6  produced one of them.  They never did.  We got it from

7  somebody else.  They're trying to use their individual status

8  and say that they should be absolved from this.

9         But, yes, an order from the Court would absolutely

10  deter and tell people you need to actually respond to and do

11  what the statute tells you to do.  They undertook that

12  responsibility voluntarily.  They should be charged with it.

13  Thank you.

14         THE COURT:  Thank you.

15         I want to thank counsel.  You-all have really worked

16  well together.  I don't know if there was tension in the past.

17  It sounds like there was some.  Today, I think you came

18  together and worked out a big chunk of this case, and there's

19  still more to go, but I think we've made some tremendous

20  headway.  I thank counsel for making that happen.

21         Any -- well, the schedule, the pleadings the

22  post-trial motions schedule, 30 days and then 14 days.

23         Mr. Zhao is going to do a short written order and

24  file that so it's official.

25         And I think -- I mean, that's all we need is 30

1  days.  We can deal with everything in those 30 days, right,
2  with two weeks' response?
3              MS. MATESIC:  I think that's fine.  I don't know --
4  we did in the consent judgment say 30 days.  I think we had
5  discussed earlier about moving the time to respond about the
6  the attorney's fees for the benefits claim.  Do we want to
7  move that so that we're briefing?  I think in the consent
8  judgment we agreed to brief that one.
9              MR. TYSON:  Thirty days.
10              THE COURT:  Thirty days on attorney's fees, but you
11  want to take --
12              MS. MATESIC:  Modify that.  So we'll brief the
13  attorney's fees all at one time.
14              THE COURT:  Well, on the record, without going into
15  the written record, it's now filed.  I don't want to mess with
16  that.  I will agree that, as I said a few moments ago, that we
17  need a briefing on attorney's fees to come at the end.
18              MS. MATESIC:  Yeah, no.  For the written order.
19              THE COURT:  And that the parties just will remember
20  that, and you have the oral record to confront that.  I'm not
21  setting specific dates, but just when the attorney's fees
22  issue is ripe, because we know how much we're towards the end,
23  that's the appropriate time to make the filing, and then
24  defense will be able to respond on your attorney's fees.
25              All right.  I thank you very much.  We will be in

1    recess.

2                (The proceedings were recessed at 3:20 p.m.)

3                          *    *    *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF OFFICIAL REPORTER

I, Jillian M. Turner, RMR, CRR, CRC, Federal Official Court Reporter, in and for the United States District Court for the Western District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this the 3rd day of July 2019.


/s/ Jillian M. Turner
Jillian M. Turner, RMR, CRR, CRC
U.S. Official Court Reporter